**RAINES FELDMAN LITTRELL LLP**
Kyra E. Andrassy, State Bar No. 207959
kandrassy@raineslaw.com
Robert S. Marticello, State Bar No. 244256
rmarticello@raineslaw.com
Stephen M. Mott, State Bar No. 362642
smott@raineslaw.com
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Telephone: (310) 440-4100
Facsimile: (310) 691-1943

Proposed Counsel for Ynez Shops, LLC, and
Pro Temecula Town Center, LLC,
Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>YNEZ SHOPS, LLC, *et al.*,<br><br>Debtors-in-Possession. | Case No. 8:26-bk-10693-SC<br><br>Chapter 11<br><br>Jointly Administered with:<br>Case No. 8:26-bk-10694-SC |
| Affects:<br><br>☒ All Debtors<br>☐ Ynez Shops, LLC. Only<br>☐ Pro Temecula Town Center, LLC Only | **MOTION FOR APPROVAL OF STIPULATIONS TO APPOINT HOWARD GROBSTEIN AS DEBTOR-IN-POSSESSION AUTHORIZED REPRESENTATIVE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF**<br><br>**[No hearing set pursuant to Local Bankruptcy Rule 9013-1(o)]** |

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:**

Ynez Shops, LLC ("**Ynez**") and Pro Temecula Town Center, LLC ("**Pro Temecula**") the debtors-in-possession (collectively, the "**Debtors**"), hereby submit this *Motion for Approval of Stipulations to Appoint Howard Grobstein as Debtor-in-Possession Authorized Representative; Memorandum of Points and Authorities; Declaration of Howard Grobstein in Support Thereof*

(the "**Motion**"). In support of the Motion, the Debtors submit the following memorandum of points and authorities and the attached declaration of Howard Grobstein and respectfully represent as follows:

## I. INTRODUCTION

Pursuant to the Motion, the Debtors request approval of substantially similar stipulations with Nano Banc, the Debtors' secured creditor, and the City of Temecula, which has appeared in the case as an interested party because of various violations of the city's municipal codes and which joined in a motion filed by the Office of the United States Trustee to dismiss the case (that motion was denied without prejudice). The stipulations confirm Mr. Grobstein's appointment as the manager of the Debtors and his authority over the Debtors, to the exclusion of anyone involved in prior management or in ownership of the Debtors and were entered into at the request of Nano Banc.

## II. STATEMENT OF FACTS

On March 3, 2026 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned cases. The Debtors are operating as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner have been made in these cases and no official committees have been appointed or designated. Because they own different parcels of the same shopping center and have the same ownership and management structure, the Debtors sought joint administration of their cases and the Court granted that motion.

The Debtors own different parcels of a retail shopping center located at Ynez Road and Rancho California Road in Temecula, California. Pro Temecula owns four of the parcels (the "**Pro Temecula Property**") and Ynez Shops, LLC, owns the rest (the "**Ynez Property**" and together with the Pro Temecula Property, the "**Property**"). The Pro Temecula Property was appraised at Nano Banc's request in December 2024, and it was appraised in as-is condition at

$54,400,000. Pro Temecula owes Nano Banc approximately $34,194,705. The Ynez Property was appraised at the same time in as-is condition at $37,460,000, and Ynez owes Nano Banc approximately $23,528,000.

Prepetition, Nano Banc commenced nonjudicial foreclosure proceedings and also sued the Debtors in Orange County Superior Court. The Debtors filed their cases to avoid losing the Property at a foreclosure sale.

As of the Petition Date, Pro Temecula's operating agreement provided that its manager need not be a member and was subject to removal by a majority vote of the members other than the manager. The initial manager was Temecula Town Center Manager, LLC. A copy of the Pro Temecula operating agreement is attached as Exhibit "1." A copy of Ynez's operating agreement is attached as Exhibit "2." The Debtors' managers were later changed to Henkin Investor Group, LLC. A copy of that consent is attached as Exhibit "3." The manager of Henkin Investor Group, LLC, is Weyl Manager, LLC, and as manager has exclusive authority to act on behalf of Henkin Investor Group, LLC and to appoint the successor manager. A copy of the operating agreement for Henkin Investor Group is attached as Exhibit "4." The manager of Weyl Manager, LLC, is Jason Miller. A copy of the operating agreement for Weyl Manager is attached as Exhibit "5." Jason Miller, the manager of Weyl Manager, LLC, is believed to be an employee of Continuum Analytics, which is an asset manager.

Because of allegations of fraudulent conduct by Continuum Analytics in these and other cases and the concern of various constituencies and so these cases could proceed without those allegations hampering their ability to move forward, the Debtors agreed to retain Howard Grobstein as their manager. Copies of the engagement agreements are attached collectively as Exhibit "6." Mr. Grobstein was appointed as the Debtors' managers effective April 20, 2026, when amendments to the Debtors' operating agreements were signed under which Mr. Grobstein was appointed as the manager of the Debtors, subject to removal by resignation, death, or order of the Bankruptcy Court. The amendments to the operating agreements further provide that Henkin Investor Group, as the Debtors' member, can take no action to limit Mr. Grobstein's authority,

including by further modifying the operating agreements. Henkin Investor Group approved the amendments by written consents. A copy of the Pro Temecula written consent with the amendment to the operating agreement attached is provided as Exhibit "7" and a copy of the Ynez written consent with the amendment to the operating agreement attached is provided as Exhibit "8."

The Debtors filed motions to confirm Mr. Grobstein's appointment as the Debtors' managers and the retention of Grobstein Teeple to provide support services in May.[1] Notwithstanding the written consents and the anticipated orders regarding Grobstein Teeple, Nano Banc requested additional confirmation of Mr. Grobstein's independence as a fiduciary and the Debtors, through Mr. Grobstein, and Nano Banc and the City of Temecula, which has appeared in the case, have entered into stipulations designating Mr. Grobstein as the Debtors' DIP Authorized Representative (together, the "**Stipulations**"). The signed stipulation for Pro Temecula is attached as Exhibit "9" and the stipulation for Ynez is attached as Exhibit "10." The Stipulations are substantively the same and provide the following:

(1) Mr. Grobstein has the broadest rights, power, authority, and duties available under applicable law to manage, administer, and operate the Debtors' bankruptcy estates including the authority to sell the Property. As the DIP Authorized Representative, Mr. Grobstein is vested with the same authority, powers, duties, rights and remedies as a chapter 11 trustee under 11 U.S.C. § 1104;

(2) Mr. Grobstein shall not take direction from any party and shall be answerable solely to this Court;

(3) Upon entry of an order approving the Stipulation, none of the Debtor's Former Management shall have any authority to take any action in connection with the Debtor's chapter 11 case, including any action related to administration of the Debtor's bankruptcy estate, the Property or any other asset of the Debtor. Former Management shall also have

---

[1] Although no oppositions were filed, the Office of the United States Trustee had a few issues that are in the process of being addressed consensually and supplements and declarations of nonopposition are expected to be filed in the near future.

no authority to take any corporate governance actions, including amending the Debtor's operating agreement. Notwithstanding the foregoing, nothing in the Stipulation or any order approving it deprives any of the Debtor's members of standing to seek appropriate relief in the Court. Former management includes the Debtor's member and its members;

(4) The Debtors shall take all actions reasonably necessary to implement this structure, including amending any implicated corporate governance documents, if necessary; and

(5) As the sole DIP Authorized Representative, Mr. Grobstein shall have sole and exclusive possession, custody, and control over the Debtors' books and records, including financial statements, general ledgers, accounts payable and receivable records, bank and brokerage statements, tax returns and supporting workpapers, contracts, corporate governance and organizational documents, communications, and all other data relating to the Debtor or the Property. This is to the exclusion of Former Management, who shall be required to turnover these documents within thirty days of entry of the order approving the Stipulation.

The provisions regarding the Debtors' books and records were added at the request of the Debtors because the Debtors are still waiting for their former manager to provide all of the books and records requested by Mr. Grobstein, including three years' worth of bank statements. Mr. Grobstein has recently obtained access to the QuickBooks backup. This information is critical to the Debtor's completion of accurate cash flow projections and to get consent to the use of cash collateral from its secured creditors.

## III. LEGAL ARGUMENT

Section 105(a) permits the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." This authority is broad, as long as it is not in contravention of a specific statutory provision. See Law v. Siegel, 571 U.S. 415, 421 (2014). There is no provision in the Bankruptcy Code addressing this particular issue, which is really one of corporate governance. As set forth above, the Debtors' operating agreements vest sole

authority to act on behalf of the Debtors in their managers, including the appointment of a successor manager. The Debtors' member and former managers ceded this authority to Mr. Grobstein for the duration of this bankruptcy case. The purpose of this stipulation is to confirm (1) the effect of the appointment of Mr. Grobstein as the manager under the Debtors' operating agreement and (2) that he will act independently in exercising his fiduciary duties. Although Mr. Grobstein's authority is broad, it is not absolute, as he may still be removed for cause by this Court on motion by any party in interest. The Motion is being served on former management to give them an opportunity to raise any objections they may have, although none is expected given that the former manager voluntarily resigned and designated Mr. Grobstein as the successor.

In order to provide clarity regarding the effect of Mr. Grobstein's appointment as manager, the Debtors request that the Court grant the Motion and approve the Stipulations.

## IV. CONCLUSION

WHEREFORE, the Debtor requests that the Court enter an order:

(1) Granting this Motion and approving the Stipulations in their entirety and incorporating the recitals and agreements in the Stipulations as if fully set forth in the order;

(2) Providing that the terms of the Stipulations and the order are binding on all parties to the Stipulations and their successors and assigns.

(3) Providing that the Debtors shall take all actions reasonable and necessary to implement the DIP Authorized Representative structure, including but not limited to amending any implicated corporate governance documents of Debtors, in form and substance acceptable to Nano Banc, to the extent necessary to do so.

(4) Vesting Mr. Grobstein with the broadest powers available under applicable law to manage, administer, and operate the Debtors' estates, including, without limitation, the authority to sell the Property.

(5) Providing that Mr. Grobstein, as DIP Authorized Representative, shall have the same powers, rights, and remedies as a trustee appointed under 11 U.S.C. § 1104, including,

without limitation, the powers and duties set forth in 11 U.S.C. §§ 363, 364, 365, 704, and 1106, as applicable.

(6) Providing that Mr. Grobstein shall not take direction from any party and shall be answerable solely to the Bankruptcy Court.

(7) Clarifying that upon entry of the order, the Former Management shall not have any authority whatsoever to take any action in or in connection with the Cases, including, without limitation, any action relating to the administration of the Debtors' estates, the Property, or any other asset of the Debtors, nor shall they have any authority to take corporate governance actions, including amending the operating agreement. Instead, all such authority shall be vested exclusively in Mr. Grobstein as DIP Authorized Representative, subject only to the jurisdiction and approval of this Court. Notwithstanding the foregoing, nothing in the Order shall deprive the Debtors' members of any standing they may have to seek appropriate relief in this Court, whether by opposition or motion or otherwise.

(8) Providing that Mr. Grobstein shall take all actions reasonable and necessary to administer the Debtors' estates, including, without limitation, the sale of the Property, and shall exercise the broadest authority available under applicable law in furtherance thereof.

(9) Vesting Mr. Grobstein, as the sole DIP Authorized Representative and as sole manager of the Debtors, with sole and exclusive possession, custody, and control of all Books and Records (as defined in the Stipulation) and providing that no Former Management or other person or entity shall retain or assert any right of possession, custody, or control over the Books and Records.

(10) Requiring that within thirty (30) days of entry of this Order, the Custodians (as defined in the Stipulation) shall turn over to Mr. Grobstein all Books and Records in their possession, custody, or control, including all physical and electronic records, together with all access credentials, keys, codes, and administrative rights required for Mr. Grobstein to access and administer such records and any premises or systems where they are stored, all on the terms set forth in the Stipulation.

(11) Providing that Mr. Grobstein shall be compensated pursuant to the terms of a separate order authorizing his employment.

(12) Providing that the Court retains jurisdiction over all matters arising from or related to the implementation, interpretation, and enforcement of this Order; and

(13) Granting such other relief as the Court may deem just and appropriate.

Respectfully submitted,

DATED: June 17, 2026

**RAINES FELDMAN LITTRELL LLP**

By: *[/s/ Kyra E. Andrassy]*
Kyra E. Andrassy
Proposed Counsel for Debtors-in-Possession

**DECLARATION OF HOWARD GROBSTEIN**

I, Howard Grobstein, declare as follows:

1. I am a partner with Grobstein Teeple LLP ("**GT**"), which is a financial advisory firm with its principal office located at 6300 Canoga Avenue, Suite 1500W, Woodland Hills, California 91367. GT also has offices in the Orange County, Las Vegas, Metro Washington, Riverside, Boston and Phoenix areas. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto. I make this declaration in support of the *Motion for Approval of Stipulations to Appoint Howard Grobstein as Debtor-in-Possession Authorized Representative* (the "**Motion**"). Capitalized terms not defined in this declaration shall have the same meaning as in the Motion.

2. On March 3, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned cases. The Debtors are operating as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner have been made in these cases and no official committees have been appointed or designated. Because they own different parcels of the same shopping center and have the same ownership and management structure, the Debtors sought joint administration of their cases and the Court granted that motion.

3. The Debtors own different parcels of a retail shopping center located at Ynez Road and Rancho California Road in Temecula, California. Pro Temecula owns four of the parcels (the "Pro Temecula Property") and Ynez Shops, LLC, owns the rest (the "Ynez Property" and together with the Pro Temecula Property, the "Property"). The Pro Temecula Property was appraised at Nano Banc's request in December 2024, and it was appraised in as-is condition at $54,400,000. I am informed that Pro Temecula owes Nano Banc approximately $34,194,705. The Ynez Property was appraised at the same time in as-is condition at $37,460,000, and I am informed that Ynez owes Nano Banc approximately $23,528,000.

4. Prepetition, Nano Banc commenced nonjudicial foreclosure proceedings and also sued the Debtors in Orange County Superior Court. The Debtors filed their cases to avoid losing the Property at a foreclosure sale.

5. A true and correct copy of the Pro Temecula operating agreement I received from former management is attached as Exhibit "1." A true and correct copy of Ynez's operating agreement that I also received from former management is attached as Exhibit "2." The Debtors' managers were later changed to Henkin Investor Group, LLC. A true and correct copy of the consent that changed the Debtors' manager is attached as Exhibit "3." A true and correct copy of the operating agreement for Henkin Investor Group, LLC, that I obtained from former management is attached as Exhibit "4." A true and correct copy of the operating agreement for Weyl Manager that I was provided by former management is attached as Exhibit "5." I am informed that Jason Miller, the manager of Weyl Manager, LLC, is an employee of Continuum Analytics, which represents that it is an asset manager.

6. Because of allegations of fraudulent conduct by Continuum Analytics in these and other cases and the concern of various constituencies and so these cases could proceed without those allegations hampering their ability to move forward, the Debtors agreed to retain me as their manager. True and correct copies of the engagement agreements are attached collectively as Exhibit "6." I was appointed as the Debtors' managers effective April 20, 2026, when amendments to the Debtors' operating agreements were signed. A true and correct copy of the Pro Temecula written consent with the amendment to the operating agreement attached is provided as Exhibit "7" and a true and correct copy of the Ynez written consent with the amendment to the operating agreement attached is provided as Exhibit "8."

7. The Debtors filed motions to confirm my appointment as the Debtors' managers and to retain Grobstein Teeple to provide support services in May. Notwithstanding the written consents and the anticipated orders regarding Grobstein Teeple, Nano Banc requested additional confirmation of my independence as a fiduciary. A true and correct copy of the stipulation for Pro

Temecula is attached as Exhibit "9" and a true and correct copy of the stipulation for Ynez is attached as Exhibit "10."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 15th day of June, 2026, at Woodland Hills, California.

______________________________
HOWARD GROBSTEIN

# EXHIBIT 1

# OPERATING AGREEMENT
# OF
# PRO TEMECULA TOWN CENTER LLC
a Delaware limited liability company

THE INTEREST REPRESENTED BY THIS DOCUMENT HAS NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH INTEREST IS RESTRICTED. SUCH INTEREST MAY NOT BE SOLD, ASSIGNED OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTEREST BY THE ISSUER FOR ANY PURPOSES, UNLESS (1) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH INTEREST SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO THE COMPANY. THE INTEREST REPRESENTED BY THIS DOCUMENT IS SUBJECT TO FURTHER RESTRICTION AS TO ITS SALE, TRANSFER, HYPOTHECATION OR ASSIGNMENT AS SET FORTH IN THE OPERATING AGREEMENT AND AGREED TO BY EACH MEMBER. SAID RESTRICTION PROVIDES, AMONG OTHER THINGS, THAT NO INTEREST MAY BE TRANSFERRED WITHOUT FIRST OFFERING SUCH INTEREST TO THE OTHER MEMBERS, AND THAT NO VENDEE, TRANSFEREE OR ASSIGNEE OF A MEMBER SHALL HAVE THE RIGHT TO BECOME A SUBSTITUTED MEMBER WITHOUT THE CONSENT OF THE GENERAL MANAGER, WHICH CONSENT MAY BE GIVEN OR WITHHELD IN THE SOLE AND ABSOLUTE DISCRETION OF THE GENERAL MANAGER.

TABLE OF CONTENTS

SECTION 1 FORMATION, NAME AND PRINCIPAL EXECUTIVE OFFICE 6

SECTION 2 DEFINITIONS 6

SECTION 3 PURPOSE AND TERM 14
3.1 Purpose 14
3.2 Term 14
3.3 INTENTIONALLY DELETED 14

SECTION 4 ADDITIONAL CAPITAL CONTRIBUTIONS AND NEW MEMBERS 14
4.1 Capital Contributions 14
4.2 Additional Members 14
4.3 Required Additional Capital Contributions 15
4.3.1 Notice 15
4.3.2 Manner of Contribution 15
4.4 Remedies if a Member is Delinquent in Making a Required Additional Capital Contribution 15
4.4.1 Remedy of Purchase of a Delinquent Member's Interest 15
4.4.2 Remedy of Election to Have Such Delinquent Contribution Treated as Recourse Debt 17
4.5 No Interest on Capital Contributions 17
4.6 Return of Capital Contributions 17
4.7 Capital Accounts 18
4.8 Loans and Other Business Transactions 18
4.9 Limited Liability of Members 18

SECTION 5 PROFIT AND LOSS ALLOCATIONS 18
5.1 Profits 18
5.2 Losses 19
5.3 Allocations in General 19
5.3.1 Adjusted Capital Account Deficit 19
5.3.2 Other Items 19
5.3.3 Allocation Between Periods 19
5.3.4 Intention 19
5.4 Special Allocations 19
5.4.1 Minimum Gain Chargeback 19
5.4.2 Member Minimum Gain Chargeback 19
5.4.3 Qualified Income Offset 20
5.4.4 Gross Income Allocation 20
5.4.5 Code Section 754 Adjustment 20
5.4.6 Member Nonrecourse Deductions 20
5.5 Curative Allocations 20
5.6 Allocations Relating to Taxable Issuance of a Member Interest 21
5.7 Tax Allocations: Code Section 704 (c) 21

SECTION 6 DISTRIBUTIONS 21
6.1 Distributions 21
6.1.1 Distributions of Net Cash Flow From Operations 22
6.1.2 Distributions From Net Cash Flow From Refinancings 22
6.1.3 Distributions From Net Cash Flow From Sales 22
6.1.4 Distributions to General Manager 22
6 .2 True Up on Sale of Property 22
6.3 Distributions 23
6.4 Rights of the Company to Offset 23

SECTION 7 TRANSFERS 23
7.1 Restrictions on Transfers 23
7.2 Permitted Transfers 23
7.3 Conditions to Permitted Transfers 23
7.3.1 Consent of General Manager 23
7.3.2 Documents to Effect Transfer 23
7.3.3 Tax Information 23
7.3.4 Securities Laws Compliance 24
7.3.5 No Termination of Company 24
7.4 Right of First Refusal 24
7.4.1 Limitation on Transfers 24
7.4.2 Offer Notice 24
7.4.3 Offer Period 24
7.4.4 Acceptance of First Offer 24
7.4.5 Closing of Purchase Pursuant to Firm Offer 25
7.4.6 Sale Pursuant to Purchase Offer if Firm Offer Rejected 25
7.4.7 No Duty of General Manager 25
7.5 Prohibited Transfers 25
7.6 Rights of Unadmitted Assignees 25
7.7 Representations Regarding Transfers; Legend 26
7.7.1 No Violation of Securities Laws 26
7.7.2 Legend 26
7.8 Distributions and Allocations in Respect of a Transferred Interest 26

SECTION 8 SUBSTITUTED MEMBERS 27
8.1 Becoming a Substituted Member 27
8.1.1 Acceptable Form of Assignment 27
8.1.2 Other Instruments 27
8.1.3 Consent of General Manager 27
8.1.4 Reimbursement of Fees 27
8.2 Rights of Assignee 27

SECTION 9 BOOKS, RECORDS, ACCOUNTING AND REPORTS 27
9.1 Maintenance of Books and Records 27
9.1.1 List of Members 27
9.1.2 Articles of Organization 27
9.1.3 Tax Returns 27
9.1.4 Operating Agreement 27
9.1.5 Financial Statements 28
9.1.6 Books and Records 28
9.2 Tax Year and Accounting Method 28

SECTION 10 RIGHTS, AUTHORITY, POWER, RESPONSIBILITIES AND DUTIES OF THE GENERAL MANAGER 28
10.1 General Manager 28
10.2 General Powers 28
10.2.1 Partnership and Limited Liability Company 28
10.2.2 Collateral 28
10.2.3 Execution of Documents 28
10.2.4 Borrowing Monies 28
10.2.5 Insurance 28
10.2.6 Employment of Persons 29
10.2.7 Appointment of Officers 29
10.2.8 Removal of Officers 29
10.2.9 Accounts at Banks and Brokerage Houses 29
10.2.11 Accounting Year 29
10.2.12 Filing of Documents 29
10.2.13 Other Actions 29
10.2.14 Powers of Attorney 29
10.3 Limitation on Authority of Members 29
10.4 Removal and/or Replacement of the General Manager 29
10.5 Action Without Meeting 30
10.6 Actions on Which Members May Vote 30
10.6.1 Continue Business 30
10.6.2 Amendments 30
10.7 Other Businesses and Transactions 30
10.8 No Requirement for Personal Services 30
10.9 Costs and Reimbursement 30
10.10 [INTENTIONALLY DELETED] 31
10.11 Power of Attorney 31
10.11.1 Grant of Power 31
10.11.2 Irrevocability 31
10.12 [INTENTIONALLY DELETED] 31
10.13 Indemnification of General Manager 31
10.14 Other Matters Concerning the General Manager 32
10.14.1 Reliance on Documents 32
10.14.2 Use of Affiliates and Consultants 32
10.14.3 Transactions With Affiliates 32
10.15 Tax Matters Partner 32
10.16 Tax Withholding 32
10.16.1 Withholding 32
10.16.2 Payments By the Company 33
10.16.3 Cooperation on Withholding 33

SECTION 11 LIMITATION ON MEMBERS RIGHTS 33

SECTION 12 TERMINATION AND DISSOLUTION OF THE COMPANY 33
12.1 Termination and Dissolution 33
12.1.1 Termination Date 34
12.1.2 Written Election 34
12.1.3 Judicial Decree 34
12.2 Liquidation and Distribution 34

12.2.1 Creditors 34
12.2.2 Payment of Obligations 34
12.2.3 Repayment of Member Loans 34
12.2.4 To Members 34

SECTION 13 MISCELLANEOUS 34
13.1 Arbitration 34
13.2 Assurances 35
13.3 Attorneys' Fees 35
13.4 Captions 35
13.5 Choice of Law 35
13.6 Complete Agreement and Amendment 35
13.7 Counterparts 35
13.8 Notifications 35
13.9 Number and Gender 36
13.10 Other Acts 36
13.11 Severability 36
13.12 Successors and Assigns 36
13.13 No Third-Party Beneficiaries 36
13.14 Time is of the Essence 36

SECTION 14 ACKNOWLEDGMENT OF SEPARATE LEGAL COUNSEL 36

SECTION 15 MEMBERS' AGREEMENTS AND ACKNOWLEDGMENTS 37
15.1 Received Full Copy of Agreement 37
15.2 Acquired for Long-term Investment 37
15.3 No Receipt of Advertisement 37
15.4 Pre-existing Relationship 37
15.5 Received Financial and Other Information 37
15.6 Understood This Agreement and Financial Information 38
15.7 Member Has Adequate Financial Condition 38
15.8 No Registration Under Securities Laws 38
15.9 No Reliance On Any Representation 38

**OPERATING AGREEMENT**
**of**
**PRO TEMECULA TOWN CENTER LLC**
**a Delaware limited liability company**

This Operating Agreement (the "Agreement") of Pro Temecula Town Center LLC, a Delaware limited liability company (the "Company"), is made and entered into effective the date of the first filing of the company's Articles of Organization with the office of the Secretary of State of the State of Delaware, by and among its Members and the General Manager (defined in Section 10 as initially Temecula Town Center Manager LLC. The Company is formed pursuant to the Limited Liability Company Act of the State of Delaware (the “Act “). The parties hereto enter into this Operating Agreement as of the effective date hereof and agree as follows:

SECTION 1 FORMATION, NAME AND PRINCIPAL EXECUTIVE OFFICE

1.1 Formation of Company. The parties hereto enter into this Agreement upon the terms and conditions set forth herein for the purposes set forth in Section 3 hereof. To the extent the rights or obligations of the Members are different by reasons of any provision of this Agreement than they would be in the absence of such provisions, this Agreement shall, to the extent permitted by the Act, control. The rights and liabilities of the Members are as specified in the Act, the Articles of Organization, and this Agreement.

1.2 Name and Address of Company. The name of the Company is PRO TEMECULA TOWN CENTER LLC, a Delaware limited liability company, and its principal executive office is located at 2790 E. Regal Park Dr, Anaheim, CA 92806, or such other place or places in the State of California as the General Manager may hereafter determine.

SECTION 2 DEFINITIONS

The following terms used in this Agreement shall (unless expressly provided herein or unless the context otherwise requires) have the following respective meanings:

2.1 "Accepting Offeree(s)” is defined in Paragraph 7.4.4.

2.2 "Act" shall mean the Limited Liability Company Act adopted by the State of Delaware.

2.3 "Additional Members" shall mean the Persons admitted to the Company as Additional Members pursuant to the provisions of Section 4 of this Agreement.

2.4 "Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2 (g) (1) and 1.704-2(i) (5) of the Regulations; and

(ii) Debit to such Capital Account the items described in Sections 1.704-1 (b) (2) (ii) (d) (4), 1.704-1 (b) (2) (ii) (d) (5) and 1.704-1 (b) (2) (ii) (d) (6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b) (2) (ii) (d) of the Regulations and shall be interpreted consistently therewith.

2.5 "Affiliate" shall mean with respect to a Person: (i) any Person directly or indirectly controlling, controlled by or under common control with such Person; (ii) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities or beneficial interest of such Person; (iii) any officer, director, partner or trustee of anyone acting in substantially similar capacity with respect to such Person; (iv) any Person who is an officer, director, partner or trustee, or holder of ten percent (10%) or more of the voting securities or beneficial interests of any of the foregoing; and (v) an entity of which any of the foregoing is an officer, director, partner, or trustee, or with respect to which such Person serves in a substantially similar capacity. For purposes of clarity, and without limiting the generality of the foregoing, partnerships which share a common general partner or which have general partners which are Affiliates of one another under the above definitions, are Affiliates.

2.6 “ Agreement” shall mean this Operating Agreement, as amended from time to time pursuant to the provisions of this Agreement.

2.7 “Allocation (s)” shall mean the allocation (s) of the Company's Profits, Losses and other items of income, loss, gain or credit made for federal income tax purposes and shown on the Company's federal income tax return.

2.8 “Articles of Organization” shall mean the instruments, and any amendments thereto, required by the Act that must be executed and filed in the office of the Secretary of State of the State of Delaware by the Company, and in the appropriate public offices of other states in which the Company may do business, in order to create and preserve the limited liability of the Members provided for in this Agreement and available pursuant to the Act and the applicable laws of other states.

2.9 “Assignee” shall mean a Person who has acquired an Interest in compliance with Section 7, but who is not a Substituted Member.

2.10 “Assignee of Record” shall mean an Assignee who has been assigned the Interest in one or more Interests, or fraction thereof, by a Member pursuant to Section 7 of this Agreement who has not been admitted as a Substituted Member, and whose ownership of the Interest in the assigned Interests (i) has been recorded on the books of the Company and (ii) is the subject of a written instrument of assignment, the effective date of which assignment has passed.

2.11 “Attorney-In-Fact [li] is defined in Paragraph 10.11.

2.12 “Bankruptcy” shall mean, with respect to a Person, a “Voluntary Bankruptcy” or an “Involuntary Bankruptcy. “ A “Voluntary Bankruptcy” means, with respect to any Person, the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; the filing of any petition or answer by such Person seeking to adjudicate it a bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a

receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property; or corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver, or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within ninety (90) days

2.13 "Capital Account" shall mean, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions;

(a) to each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's share of Profits allocated pursuant to Paragraph 5.1 any items in the nature of income or gain which are specially allocated pursuant to Paragraph 5.3 or Paragraph 5.4 of this Agreement, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b) to each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses allocated pursuant to Paragraph 5.2, any items in the nature of expenses or losses which are specially allocated pursuant to Paragraph 5.3 or Paragraph 5.4 of this Agreement, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company;

(c) in the event all or a portion of a Member's Interests in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interests; and

(d) in determining the amount of any liability for purposes of this definition of Capital Account, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the General Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or a General Manager), are computed in order to comply with such Regulations, the General Manager make such modification, provided that it will not have any effect on the amount of Distributions to any Person pursuant to this Agreement upon the dissolution of the Company. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Company by the maker of the note (or a person related to the maker of the note within the meaning of Regulation Section 1.704-1(b) (2) (ii) (c)) shall not be included in the Capital Account of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulation Section 1.704-1 (b) (2) (iv) (d) (2) .

The General Manager shall also (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company I s balance sheet, as computed for book purposes, in accordance with Regulation Section 1.7041 (b) (2) (iv) (q), and (ii) make appropriate modifications in the event unanticipated events that might otherwise cause this Agreement not to comply with Regulation Section 1.704-1(b)

2.14 "Capital Contribution (s)" means, with respect to any Member, the amount of money and the Gross Asset Value of any property (other than money) contributed to the Company with respect to the interest in the Company held by such Member. The Initial Capital Contribution of each Member is listed on Schedule A attached hereto.

2.15 "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

2.16 [INTENTIONALLY DELETED].

2.17 "Company" shall mean PRO TEMECULA TOWN CENTER LLC, a Delaware limited liability company, formed pursuant to this Agreement.

2.18 "Company Minimum Gain" has the meaning set forth in Regulation Sections 1.704-2(b) (2) and 1.704-2(d). For purposes of Regulation Section 1.704, Company shall mean partnership where the context of such Regulation requires.

2.19 "Consultants" is defined in Paragraph 10.14.2.

2.20 "Contribution Date" is defined in Paragraph 4.4.

2.21 "Contribution Notice" is defined in Paragraph 4.3.

2.22 "Delinquent Contribution" is defined in Paragraph 4.4.

2.23 "Delinquent Interest Rate" is defined in Paragraph 4.4.2.

2.24 "Delinquent Member" is defined in Paragraph 4.4.

2.25 "Depreciation" shall mean, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Manager.

2.26 "Distributions" or "Distribution" shall mean any cash or other property distributed to Members arising from their Interests in the Company.

2.27 "Event of Dissolution" is defined in Section 12.

2.28 "Firm Offer" is defined in Paragraph 7.4.2.

2.29 "Fiscal Year" means the taxable year of the Company.

2.30 "General Manager" initially means the Person designated

2.31 "Gross Asset Value" means, with respect to any asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a) the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the General Manager;

(b) the Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values as determined by the General Manager as of the following times: (i) the acquisition of an additional Interest in the Company after the date of the initial Capital Contribution by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the Distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an Interest in the Company; and (iii) the liquidation of the Company within the meaning of Regulation Section 1.704-1 (b) (2) (ii) (g) ; provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the General Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative Interests of the Members in the Company;

(c) the Gross Asset Value of any Company assets distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of Distribution as determined by the General Manager; and

(d) the Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b) (2) (iv) (m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) to the extent the General Manager determines that an adjustment pursuant to subparagraph (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (a), (b) or (d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

2.32 "Initial Capital Contribution" shall mean the initial Capital Contribution amount by a Member to the Company for the Original Project. The Initial Capital Contribution for each Member is set forth on Schedule A.

2.33 "Interest" or "Interests" shall mean the Percentage Interest, or fraction thereof, including any Capital Contributions to the Company, evidencing a Member's total rights in the Company, including but not limited to a Member's Percentage Interest in Distributions unless

otherwise assigned pursuant to the provisions of this Agreement, any Member's right to vote contained in this Agreement, any Member’s right to information contained in this Agreement, and with respect to each Member, all powers granted pursuant to the Act or this Agreement.

2.34 "Majority Vote" shall mean the vote of more than fifty percent (50%) of the then total outstanding Percentage Interests owned by all of the Members (including the General Manager). A Majority Vote may be taken at a meeting of the Members or a Majority Vote shall be deemed given if more than fifty percent (50%) of the then total outstanding Percentage Interests consent in writing to the act requiring such Majority Vote (whether or not all of the Members have notice of such act, consent or vote or whether or not a meeting takes place) .

2.35 "Management Committee" is defined in Paragraph 10.12.

2.36 "Member" or "Members" shall mean the original Members, Additional Members or Substituted Members, and shall also include the General Manager. Reference to a "Member" shall be to anyone of the Members. Members shall mean all of the Members listed on the signature page hereto, plus the General Manager (unless otherwise stated).

2.38 "Member Nonrecourse Debt Minimum Gain" shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulation Section 1.704-2(i) (3). For purposes of applying Regulation Section 1.704, Member shall mean partner where the context of such Regulation requires.

2.39 “Member Nonrecourse Deductions” has the same meaning as the term “partner nonrecourse deductions “ set forth in Sections 1.704-2(i) (1) and 1.704-2(i) (2) of the Regulations.

2.40 “Net Cash Flow From Operations” shall mean total cash receipts of the Company from the operations of the Company including any distributions to the Company from partnerships or joint ventures, excluding receipts from the sale, financing or other disposition of the Company's property and any loans to the Company, less:

(a) all operating expenses of the Company, other than any expense not involving a cash expenditure (such as any amount charged for Depreciation or amortization) *i*

(b) all principal and interest payments made out of gross revenues on account of any loans made to the Company or secured by Company assets;

(c) any sums expended out of gross revenues by the Company for capital expenditures; and

(d) cash reserves for working capital, debt repayment or other purposes, the amounts of which shall be determined by the General Manager.

2.41 “Net Cash Flow From Refinancings” shall mean total cash receipts of the Company from the refinancing, financing or otherwise obtaining loans on the Company’s Property, less any sums expended in connection with obtaining such loans, use of proceeds for repayment of expenses, and less any cash reserves for working capital, debt payment or other purposes, the amounts of which shall be determined by the General Manager.

2.42 “Net Cash Flow From Sales” shall mean total cash receipts of the Company from the

sale of the Company's Property, less repayment of loans, expenses of such sale, and any cash reserves for working capital, debt repayment or other purposes, the amounts of which shall be determined by the General Manager.

2.43 [INTENTIONALLY DELETED] .

2.44 “Nonrecourse Deductions” has the meaning set forth in Regulations Section 1.704-2 (b) (1).

2.45 “Nonrecourse Liability” has the meaning set forth in Section 1.704-2 (b) (3) of the Regulations.

2.46 "Notice" is defined in Paragraph 13.8.

2.47 "Offer Notice" is defined in Paragraph 7.4.2.

2.48 "Offer Period" is defined in Paragraph 7.4.3.

2.49 "Offer Price" is defined in Paragraph 7.4.1.

2.50 "Offered Interest" is defined in Paragraph 7.4.

2.51 "Offerees" is defined in Paragraph 7.4.2.

2.52 "Option" is defined in Paragraph 4.4.1.

2.53 "Option Exercise Notice" is defined in Paragraph 4.4.1.

2.54 "Option Price" is defined in Paragraph 4.4.1.

2.55 [INTENTIONALLY DELETED].

2.56 "Percentage Interest and Percentage Interests" shall mean, as to a Member (including the General Manager), the percentage set forth after such Member I s name on Schedule A, attached hereto and incorporated herein, as amended from time to time; and as to any Assignee of Record, the Percentage Interest or part of the Percentage Interest that corresponds to the portion of a Member's Interest that the Assignee of Record has acquired, to the extent that the Assignee of Record has succeeded to a Member's Interest.

2.57 "Person" means any individual, partnership, joint venture, limited liability company, estate, trust, or other entity.

2.58 "Profits" or "Losses" shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a) (1) shall be included in taxable income or loss), with the following adjustments:

(a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this paragraph shall be added to such taxable income or loss;

(b) any expenditures of the Company described in Code Section 705 (a) (2) (B) or treated as Code Section 705 (a) (2) (B) expenditures pursuant to Regulation Section 1.704-1(b) (2) (iv) (i), and not otherwise taken into account in computing Profits or Losses pursuant to this paragraph shall be subtracted from such taxable income or loss;

(c) in the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the Asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(d) gain or loss from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e) in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of Depreciation above;

(f) to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulation Section 1.7041(b) (2) (iv) (m) (4) to be taken into account in determining Capital Accounts as a result of a Distribution other than in liquidation of a Mernber1s Interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(g) notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Paragraph 5.3 or Paragraph 5.4 of this Agreement shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Paragraphs 5.3 and 5.4 of this Agreement shall be determined by applying rules analogous to those set forth in this paragraph.

2.59 “Property” means all real and personal property acquired or owned by the Company, including cash, improvements, and tangible and intangible property.

2.60 “Purchase Offer” is defined in Paragraph 7.4.1.

2.61 “Purchaser” is defined in Paragraph 7.4.1.

2.61 “Purpose” the primary purpose of the Company shall be acquisition and management of certain assets including but not limited to financial instruments, notes, deeds of trust, real property and personal property (the “Collateral”).

2.62 “Regulation” or “Regulations” shall mean the Income Tax Regulations, including

Temporary Regulations, promulgated under the Code, as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations) .

2.63 "Required Additional Capital Contribution(s)" is defined in Paragraph 4.3.

2.64 [INTENTIONALLY DELETED].

2.65 "Seller" is defined in Paragraph 7.4.

2.66 [INTENTIONALLY DELETED].

2.67 "Substituted Member" shall mean any Person who becomes a substituted Member pursuant to the provisions of Section 8.

2.68 "Transfer" or "Transferred" shall mean when used as a noun, any sale, hypothecation, conveyance, pledge, assignment, attachment, or other transfer, and when used as a verb, to sell, hypothecate, pledge, assign or otherwise transfer.

2.69 "UCC" is defined in Paragraph 4.4.2.

2.70 "Unrepaid Invested Capital" shall mean with respect to any Member the amount of Capital Contributions (including any Required Additional Capital Contributions made to the Company).

## SECTION 3 PURPOSE AND TERM

3.1 Purpose. The primary purpose of the Company is that more particularly described in paragraph 2.61 set forth above.

3.2 Term. The term of the Company commenced on the date the Articles of Organization were filed with the Office of the Secretary of State of the State of Delaware, and shall continue indefinitely, unless previously terminated in accordance with the provisions of this Agreement or as otherwise provided by law.

3.3 [INTENTIONALLY DELETED].

## SECTION 4 ADDITIONAL CAPITAL CONTRIBUTIONS AND NEW MEMBERS

4.1 Capital Contributions. The Initial Capital Contribution of each of the Members is set forth on Schedule A attached hereto. No Initial Capital Contribution of the General Manager in its capacity as a general manager has been required.

4.2 Additional Members. Additional members ("Additional Members") may not be admitted to the Company except by the written consent of the General Manager (which consent the General Manager may give or withhold in the General Manager's sole and absolute discretion) and the execution of such documents and instruments as the General Manager may deem necessary or desirable to effect such admission. The General Manager shall have the power to allow Additional Members (and existing Members) to make Capital Contributions to the Company for Secondary Project(s).

4.3 Required Additional Capital Contributions. Each Member is obligated, upon written or electronic notice via email ("Contribution Notice") from the General Manger, to make additional Capital Contributions ("Required Additional Capital Contributions") to the Company for each Project as follows: For each Project, each Member can be required to make Required Additional Capital Contributions of up to three hundred percent (300%) multiplied times the amount of such Member's Initial Capital Contribution for the Original Project.

The General Manager may by a Contribution Notice require the Members as to a particular Project to contribute the Required Additional Capital Contributions to the Company in the form of monies up to such Members' Required Additional Capital Contributions' amount specified in this paragraph.

The provisions of this Paragraph 4.3 (and those of Paragraph 4.4) may not be invoked or enforced by any third party, including but not limited to any creditor of the Company or any trustee in bankruptcy, and no third party or creditor of the Company (including no trustee in Bankruptcy) may bring any action to enforce the provisions of this Paragraph 4.5 or Paragraph 4.4.

Notwithstanding any other provision of this Section 4.3, for purposes of the General Manager being able to require a Member to make Required Additional Contributions, references to the General Manager shall solely mean that Person then serving as the General Manager who is Temecula Town Center Manager LLC (but no other Person who is serving as General Manager).

4.3.1 Notice. A Contribution Notice from the General Manager to the Members shall specify the Required Additional Capital Contribution amount by each Member for such Project. All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the second day after mailing if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid, and properly addressed or may be given by facsimile or email transmission which shall be effective as of the date of such transmission.

4.3.2 Manner of Contribution. For each Required Additional Contribution amount which a Member is required to contribute to the Company for a Project the following provisions shall apply: (i) No Member shall be required to contribute amounts for a Project in excess of the amount described in the preamble of this Paragraph 4.3; and (ii) any Required Additional Contribution for a specific Project shall be required of all of the Members who Contributions to the Company for that Project (without considering any Required Additional Capital Contributions made by a Member for that Project).

4.4 Remedies if a Member is Delinquent in Making a Required Additional Capital Contribution. If a Member within three (3) days of the General Manager's Contribution Notice to such Member (“Contribution Date") fails to deliver to the Company such Member's Required Additional Capital Contribution then such delinquent Member ("Delinquent Member") shall continue to be obligated to make such delinquent Required Additional Capital Contribution ("Delinquent Contribution") to the Company and the General Manager, on behalf of the Company may elect in the General Manager's sole discretion to enforce any or all of the remedies in Paragraphs 4.4.1 through 4.4.2 hereof as to such Member's Delinquent Contribution:

4.4.1 Remedy of Purchase of a Delinquent Member's Interest.

a. Grant of Option. Each Member hereby grants to the General Manager under the following terms the irrevocable option ("Option") to purchase such Member's Interest in the Company at any time during which such Member is a Delinquent Member for a price (the "Option Price") equal to the greater of Ten Dollars ($10.00) or an amount equal to the balance of such Delinquent Member's Unrepaid Invested Capital determined on the day of the General Manager's Option Exercise Notice (as hereinafter defined). With respect to any Member who is a Delinquent Member, the Option may be exercised by the General Manager by the General Manager giving notice of such exercise (“Option Exercise Notice") to such Delinquent Member.

b. Effective Exercise of Option. Upon the General Manager giving to a Delinquent Member an Option Exercise Notice t and without the requirement of any further action or execution the Delinquent Member whose Interest is being purchased pursuant to an Option shall cease to be a Member in the Company and thereafter such Delinquent Member I s rights as against the Company shall be strictly limited to the rights provided hereby. Each Delinquent Member will take such other actions and exercise such instruments of transfer and any other agreements documents or assignments as counsel for the Company may determine is appropriate to further evidence and confirm such Delinquent Member's Interest being terminated and purchased on the date of the exercise of such Option.

c. Determination of Purchase Price on Option. As soon as practical after the giving of an Option Exercise Notice by the General Manager, the Option Price shall be determined by the Company's regular accounting firm, which determination shall be made without the requirements that the books of the Company be first reviewed, audited or certified. The Option Price shall equal such Delinquent Member's Unrepaid Invested Capital.

d. General Manager May Assign and Allocate Option Rights to Purchase a Delinquent Member’s Interest. The General Manager may, under this Paragraph 4.4.1, assign and allocate to the Company, among any or all of the non-Delinquent Members (which shall not be required to be in proportion to any of their Percentage Interests or by any other proportionality formula), including all in part to the General Manager itself or to any other Person, the Option right (or portion thereof) to purchase such Delinquent Member's Interest under this Paragraph 4.4.1. Such Delinquent Member's Interest may after its purchase then be sold by the Company, or any Member including the General Manager (if they are the purchaser), to any Member or any other Person.

e. Payment of the Option Price to the Delinquent Member. The Option Price shall be paid by the Company (or other applicable Person who has been assigned and exercises such Option) to the Delinquent Member within ninety (90) days following the date of the Option Exercise Notice by the General Manager to the Delinquent Member in the form of cash or other immediately available funds. Relief From Other Indebtedness. If the General Manager (or its assignee(s) of the Option) exercises the Option hereunder by delivering the Exercise Notice to the Delinquent Member, such Delinquent Member whose Membership Interest is redeemed by the Company or is purchased by any other Person pursuant to the Option under this Paragraph 4.4.1 shall, after such purchase of the Interest is completed and closed, be relieved of any obligation to contribute or pay any further Required Additional Capital Contributions under Paragraph 4.3. Person Exercising Option Required Additional Capital Contribution. Any Person or the Company purchasing the Interest of a Delinquent Member by the Option hereunder shall be required to make the Required Additional Capital

h. Allocation of Option Rights. It is specifically understood that the General Manager may allow more than one Person to purchase a Delinquent Member's Interest under the

Option hereof. The General Manager shall not be required to offer the opportunity to purchase the Delinquent Member's Interest under the Option to any or all of the existing Members (whether such Member is a non-Delinquent Member or a Delinquent Member), and the General Manager may elect for the General Manager itself to purchase the Delinquent Member's Interest in whole or in part under the Option (or may elect for one or more other Member's or outside Persons to do so) without any liability or accountability to any other Member.

4.4.2 Remedy of Election to Have Such Delinquent Contribution Treated as Recourse Debt. The General Manager may, by written notice to the Delinquent Member, elect to have such Delinquent Member's Delinquent Contribution classified as recourse debt owed by the Delinquent Member to the Company as follows: Each Member acknowledges and agrees that any of such Member's Delinquent Contribution resulting from such Member's failure to timely make a Required Additional Capital Contribution shall constitute such Member's full recourse personal liability debt owed by such Delinquent Member to the Company. Such debt may be collected by the Company by any legal means, unless and until the Company or the other Members shall have purchased (if at all) such Delinquent Member's Interest pursuant to Paragraph 4.4.1, above. Each Member hereby waives any right that such Member may have to require the Company to have an accounting as a condition precedent to any legal action to collect such debt. Such Member's Delinquent Contribution shall bear interest at the "Delinquent Interest Rate".

a. Delinquent Interest Rate. The "Delinquent Interest Rate" shall mean interest, compounded on the first day of each calendar quarter, occurring after the applicable delinquency date which is equal to the lesser of: (i) the prime rate of interest announced by Bank of America, N.T. & S.A. in Los Angeles, California as its prime rate plus four percent (4%), or (ii) the highest legal interest rate permitted under the laws of the State of California.

b. Pledge Agreement. Each Member hereby grants to the Company a first priority security interest in and to such Member's entire Interest in the Company, including, without limitation, any right to Distributions, in liquidation or otherwise, with respect to such Member's Interest, for the purposes of securing the Member's obligation to the Company to make any Required Additional Capital Contribution pursuant to Paragraph 4.3 becomes liable to the Company. Each Member on the date hereof represents and warrants to the Company that such Member has good and marketable title to such Member's Interest in the Company, and such Interest is free and clear of all liens, claims and encumbrances whatsoever, except for the security interest granted hereby. The Company shall have all of the rights and remedies of a secured party under the California Uniform Commercial Code ("UCC") as to the Company's security interest in such Member1s Interest. Each Member further agrees to execute and deliver to the Company such UCC financing statements and other documents and instruments (including, without limitation, a separate security agreement with respect to the security interest granted hereby), and to take such further actions as may be necessary or appropriate in the opinion of counsel to the Company to perfect and maintain the Company's first priority security interest in the Member's Interest granted hereby. The Company and any other non-delinquent Member shall be entitled to bid for and to purchase any and all of the Interests being sold in any sale conducted pursuant to, or as permitted under, this security agreement and the UCC.

4.5 No Interest on Capital Contributions. No Member shall be paid interest with respect to any Capital Contributions by such Member.

4.6 Return of Capital Contributions. Except as otherwise provided for in this Agreement, no Member shall have the right to receive the return of any Capital Contributions or withdraw from the Company any Capital Contributions. In the event that no Collateral is acquired within one year

of the filing of the articles of organization for the Company, the initial Capital Contribution of the Members, other than the General Manager shall be returned to each of the non-managing Members less $100.00 for each of said Members, to pay management costs and fees of the General Manager and the entire initial Capital Contribution of the General Manager will be returned to the General Manager without deductions.

4.7 Capital Accounts. A separate Capital Account shall be maintained for each Member.

4.8 Loans and Other Business Transactions. Any Member (including the General Manager) may at any time, by the approval of the General Manager in the General Manager's sole discretion, make a loan to the Company in such amounts on such terms as the General Manager determines *I* which loan proceeds may be used for the Company's operations, improvements and/or acquisition of any Secondary Project or the Original Project. Such loans shall be on such terms as the General Manager determines and shall be at an interest rate equal to the prime rate at Bank of American, N.T. & S.A. in Los Angeles, California plus two percent (2%) per annum (but not greater than the maximum rate permitted by law), with interest to begin to accrue thirty (30) days after such loan has been made and not repaid within such time period and to continue thereafter. Interest on such loan made under the immediately preceding sentence shall be paid monthly, and the principal shall be repaid at such time as the General Manager determines, in the General Manager's reasonable discretion. Any loan made by a Member to the Company under this Paragraph 4.8 shall be repaid to such Member prior to any Distributions being made to Members under the terms of this Agreement. Members may also transact business with the Company as the General Manager shall approve, and in doing so they shall have the same rights and shall be subject to the same obligations arising out of any such business transaction as would be enjoyed by and imposed upon any Person, not a Member, engaged in a similar business transaction with the Company. The provisions of this Paragraph 4.8 are in addition to the rights of the Company under Paragraphs 4.3 and 4.4 hereof, and the General Manager, in its sole and absolute discretion, may have the Members and other Persons make loans to the Company without invoking any of the provisions of Paragraph 4.4.

4.9 Limited Liability of Members. Members shall not be bound by, or be personally liable for, any judgment of a court, or in any other manner for the debts, expenses, liabilities, contracts, leases or obligations of the Company, except if same is guaranteed in writing by a specific written signed guaranty of such Member. No third party, including but not limited to any creditor of the Company, or any trustee in Bankruptcy may bring an action under this Agreement or otherwise to require any Member to make additional contributions of capital of any kind to the Company, nor may such Persons enforce any of the provisions of this Section 4.

## SECTION 5 PROFIT AND LOSS ALLOCATIONS

5.1 Profits. Profits for any Fiscal Year of the Company shall be allocated in the following order and priority:

5.1.1 First, to the Members in proportion to, and to the extent of, any deficit balances in their respective Capital Accounts until all such Capital Accounts have been restored to zero;

5.1.2 Second, after giving effect to the Allocations made pursuant to Paragraph 5.1.1, among the Members as necessary to cause the Capital Account balance of each Member to at least equal such Member1s Unrepaid Invested Capital; and

5.1.3 Third, among the Members in proportion to their Percentage Interests.

5.2 Losses. Losses for any Fiscal Year of the Company shall be allocated among the Members in proportion to their Percentage Interests.

5.3 Allocations in General.

5.3.1 Adjusted Capital Account Deficit. The Losses allocated pursuant to Paragraph 5.2 hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event that some, but not all, of the Members have an Adjusted Capital Account Deficit as a consequence of an Allocation of Losses pursuant to Paragraph 5.2, the limitation set forth in this Paragraph 5.3.1 shall be applied on a Member-by-Member basis so as to allocate the maximum permissible Losses to each Member under Regulation Section 1.704l(b) (2) (ii) (d). All Losses in excess of the limitation set forth in this Paragraph 5.3.1 shall be allocated to the General Manager.

5.3.2 Other Items. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other Allocations not otherwise provided for in this Agreement shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

5.3.3 Allocation Between Periods. For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any other items shall be determined on a daily, monthly, or other basis, as determined by the General Manager using any permissible method under Code Section 706 and the Regulations thereunder.

5.3.4 Intention. The intention of this Section 5 is to make Allocations in accordance with each Member's Interest in the Company in order to reflect the economic substance of each Member's Capital Account and Distributions.

5.4 Special Allocations. The following special Allocations shall be made in the following order:

5.4.1 Minimum Gain Chargeback. Except as otherwise provided in Regulation Section 1.704-2 (f), notwithstanding any other provisions of this Section 5, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain determined in accordance with Regulation Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulation Sections 1.704-2(f) (6) and 1.704-2(j) (2). This Paragraph 5.4.1 is intended to comply with the minimum gain chargeback requirement in such Regulations' sections and shall be interpreted consistently therewith.

5.4.2 Member Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(i) (4), notwithstanding any other provisions of this Section 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i) (5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net

decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section **1.704-2** (i) (4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections **1.704-2** (i) (4) and **1.704-2** (j) (2). This Paragraph 5.4.2 is intended to comply with the minimum gain chargeback requirement of Regulations Section **1.704-2** (i) (4) and shall be interpreted consistently therewith.

5.4.3 Qualified Income Offset. In the event any Member who is not a General Manager unexpectedly receives any adjustments, Allocations, or Distributions described in Regulations Sections 1.704-1 (b) (2) (ii) (d) (4), 1.704-1 (b) (2) (ii) (d) (5) or 1.7041 (b) (2) (ii) (d) (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an Allocation pursuant to this paragraph 5.4.3 shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other Allocations provided for in this Section 5 have been tentatively made as if this Paragraph 5.4.3 were not in this Agreement.

5.4.4 Gross Income Allocation. In the event that any Member has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to the terms of this Agreement; and
(ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g) (1) and 1.704-2(i) (5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an Allocation pursuant to this Paragraph 5.4.4 shall be made if and only to the extent that such Member would have a deficit Capital Account in excess of such sum after all other Allocations provided for in this Section 5 have been tentatively made as if Paragraph 5.4.3 hereof and this Paragraph 5.4.4 were not in the Agreement.

5.4.5 Code Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743 (b) is required, pursuant to Regulations Section 1.704-1 (b) (2) (iv) (m), to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of such Member's Interest, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specifically allocated to the Members in accordance with their Member Interests in the event that Regulations Section 1.704-1 (b) (2) (iv) (m) (2) applies, or to the Member to whom such Distribution was made in the event that Regulations Section 1.704 -1 (b) (2) (iv) (m) (4) applies.

5.4.6 Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2 (i) (1).

5.5 Curative Allocations. The Members and the Company intend that the tax Allocation provisions of this Section 5 shall produce final Capital Account balances of the Members that will permit liquidating Distributions that are made in accordance with final Capital Account balances under Paragraph 12.2, to be made (after unpaid loans and interest thereon, including those owed to Members have been paid) in a manner identical to the order of priorities set forth in Paragraph 12.2. To the extent that the tax Allocation provisions of this Section 5 would fail to produce such final

Capital Account balances (i) such provisions shall be amended by the General Manger if and to the extent necessary to produce such result and (ii) taxable income and taxable loss of the Company for prior open years (or items of gross income and deduction of the Company for such years) shall be reallocated by the General Manager among the Members to the extent it is not possible to achieve such result with Allocations of items of income (including gross income) and deduction for the current year and future years, as determined by the General Manager. This Paragraph 5.5 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority. The General Manager shall have the power to amend this Agreement without the consent of the Members, as the General Manager reasonably considers advisable, to make the Allocations and adjustment described in this Paragraph 5.5. To the extent that the Allocations and adjustments described in this Paragraph 5.5 result in a reduction in the Distributions any Member will receive under this Agreement compared to the amount of the Distributions such Member would receive if all such Distributions were made pursuant to the order of priority set forth in Paragraph 12.2, the General Manager may, in its discretion (but is not required to), have the Company make a guaranteed payment (within the meaning of Code Section 707(c)) to such Member (to be made at the time such Member would otherwise receive the Distributions that have been reduced) to the extent such payment does not violate the requirements of Code Sections 704 (b) and 514 (c) (9) (E), or the General Manager may take such other action as determined by the General Manager in its discretion to offset such reduction.

5.6 Allocations Relating to Taxable Issuance of a Member Interest. Any income, gain, loss, or deduction realized as a direct or indirect result of the issuance of a Member Interest by the Company to a Member (the “Issuance Items”) shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other Allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

5.7 Tax Allocations: Code Section 704 (c). In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its initial Gross Asset Value (computed in accordance with subparagraph (a) of the definition of Gross Asset Value under Section 2 hereof). In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (b) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such Allocations and Code Section 704(c) shall be made by the General Manager in its sole discretion.

## SECTION 6 DISTRIBUTIONS

6.1 Distributions. The Members shall receive from the Company Distributions from each Project the following amounts in the following priorities:

6.1.1 Distributions of Net Cash Flow From Operations.
Net Cash Flow From Operations, if any, shall be distributed to the Members in proportion to the Members' Percentage Interests.

6.1.2 Distributions From Net Cash Flow From Refinancings. Net Cash Flow From Refinancings shall be distributed to the Members in proportion to the Members' Percentage Interests.

6.1.3 Distributions From Net Cash Flow From Sales. Net Cash Flow From Sales shall be distributed to the Members in the following order of priority:

a. Unrepaid Invested Capital. First, to the Members in order to pay the Members the Members' Unrepaid Invested Capital (and among the Members in proportion to each Member's then Unrepaid Invested Capital); and

b. Percentage Interests. Second, to the Members in proportion to the Members' Percentage Interests.

For purposes of this Agreement, the sale of the Company assets shall include a sale or taking pursuant to or under the threat or power of eminent domain. In addition, references to Net Cash Flow from Sales shall include any property casualty insurance payments (other than rental or business interruption insurance, which shall be treated as part of Net Cash From Operations) paid as a result of damage or destruction of Company Property which is received by the Company, to the extent those payments are not otherwise used to replace or rebuild those assets, or to pay other Company debts or liabilities, as determined by the General Manager.

6.1.4 Distributions to General Manager. The general manager of the Company shall be entitled to receive, on an annual basis, 25% of the Net Cash Flow From Operations, Refinancing or otherwise of the Company payable when the Net Cash Flow of the Company is distributed to all members of the Company and shall be entitled to receive 25% of the Net Cash Flow From Sales or otherwise received from the sale of assets of the Company when the Net Cash Flow of the Company are distributed to all members of the Company. Said payments shall be in addition to other payments to be received by the General Manager pursuant to the terms of the operating agreement of the Company.

6 .2 True Up on Sale of Property. Upon the sale of the Company's Property for a particular Project, the Company shall adjust the Distributions to the Members so that each Member receives Distributions attributable to such Property for that Project in the Distribution amounts for such Project specified under Paragraph 6.1, above (“True Up “ ) . Upon the sale of a Project 's Property, if it is determined that a Member has been distributed more than such Member is otherwise entitled to receive under Paragraph 6.1, then such Member agrees that such Member shall immediately pay back to the Company any amounts that the Member was distributed by the Company in excess of the amounts that such Member is otherwise entitled to receive under Paragraph 6.1 (and/or the Company may in its discretion offset against any other Distributions owed to such Member for such excess amounts paid to such Member) in order that the Company can make the correct True Up for that Project. The Company, upon a Project's Property's sale, shall make Distributions to the Members so that the Members receive the amounts that the Members are otherwise entitled to receive as Distributions under Paragraph 6.1. Any amounts paid by a Member to the Company under this Paragraph 6.2 or amounts paid to a Member by the

Company under this Paragraph 6.2 shall be paid to or by such Member without interest. The True Up of the Distributions under this Section 6 shall be determined by the General Manager, in the General Manager's discretion, upon the sale of a Project's Property.

6.3 Distributions. The time and amount of Distributions shall be made in the sole discretion of the General Manager. This Section 6 is subject to the provisions of Paragraph 3.3.

6.4 Rights of the Company to Offset. If a Member is entitled to a Distribution under this Section 6 or under Section 12, and such Member owes any amounts to the Company, then the Company shall be entitled to deduct from the amount of Distribution that such Member is otherwise entitled to receive from the Company the amount that such Member otherwise owes to the Company.

SECTION 7 TRANSFERS

7.1 Restrictions on Transfers. Except as otherwise permitted by this Agreement, no Member shall Transfer all or any portion of its Interest.

7.2 Permitted Transfers. Subject to the conditions and restrictions set forth in Paragraphs 7.3.2 through 7.3.5 hereof, a Member may at any time Transfer all or any portion of such Member's Interest to: (a) any other Member, (b) any spouse or issue of such Member, or revocable living trust for their benefit, or (c) such Member's executor or administrator to whom such Interest is transferred involuntarily by operation of law, such as by such Member's death. Any such permitted Transfer is referred to in this Agreement as a "Permitted Transfer." A Permitted Transfer must also satisfy the provisions of Paragraphs 7.3.2 through 7.3.5 hereof.

7.3 Conditions to Permitted Transfers. Any Transfer of a Member's Interest must satisfy each and all of the following conditions:

7.3.1 Consent of General Manager. Except in the case of a Transfer involuntarily by operation of law, a Member may not Transfer all or any portion of such Member's Interest without the prior consent of the General Manager, which consent may be withheld in the General Manager's absolute discretion.

7.3.2 Documents to Effect Transfer. Except in the case of a Transfer involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer. In the case of a Transfer of an Interest involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that the Company reasonably incurs in connection with such Transfer.

7.3.3 Tax Information. The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Interest transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any Distribution otherwise provided for in this Agreement with respect to any transferred Interest until it has received such information.

7.3.4 Securities Laws Compliance. Except in the case of a Transfer of an Interest involuntarily by operation of law, either: (i) such Interest shall be registered under the Securities Act of 1933 and any applicable state securities laws, (ii) the Transferor is exempt from all applicable registration requirements and that such Transfer will not violate any applicable federal or state securities laws regulating the Transfer of securities, or (iii) the General Manager waives in writing the provisions of this Paragraph 7.3.4.

7.3.5 No Termination of Company. Unless otherwise approved by the General Manger, no Transfer of an Interest shall be made except upon terms that would not, in the opinion of counsel chosen by and mutually acceptable to the General Manager and the transferor Member, result in the termination of the Company within the meaning of Code Section 708.

7.4 Right of First Refusal. In addition to the other limitations and restrictions set forth in this Section 7, except for a Permitted Transfer under Paragraph 7.2 hereof, no Member shall Transfer all or any portion of such Member's Interest ("Offered Interest") unless such Member (the "Seller") first offers made under this Paragraph 7.4

7.4.1 Limitation on Transfers. No Transfer may be made under this Paragraph7.4 unless the Seller has received a bona fide written offer ("Purchase Offer") from a Person (the "Purchaser") to purchase the Offered Interest for a purchase price ("Offer Price") denominated and payable in United States dollars at closing or according to specified terms, with or without interest, which offer shall be in writing signed by the Purchaser and shall be irrevocable for a period ending no sooner than the business day following the end of the Offer Period, as hereinafter defined.

7.4.2 Offer Notice. Prior to making any Transfer that is subject to the terms of this Paragraph 7.4, the Seller shall give to the General Manager written notice ("Offer Notice") which shall include a copy of the Purchase Offer and an offer ("Firm Offer") to sell the Offered Interest to the General Manager and/or the Company and/or the other Members or any other Person as appointed by the General Manager (collectively "Offerees") for the Offer Price, payable according to the same terms as (or more favorable terms than) those contained in the Purchase Offer, provided that the Firm Offer shall be made without regard to the requirement of any earnest money or similar deposit required of the Purchaser prior to closing, and without regard to any security (other than the Offered Interest) to be provided by the Purchaser for any deferred portion of the Offer Price.

7.4.3 Offer Period. The Firm Offer shall be irrevocable for a period (“0ffer Period") ending at 11: 59 p.m. local time at the Company's principal place of business, on the ninetieth (90th) day following the day of the Offer Notice.

7.4.4 Acceptance of First Offer. At any time during the Offer Period, the General Manager may accept all or part of the Firm Offer or may allow by written notice the Company and/or any Member or other Person to accept all or part of the Firm Offer as to all or any portion of the Offered Interest, by giving written notice of such acceptance to the Seller, which notice shall indicate the amount of the Offered Interest that such accepting offeree is willing to purchase. The General Manager or the Company or any Member or other Person appointed by the General Manager to accept all or a portion of the Firm Offer is herein sometimes referred to as the "Accepting Offeree(s)." In the event that the General Manager and the other Accepting Offerees (by the General Manager1s written notice or otherwise) accept the Firm Offer with respect to all of the Offered Interest, the Firm Offer shall be deemed to be accepted and each Accepting

Offeree shall be deemed to have accepted the Firm Offer as to that portion of the Offered Interest which such Accepting Offeree indicated a willingness to purchase. If the General Manager does not accept the Firm Offer
(by itself or by notice on behalf of the Company or any of the other Members or other Person) as to all of the Offered Interest during the Offer Period, the Firm Offer shall be deemed rejected in its entirety.

7.4.5 Closing of Purchase Pursuant to Firm Offer. In the event that the Firm Offer is accepted, the closing of the sale of the Offered Interest shall take place within thirty (30) days after the Firm Offer is accepted; or, if later, the date of closing set forth in the Purchase Offer. The Seller and all Accepting Offerees shall execute such documents and instruments as may be necessary or appropriate to effect the sale of the Offered Interest pursuant to the terms of the Firm Offer and this Section 7.

7.4.6 Sale Pursuant to Purchase Offer if Firm Offer Rejected. If the Firm Offer is not accepted in the manner hereinabove provided, the Seller may sell the Offered Interest to the Purchaser at any time within sixty (60) days after the last day of the Offer Period, provided that such sale shall be made on terms no more favorable to the Purchaser than the terms contained in the Purchase Offer and, provided further, that such sale complies with other terms, conditions and restrictions of this Agreement that are not expressly made inapplicable to sales occurring under this Paragraph 7.4. In the event that the Offered Interest is not sold in accordance with the terms of the preceding sentence, the Offered Interest shall again become subject to all of the conditions and restrictions of this Paragraph 7.4.

7.4.7 No Duty of General Manager. The General Manager may allow one or more Members or the Company, or any other Person, to purchase a Seller Member's Interest hereunder or may elect to purchase the entire Seller Member Interest itself. Specifically, the General Manager is not required to offer the opportunity to purchase the Seller Member's Interest to any or all of the existing Members, and the General Manager may elect for the General Manager itself or any other Person to purchase all or any portion of the Seller's Offered Interest without any liability or accountability of the General Manager to any other Member or the Company.

7.5 Prohibited Transfers. Any purported Transfer of an Interest in violation of this Section 7 shall be null and void and of no force or effect whatsoever, provided that if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the General Manager, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the Interest Transferred shall be strictly limited to the transferor's rights to Allocations and Distributions as provided by this Agreement with respect to the transferred Interest, which Allocations and Distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of such Interest may have to the Company. In the case of a Transfer or attempted Transfer of an Interest that is in violation of this Section 7, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all costs, liabilities and damages that any of such indemnified Members may incur (including, without limitation, incremental tax liabilities, attorneys' fees, and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby. No charging order against a Member's Membership Interest shall be a lien or claim against any of the Company's assets or property.

7.6 Rights of Unadmitted Assignees. A Person who acquires an Interest but who is not admitted as a Substituted Member pursuant to Section 8 hereof shall be entitled only to

Allocations and Distributions with respect to such Interest in accordance with accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

7.7 Representations Regarding Transfers; Legend.

7.7.1 No Violation of Securities Laws. Each Member hereby covenants and agrees with the Company for the benefit of the Company and all Members, that (i) such Member is not currently making a market in its Interests and will not in the future make a market in its Interests, and (ii) such Member will not Transfer its Interest on an established securities market or a secondary securities market. Each Member further agrees that it will not Transfer any Interest to any Person unless such Person agrees to be bound by this Section 7 and to Transfer such Interest only to Persons who agree to be similarly bound.

7.7.2 Legend. Each Member hereby represents and warrants to the Company and the other Members that such Member's acquisition of an Interest hereunder is made as principal for such Member's own account and not for resale or distribution of such Interest. Each Member further hereby agrees that the following legend may be placed upon any counterpart of this Agreement or any other document or instrument evidencing ownership of an Interest:

“The Interest represented by this document has not been registered under any securities laws and the transferability of such Interest is restricted. Such Interest may not be sold, assigned or transferred, nor will any assignee, vendee, transferee or endorsee thereof be recognized as having acquired any such Interest by the issuer for any purposes, unless (1) a registration statement under the Securities Act of 1933, as amended, with respect to such Interest shall then be in effect and such transfer has been qualified under all applicable state securities laws, or (2) the availability of an exemption from such registration and qualification shall be established to the satisfaction of counsel to the Company. The Interest represented by this document is subject to further restriction as to its sale, transfer, hypothecation or assignment as set forth in the Operating Agreement and agreed to by each Member. Said restriction provides, among other things, that no Interest may be transferred without first offering such Interest to the other Members, and that no vendee, transferee or assignee of a Member shall have the right to become a substituted Member without the consent of the General Manager, which consent may be given or withheld in the sole and absolute discretion of the General Manager.”

7.8 Distributions and Allocations in Respect of a Transferred Interest. If any Interest is Transferred during any Fiscal Year in compliance with the provisions of this Section 7, Profits, Losses, each item thereof, and all other items attributable to the Transferred Interest for such Fiscal Year shall be divided and allocated between the transferor and the transferee by taking into account their varying Percentage Interests during the Fiscal Year in accordance with Code Section 706, using any conventions permitted by the Code and selected by the General Manager. All Distributions on or before the date of such Transfer shall be made to the transferor, and all Distributions thereafter shall be made to the transferee. Solely for purposes of making such Allocations and Distributions, the Company shall be required to recognize such Transfer only after the Company is given notice of such Transfer. Neither the Company nor the General Manager shall incur any liability for making Allocations and Distributions in accordance with the provisions of this Paragraph 7.8, whether or not the General Manager or the Company has knowledge of any Transfer of ownership of any Interest.

## SECTION 8 SUBSTITUTED MEMBERS

8.1 Becoming a Substituted Member. In addition to the provisions and restrictions of Section 7, no Assignee of any Interest shall have the right to become a substituted Member ("Substituted Member") in place of such Assignee's assignor unless all of the following conditions are first satisfied:

8.1.1 Acceptable Form of Assignment. The provisions of Section 7 hereof have been complied with and a duly executed and acknowledged written instrument of assignment in a form acceptable to the Company shall have been filed with the Company, which instrument shall specify the Percentage Interests being assigned and set forth the intention of the assignor that the Assignee succeed to assignor I s interest as a Substituted Member in the assignor's place;

8.1.2 Other Instruments. The assignor and Assignee shall have executed and acknowledged such instruments as the Company may deem necessary or desirable to effect such substitution, including the written acceptance and adoption by the Assignee of the provisions of this Agreement;

8.1.3 Consent of General Manager. The written consent of the General Manager to such substitution shall have been obtained, the granting or denial of which shall be within the absolute discretion of the General Manager; and

8.1.4 Reimbursement of Fees. The Assignee pays and reimburses the Company for all legal fees, filing fees and publication fees that the Company incurs in connection with the admission of the Assignee as a Member with respect to the transferred Interest.

8.2 Rights of Assignee. An Assignee of a Member's Interest shall not hold any non-economic rights in the Company until such Assignee becomes a Substituted Member under the terms of this Section 8. By way of example, and not by way of limitation, an Assignee who is not a Substituted Member shall have no right to vote or consent as a Member to any action under the terms of this Agreement, and shall have no rights to receive or review the Company's books, records, reports or other information.

## SECTION 9 BOOKS, RECORDS, ACCOUNTING AND REPORTS

9.1 Maintenance of Books and Records. The Company shall keep at its principal executive office in California the following Company documents:

9.1.1 List of Members. A current list of the full name and last known business or residence address of each Member and any Assignee together with the Capital Contribution and share in Profits and Losses of each Member and any Assignee.

9.1.2 Articles of Organization. A copy of the Company's Articles of Organization and all amendments thereto, and executed copies of any powers of attorney pursuant to which the Articles of Organization or amendments thereto have been executed;

9.1.3 Tax Returns. Copies of the Company's federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years;

9.1.4 Operating Agreement. Copies of the original Agreement and all amendments to the

Agreement and executed copies of any powers of attorney pursuant to which the Agreement or amendments thereto have been executed;

9.1.5 Financial Statements. Financial statements of the Company, if any, for the Company's six (6) most recent Fiscal Years;

9.1.6 Books and Records. The Company's books and records for at least the current and past four Fiscal Years; and

9.2 Tax Year and Accounting Method. The General Manager shall elect the Company's tax year and method of accounting as permitted by the Code.

SECTION 10 RIGHTS, AUTHORITY, POWER, RESPONSIBILITIES AND DUTIES OF THE GENERAL MANAGER

10.1 General Manager. The Company shall be managed by a General Manager who may be, but does not have to be, a Member. Temecula Town Center Manager LLC is hereby designated to serve as the initial General Manager.

10.2 General Powers. The General Manager shall have the full, exclusive and complete discretion, power and authority, subject in all cases to other provisions of this Agreement, to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs without the consent, vote or approval of any Member, including, without limitation, the power to:

10.2.1 Partnership and Limited Liability Company. Exercise and carry out any and all of the powers and duties of any partnership or limited liability company of which the Company is a partner or member;

10.2.2 Collateral. Acquire, purchase, own, sell, grant options, develop, improve, exchange and lease the Collateral (any assets including but not limited to financial instruments, notes, deeds of trust, real property and personal property) chosen at the sole discretion of the General Manager, at the prices, rental amounts and terms as the General Manager may determine in the General Manager's sole discretion;

10.2.3 Execution of Documents. Execute by its sole signature any and all agreements, contracts, purchase and sale agreements, option agreements, documents, deeds, bills of sale, escrow instructions, deeds of trust, mortgages, promissory notes, loan documents, leases, certifications and instruments necessary or convenient in connection with the management, maintenance and operation of the properties of the Company, and to buy, sell, lease, exchange, borrow or encumber any Company Property;

10.2.4 Borrowing Monies. Borrow money and, if security is required therefore, to mortgage, encumber and pledge any Company Property on such terms and in such amounts as the General Manager may determine in the General Manager's sole discretion, and to execute all documents in connection therewith;

10.2.5 Insurance. Acquire and enter into any contract of insurance which the General Manager deems necessary or appropriate for the protection of the Company and its Property, for the conservation of Company assets, or for any purpose convenient or beneficial to the Company;

10.2.6 Employment of Persons. Employ or retain persons including officers and other employees of a Member or its Affiliates, in the operation and management of the business of the Company including, but not limited to, supervisory managing agents, brokers, attorneys and accountants on such terms and for such compensation as the General Manager shall determine;

10.2.7 Appointment of Officers. Appoint officers at any time as determined in the sole discretion of the General Manager. The officers of the Company, if deemed necessary by the General Manager in its discretion, may include a president, vice president, secretary and/or treasurer. The officers shall serve at the pleasure of the General Manager, subject to all rights, if any, of an officer under any written contract of employment. Any individual may hold any number of offices. The officers shall exercise such powers and perform such duties as shall be determined from time to time by the General Manager;

10.2.8 Removal of Officers. Subject to the rights, if any, of an officer under a contract of employment, remove any officer, either with or without cause, at any time;

10.2.9 Accounts at Banks and Brokerage Houses. Open accounts and deposit, withdraw and maintain funds in the name of the Company in banks, savings and loan associations, thrift and loan associations, brokerage houses or other financial institutions on such signatures as the General Manager shall determine;

10.2.11 Accounting Year. Select as its accounting year such Fiscal Year as approved by the Code;

10.2.12 Filing of Documents. Cause Articles of Organization, fictitious business name statements and other documents in connection with the organization of the Company to be filed as required by applicable law;

10.2.13 Other Actions. Prepare, execute, acknowledge, record, file or deliver any and all reports, instruments or documents, and to take all actions required or deemed necessary, reasonable or desirable by the Company to effectuate any of the foregoing, to comply with requirements of applicable law or to comply with the provisions of this Agreement; and

10.2.14 Powers of Attorney. In furtherance of the foregoing, to give powers of attorney (general and/or limited) to whomsoever the General Manager shall determine to enable such attorney-in-fact to take any and all actions and to execute any and all documents on the Company's behalf.

10.3 Limitation on Authority of Members. No Member is an agent of the Company solely by virtue of being a Member, and no Member has the authority to act for the Company solely by virtue of being a Member.

10.4 Removal and/or Replacement of the General Manager. While Temecula Town Center Manager LLC is serving as the General Manager, the Members, at any time and from time to time, may by a Majority Vote of the Members other than the General Manager, remove for cause the General Manager then acting. Subject to the immediately preceding sentence all of the Members by a Majority Vote may appoint a new General Manager upon a vacation in the General Manager's position if there is no other provision for the appointment of the General Manager under this Agreement. “For cause” for purposes of this Paragraph 10.4 shall mean either: (i) the General Manager's conviction of a felony as determined by a final judgment of a court of

competent jurisdiction; or (ii) the General Manager's embezzlement of the Company's Property.

10.5 Action Without Meeting. In lieu of holding a meeting, the Members may take any action permitted of them by written consents specifying the action to be taken, which consents must be

10.6 Actions on Which Members May Vote. The following matters shall require the vote or consent of a Majority Vote of the Members:

10.6.1 Continue Business. A decision to continue the business of the Company after dissolution of the Company; and

10.6.2 Amendments. An amendment to the Articles of Organization or this Agreement.

The Members shall have no right to vote on the sale, exchange, purchase lease, financing, refinancing or encumbering of the Company's Property, and the General Manager shall solely decide to do such acts, in the General Manager's sole discretion.

10.7 Other Businesses and Transactions. The General Manager is not obligated to devote full time to the affairs of the Company. The General Manager and its Affiliates may become involved in other businesses, real estate projects (even those competing with the Company) and occupations, limited liability companies and partnerships. Any Member, General Manager, shareholder, officer, director, employee, partner, or other person holding a legal or beneficial interest in any entity which is a Member, or any Affiliate of any of the foregoing, may engage in or possess an interest in a business venture which may compete with the Company including, but not limited to, the ownership, financing, leasing, operation, development, management, syndication, brokerage or development of real property competing with the Company or any entity in which the Company may own an interest; and neither the Company nor the Members shall have any right by virtue of this Agreement in or to such independent ventures or to the income or profits derived there from. The General Manager and any other Member or their Affiliates shall have the right to hold any investment opportunity or prospective economic advantage for its own account and to recommend such opportunity to Persons other than the Company or any specific Members. Any Member, including the General Manager, may transact business with the Company and shall have the same rights with respect thereto as a person who is not a Member. No Member or the General Manager, nor any Affiliates thereof, shall be obligated to present to the Company any particular investment opportunity or the prospective economic advantage, even if the opportunity or the prospective economic advantage is of a character which if presented to the Company could be taken by the Company, and the General Manager and its Affiliates shall have the right to take for its own account or to recommend to other Persons any investment opportunity. Each Member and the Company hereby waive any rights they have against any other Member capitalizing on information learned as a consequence of its connection with the affairs of the Company.

10.8 No Requirement for Personal Services. No Member (other than the General Manager) shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the General Manager, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

10.9 Costs and Reimbursement. The General Manager shall be entitled to reimbursement for expenses incurred, costs of goods, outside services and materials, including any outside construction supervisor for any of the Company's Property (notwithstanding any provisions of

Paragraph 10.10.2 hereof). The Company shall also payor reimburse the General Manager and its Affiliates for organizational expenses incurred to form the Company. Such organizational expenses shall include, but are not limited to, legal and accounting fees, and advances made in furtherance of the business of the Company.

10.10 [INTENTIONALLY DELETED].

10.11 Power of Attorney.

10.11.1 Grant of Power. Each Member constitutes and appoints the General Manager as the Member's true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the Member's name, place and stead, to make, execute, sign, acknowledge and file:

a. Articles of Organization. One or more Articles of Organization;

b. Documents to Reflect Amendment. All documents (including amendments to Articles of Organization) which the Attorney-in-Fact deems appropriate to reflect any amendment, change, or modification of this Agreement;

c. Certificates and Other Instruments. Any and all other certificates or other instruments required to be filed by the Company under the laws of the State of Delaware or of any other state or jurisdiction, including, without limitation, any certificate or other instruments necessary in order for the Company to continue to qualify as a Limited Liability Company under the laws of the State of Delaware;

d. Fictitious Names. One or more fictitious trade name certificates; and

e. Documents to Dissolve. All documents which may be required to dissolve and terminate the Company and to cancel its Articles of Organization.

10.11.2 Irrevocability. The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member. It also shall survive the Transfer of a Member's Interest, except that if the Assignee is admitted as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge, and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate, or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

10.12 [INTENTIONALLY DELETED].

10.13 Indemnification of General Manager. The Company shall indemnify, hold harmless and defend (including all attorneys' fees, costs, judgments and claims) the General Manager, relating to any liability or damage incurred by reason of any act performed or omitted to be performed by any of them in connection with the Company and its business. The General Manager does not guaranty the return to any Member of such Member's investment or any profit from the operation of the Company, and the General Manager shall not be responsible to any other Member as a result of a loss of such Member's investment in the Company. The General Manager shall be liable to the Company only if it commits an act of gross and willful negligence against the Company. The obligations of the Company set forth in this Paragraph 10.13 are

expressly intended to shall be protected in relying, acting, or refraining from acting on any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, document, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

10.14 Other Matters Concerning the General Manager.

10.14.1 Reliance on Documents. The General Manager shall be protected in relying, acting, or refraining from acting on any resolution,certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, document, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

10.14.2 Use of Affiliates and Consultants. The General Manager may execute any of the powers granted or perform any of the duties imposed by this Agreement either directly or through agents, including without limitation any Affiliate of the General Manager. The General Manager may consult (at the Company's cost) with counsel, accountants, appraisers, management consultants, investment bankers, insurance agents and other consultants (collectively "Consultants") selected by it (who may also serve as Consultants for the Company or any Affiliate of the General Manager). An opinion by any consultant on a matter which the General Manager believes to be within its professional or expert competence shall be full and complete protection as to any action taken or omitted by the General Manager based on the opinion and taken or omitted in good faith. The General Manager shall not be responsible for the misconduct, negligence, acts or omissions of any consultant or of any agent or employee of the Company, the General Manager, or any Affiliate, and shall assume no obligations other than to use due care in the selection of all Consultants.

10.14.3 Transactions With Affiliates. Notwithstanding that it may constitute a conflict of interest, the General Manager may, and may cause the General Manager's Affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease, exchange, improvement, management or construction upon any of the Company's Property, or the rendering of any service, construction contracting service, property management service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company.

10.15 Tax Matters Partner. Temecula Town Center Manager LLC is hereby designated .as the initial "tax matters partner" under the Code. If Temecula Town Center Manager LLC is unable or unwilling to serve as tax matters partner, then the tax matters partner shall be designated by the other Members. The tax matters partner is authorized on behalf of the Company to represent the Company in any tax audit, proceeding or dispute with the Internal Revenue Service or state or local taxing authority including consenting to extending the statute of limitations for assessing tax against a Member attributable to a Company item, negotiating and entering into a settlement agreement, and contesting any proposed adjustment of a Company item. The General Manager may make all tax elections and execute all waivers and consents for tax purposes on behalf of the Company.

10.16 Tax Withholding.

10.16.1 Withholding. The General Manager is authorized to cause the Company to withhold from, or pay on behalf of, any Member the amount of federal, state, local or foreign taxes that the General Manager reasonably believes that the Company is required to withhold or

pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement, including, without limitation, any taxes required to be paid by the Company pursuant to Code Sections 1441, 1442, 1445 and 1446, and any taxes imposed by any state or other taxing jurisdiction on the Company as an entity. Without limiting the foregoing, the General Manager may cause the Company to withhold (and remit to the appropriate governmental authority), from amounts otherwise distributable to a Member, any taxes that such Member notifies the General Manager in writing should be withheld, which Member notice shall be given by any Member who becomes aware of any withholding obligation to which such Member is subject and shall specifically set forth the rate at which tax shall be withheld and the name and address to which any amounts withheld should be remitted.

10.16.2 Payments By the Company. If the Company is required to withhold and pay over to taxing authorities amounts on behalf of a Member exceeding available amounts then remaining to be distributed to such Member, such payment to the taxing authorities by the Company shall constitute a loan by the Company to such Member that shall then be paid by the Member to the Company on demand of the Company, together with interest at the applicable Federal rate determined from time to time under Code Section 7872 (f) (2) or the maximum rate permitted under applicable law, whichever is less, calculated upon the outstanding principal balance of such loan as of the first day of each month. Any such loan shall be repaid to the Company, in whole or in part, as determined by the General Manager in the General Manager's sole discretion, either (i) out of Distributions from the Company which the Member is (or becomes) entitled to receive, or (ii) by the Member in cash upon demand by the General Manager (said Member shall bear all of the Company's costs of collection of such loan, including attorneys' fees, if payment is not promptly remitted by such Member to the Company after such demand for payment by the General Manager) .

10.16.3 Cooperation on Withholding. Each Member agrees to cooperate fully with all efforts of the Company to comply with the Company's tax withholding and information reporting obligations, and each Member agrees to provide the Company with such information as the General Manager may request from time to time in connection with such obligations.

## SECTION 11 LIMITATION ON MEMBERS RIGHTS

No Member shall have the right or power to: (i) withdraw, make a demand for withdrawal or reduce the Members' Interest or Capital Contribution, except as a result of the dissolution of the Company; (ii) bring an action for partition against the Company; (iii) cause the termination and dissolution of the Company by court decree or otherwise, except as set forth in this Agreement; or (iv) demand to receive Property other than cash in return for such Person's Capital Contribution. No Member shall have the priority over any other Member either as to the return of Capital Contributions or as to Profits, Losses, other items or Distributions except as provided in Sections 4, 6 or 12. Other than upon the termination and dissolution of the Company as provided by this Agreement, there has been no time agreed upon when the Capital Contribution of any Member may be returned.

## SECTION 12 TERMINATION AND DISSOLUTION OF THE COMPANY

12.1 Termination and Dissolution. The Company shall be dissolved upon the earlier to occur of the following ("Event of Dissolution"):

12.1.1 Termination Date. The termination date of the Company set forth at Paragraph 3.2 of this Agreement;

12.1.2 Written Election. The written election of the General Manager plus the Members by a Majority vote to dissolve the Company; or

12.1.3 Judicial Decree. When a judicial decree of dissolution has been issued.

Upon an Event of Dissolution, the General Manager shall promptly wind up the affairs of, liquidate and terminate the Company. In furtherance of such liquidation and winding up, the General Manager shall: (i) have all of the administrative and management rights and powers necessary to so liquidate and wind up the Company; (ii) be reimbursed for any Company expenses which the General Manager incurs.

12.2 Liquidation and Distribution. Upon a dissolution and termination of the Company for any reason, the Company shall distribute its assets in the following order of priority:

12.2.1 Creditors. First, to the payment of the creditors of the Company but excluding secured creditors whose obligations will be assumed or otherwise transferred on the liquidation of Company assets;

12.2.2 Payment of Obligations. Second, t o t he payments of all obligations that have not yet been paid and the establishment of any reserves which the General Manager determines is necessary for any liabilities or obligations (which remaining amount in such reserves shall then be distributed pursuant to Paragraphs 12.2.3 and 12.2.4, below);

12.2.3 Repayment of Member Loans. Third, to the Members in repayment of any outstanding loans; and

12.2.4 To Members. Finally, among the Members as provided in Paragraph 6.1.3 (including the application of Paragraph 6.2), each Member shall look solely to the assets of the Company for all Distributions with respect to the Company and such Member's share of Distributions, and shall have no recourse (upon dissolution or otherwise) against the other Members. Except as may be otherwise specified in Section 6 hereof, no Member shall have any obligation to other Members, creditors of the Company, or the Company to restore any negative balance in its Capital Account. Distributions upon dissolution and termination of the Company may be made in cash or in kind, or partly in cash and partly in kind, as determined by the General Manager.

## SECTION 13 MISCELLANEOUS

13.1 Arbitration. Any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association. The arbitration shall consist of one arbitrator appointed by the parties to the controversy from a list of arbitrators experienced with real estate. If the parties to such controversy cannot agree upon the one arbitrator, then the one arbitrator shall be appointed under the rules of American Arbitration Association from a list of arbitrators experienced with real estate. Any arbitration shall be held in Los Angeles County, California. The arbitration shall be conducted in accordance with the commercial arbitration rules then obtained from the American Arbitration Association, and the decision of the arbitrator shall be final, and judgment of the

award on such arbitration may be entered into any court having jurisdiction thereof. The arbitrators may not modify any of the terms of this Agreement, and the arbitration shall be limited to the determination of the issues and facts presented. The prevailing party or parties in any arbitration shall be reimbursed by the party or parties who do not prevail for their reasonable attorneys' fees and costs of arbitration.

13.2 Assurances. Each Member shall execute all certificates and other documents and shall do all such filings, recordings, publishings, and other acts to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

13.3 Attorneys' Fees. In the event it becomes necessary for any of the parties hereto to institute any action, suit, proceeding or arbitration to enforce the provisions of this Agreement, the non-prevailing party agrees to pay the prevailing party's costs and fees, including reasonable attorneys' fees, incurred in the enforcement of this Agreement.

13.4 Captions. Section and paragraph titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference. Such titles and captions in no way define, limit, extend or describe the scope of this Agreement nor the intent of any provision hereof.

13.5 Choice of Law. The parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of California and that the Act as now adopted shall govern the aspects of this Agreement.

13.6 Complete Agreement and Amendment. This Agreement constitutes the complete and exclusive statement of the agreement among the Members, and supersedes all prior written and oral statements, including any prior representations, statements, conditions or warranties. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of the General Manager and a Majority Vote of the Members; and in the event of such amendment, the Distributions to any Member may not be modified except if such amendment is consented to in writing by such Member.

13.7 Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together,

13.8 Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a “Notice”) required or permitted under this Agreement must be in writing and delivered by any of the following: (i) personal delivery; (ii) mailed by first-class mail, postage prepaid; (iii) overnight courier service by a recognized overnight air courier; or (iv) by facsimile transmission with a copy of such Notice simultaneously deposited in the United States mail. A Notice must be addressed or sent by facsimile to a Member at the Member's last known address or facsimile number, as the case may be, on the records of the Company. A Notice to the Company must be addressed to the Company's principal office or sent to its facsimile number, as the case may be. A Notice delivered will be deemed given upon actual delivery if personally delivered; three days after it is mailed if sent by first-class mail, postage prepaid; on the next business day if sent by overnight courier; and upon receipt at the recipient's facsimile machine (and not when the mailed copy is delivered) if sent by facsimile provided that confirmation of receipt of such facsimile is obtained and generated by the sender1s facsimile machine. Any party may designate, by notice to all of the others, substitute addresses or addresses for notices; or other facsimile numbers and thereafter, notices are to be directed to those substitute

addresses or facsimile numbers.

13.9 Number and Gender. Whenever required by the context hereof, the singular shall include the plural, and vice versa; and the masculine gender shall include the feminine and neuter genders.

13.10 Other Acts. Each party to this Agreement covenants on behalf of himself and his successors, heirs and assigns to execute, with acknowledgment, verification or affidavit, if required, any and all documents and writings and to perform any and all other acts, that may be necessary or expedient in connection with the creation of this Company, the achievement of its purposes, or the consummation of any matter covered by this Agreement.

13.11 Severability. In the event any sentence or paragraph of this Agreement is declared by a court of competent jurisdiction to be void, such sentence or paragraph shall be deemed severed from the remainder of the Agreement and the balance of the Agreement shall remain in effect.

13.12 Successors and Assigns. Subject to the provisions of this Agreement and all restrictions contained in this Agreement, the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the respective Members.

13.13 No Third-Party Beneficiaries. Except with regard to the Company's obligation to indemnify the General Manager, the Management Committee and the Committee Managers as specified in this Agreement, and except as specified in Section 14 hereof, the provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party and shall not give rise to a right on the part of any third party to: (i) enforce or demand enforcement of any Member's obligation to make Required Additional Capital Contributions, any obligation to return any Distributions to the Company, or for any Member to have any obligation to make any other payments to the Company as set forth in this Agreement; or (ii) demand that the Company or the General Manager issue any request for Required Additional Capital Contributions to be made by any Member.

13.14 Time is of the Essence. All times and dates of this Agreement shall be of the essence.

SECTION 14 ACKNOWLEDGMENT OF SEPARATE LEGAL COUNSEL

Each of the Members acknowledges and agrees that the Company's legal counsel, has participated in preparing this Agreement on behalf of and in the course of such attorney's representation of the Company, and covenants that:

(i) The Company's legal counsel has provided in the past and may provide in the future legal services for General Managerand his Affiliates;

(ii) The Company's legal counsel has not been engaged to protect or represent the interests of any Member vis-a-vis the Company or the preparation of this Agreement or any Member' s investment under this Agreement, and no other legal counsel has been engaged by the Company to act in such capacity;

(iii) Each Member has been advised to seek the advice of independent legal counsel;

(iv) Each Member has had the opportunity to seek the advice of separate and independent legal counsel and has represented and warranted to the Company and to The Company's legal counsel that such Member has had the opportunity to seek the advice of separate legal counsel;

(v) Each Member has carefully considered the foregoing and hereby approves of The Company's legal counsel representation of the Company;

(vi) Each Member further acknowledges that actual or potential conflicts of interest could exist among the Members or regarding such Member's relationship with the Company and that such Member's interest is not and will not be represented by any of the Company's legal counsel;

(vii) Each Member agrees that in the event of a dispute between such Member and the Company, that The Company's legal counsel may represent the Company; and

(viii) Each Member agrees that this Agreement and the transactions hereunder do not create any attorney-client relationship or any fiduciary relationship of any kind between the Company's legal counsel and such Member, or any other relationship where such Member would have a right to object to the Company's legal counsel representation of the Company or the General Manager under any circumstances.
The Company's legal counsel is a beneficiary of and shall be entitled to obtain enforcement of this Section 14, and this Section 14 shall be treated as a supplement to, and not a substitution or replacement for, any other waiver, consent or other agreement regarding such waiver of conflict of interest. In the event of a Member's breach of this Section 14, then such Member shall defend, indemnify and hold harmless the Company, the General Manager and the Company's legal counsel (including the payment of attorneys' fees and costs).

## SECTION 15 MEMBERS' AGREEMENTS AND ACKNOWLEDGMENTS

Each of the Members hereby covenants, represents, warrants and certifies to the Company, the Company's attorneys and other professional advisors, and the General Manager that:

15.1 Received Full Copy of Agreement. The Member has received a full copy of this Agreement and is fully informed as to the proposed investments of the Company including any Property that the Company is acquiring;

15.2 Acquired for Long-term Investment. The Interest which the Member is acquiring in the Company is acquired as a long-term investment for the Member's own account and not with a view toward resale or distribution;

15.3 No Receipt of Advertisement. The Member has not seen or received any advertisement or general solicitation with respect to such Member's investment in the Company or receipt of its Member Interest;

15.4 Pre-existing Relationship. The Member currently has a pre-existing personal or business relationship with the General Manager and/or the Company;

15.5 Received Financial and Other Information. The Member, before acquiring such Member's Interest and prior to singing this Agreement, was provided with all financial

information, property information and other information about the Company that the Member requested and that the Member was given an opportunity to obtain all information and ask questions concerning the Company, and that the Member received satisfactory information and answers;

15.6 Understood This Agreement and Financial Information. The Member has read and/or had explained to that Member by the Member's own separate attorney and accountants this Agreement and Company's financial and property information. The Member, in reaching the Member's decision to invest in the Company and in signing this Agreement, carefully evaluated the Member's financial resources and investments and the risks associated with the investment in the Company, and the Member acknowledges that the Member is able to bear the economic risks of investment in the Company;

15.7 Member Has Adequate Financial Condition. The Member recognizes that the Member's entire investment in the Company could be lost and acknowledges that the Member's financial condition is such that the Member is not under any present necessity or constraint to dispose of such Member's Interest;

15.8 No Registration Under Securities Laws. The Member understands that the Member's Interests are not being registered with the Federal Securities and Exchange Commission or any other federal or state governmental agency and it is unlikely that the Member Interests will become liquid in the future; and

15.9 No Reliance On Any Representation. Such Member has not relied upon any representations from the Company or the General Manager not contained in this Agreement.

IN WITNESS WHEREOF *I* the parties hereto have executed this Agreement pursuant to the signature pages attached hereto and incorporated herein by reference which signature pages shall also set forth the Initial Capital Contribution and percentage of ownership of each of the Members.

(SIGNATURE PAGES TO FOLLOW)

SIGNATURE PAGE TO
OPERATING AGREEMENT
OF
PRO TEMECULA TOWN CENTER LLC,
a Delaware limited liability company

IN WITNESS WHEREOF, the undersigned Managing Member has executed this Agreement as of the Effective Date.

**MANAGING MEMBER:**

Temecula Town Center Manager LLC

Vincent Paglia
Vincent Paglia (Jan 27, 2025 13:54 PST)

By: Name: Vincent Paglia
Title: Manager

SIGNATURE PAGE TO
OPERATING AGREEMENT
OF
PRO TEMECULA TOWN CENTER LLC,
a Delaware limited liability company

IN WITNESS WHEREOF, the undersigned Member has executed this Agreement as of the Effective Date.

| **Name of Member** | **Percentage of ownership** |
|---|---|
| **Member:** | **100%** |

Henkin Investor Group LLC,
a Delaware limited liability company

By: Weyl Manager, LLC
a Delaware limited liability company
Its: Managing Member

By: Jason Miller (Jan 28, 2025 18:00 PST)
Name: Jason Miller
Its: Manager

# EXHIBIT 2

# OPERATING AGREEMENT
# OF
# YNEZ SHOPS LLC
a Delaware limited liability company

THE INTEREST REPRESENTED BY THIS DOCUMENT HAS NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH INTEREST IS RESTRICTED. SUCH INTEREST MAY NOT BE SOLD, ASSIGNED OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTEREST BY THE ISSUER FOR ANY PURPOSES, UNLESS (1) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH INTEREST SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO THE COMPANY. THE INTEREST REPRESENTED BY THIS DOCUMENT IS SUBJECT TO FURTHER RESTRICTION AS TO ITS SALE, TRANSFER, HYPOTHECATION OR ASSIGNMENT AS SET FORTH IN THE OPERATING AGREEMENT AND AGREED TO BY EACH MEMBER. SAID RESTRICTION PROVIDES, AMONG OTHER THINGS, THAT NO INTEREST MAY BE TRANSFERRED WITHOUT FIRST OFFERING SUCH INTEREST TO THE OTHER MEMBERS, AND THAT NO VENDEE, TRANSFEREE OR ASSIGNEE OF A MEMBER SHALL HAVE THE RIGHT TO BECOME A SUBSTITUTED MEMBER WITHOUT THE CONSENT OF THE GENERAL MANAGER, WHICH CONSENT MAY BE GIVEN OR WITHHELD IN THE SOLE AND ABSOLUTE DISCRETION OF THE GENERAL MANAGER.

TABLE OF CONTENTS

SECTION 1 FORMATION, NAME AND PRINCIPAL EXECUTIVE OFFICE 6

SECTION 2 DEFINITIONS 6

SECTION 3 PURPOSE AND TERM 14
3.1 Purpose 14
3.2 Term 14
3.3 INTENTIONALLY DELETED 14

SECTION 4 ADDITIONAL CAPITAL CONTRIBUTIONS AND NEW MEMBERS 14
4.1 Capital Contributions 14
4.2 Additional Members 14
4.3 Required Additional Capital Contributions 15
4.3.1 Notice 15
4.3.2 Manner of Contribution 15
4.4 Remedies if a Member is Delinquent in Making a Required Additional Capital Contribution 15
4.4.1 Remedy of Purchase of a Delinquent Member's Interest 15
4.4.2 Remedy of Election to Have Such Delinquent Contribution Treated as Recourse Debt 17
4.5 No Interest on Capital Contributions 17
4.6 Return of Capital Contributions 17
4.7 Capital Accounts 18
4.8 Loans and Other Business Transactions 18
4.9 Limited Liability of Members 18

SECTION 5 PROFIT AND LOSS ALLOCATIONS 18
5.1 Profits 18
5.2 Losses 19
5.3 Allocations in General 19
5.3.1 Adjusted Capital Account Deficit 19
5.3.2 Other Items 19
5.3.3 Allocation Between Periods 19
5.3.4 Intention 19
5.4 Special Allocations 19
5.4.1 Minimum Gain Chargeback 19
5.4.2 Member Minimum Gain Chargeback 19
5.4.3 Qualified Income Offset 20
5.4.4 Gross Income Allocation 20
5.4.5 Code Section 754 Adjustment 20
5.4.6 Member Nonrecourse Deductions 20
5.5 Curative Allocations 20
5.6 Allocations Relating to Taxable Issuance of a Member Interest 21
5.7 Tax Allocations: Code Section 704 (c) 21

| | |
|---|---|
| SECTION 6 DISTRIBUTIONS | 21 |
| 6.1 Distributions | 21 |
| 6.1.1 Distributions of Net Cash Flow From Operations | 21 |
| 6.1.2 Distributions From Net Cash Flow From Refinancings | 22 |
| 6.1.3 Distributions From Net Cash Flow From Sales | 22 |
| 6.1.4 Distributions to General Manager | 22 |
| 6 .2 True Up on Sale of Property | 22 |
| 6.3 Distributions | 23 |
| 6.4 Rights of the Company to Offset | 23 |
| SECTION 7 TRANSFERS | 23 |
| 7.1 Restrictions on Transfers | 23 |
| 7.2 Permitted Transfers | 23 |
| 7.3 Conditions to Permitted Transfers | 23 |
| 7.3.1 Consent of General Manager | 23 |
| 7.3.2 Documents to Effect Transfer | 23 |
| 7.3.3 Tax Information | 23 |
| 7.3.4 Securities Laws Compliance | 23 |
| 7.3.5 No Termination of Company | 24 |
| 7.4 Right of First Refusal | 24 |
| 7.4.1 Limitation on Transfers | 24 |
| 7.4.2 Offer Notice | 24 |
| 7.4.3 Offer Period | 24 |
| 7.4.4 Acceptance of First Offer | 24 |
| 7.4.5 Closing of Purchase Pursuant to Firm Offer | 25 |
| 7.4.6 Sale Pursuant to Purchase Offer if Firm Offer Rejected | 25 |
| 7.4.7 No Duty of General Manager | 25 |
| 7.5 Prohibited Transfers | 25 |
| 7.6 Rights of Unadmitted Assignees | 25 |
| 7.7 Representations Regarding Transfers; Legend | 26 |
| 7.7.1 No Violation of Securities Laws | 26 |
| 7.7.2 Legend | 26 |
| 7.8 Distributions and Allocations in Respect of a Transferred Interest | 26 |
| SECTION 8 SUBSTITUTED MEMBERS | 26 |
| 8.1 Becoming a Substituted Member | 26 |
| 8.1.1 Acceptable Form of Assignment | 27 |
| 8.1.2 Other Instruments | 27 |
| 8.1.3 Consent of General Manager | 27 |
| 8.1.4 Reimbursement of Fees | 27 |
| 8.2 Rights of Assignee | 27 |
| SECTION 9 BOOKS, RECORDS, ACCOUNTING AND REPORTS | 27 |
| 9.1 Maintenance of Books and Records | 27 |
| 9.1.1 List of Members | 27 |
| 9.1.2 Articles of Organization | 27 |
| 9.1.3 Tax Returns | 27 |
| 9.1.4 Operating Agreement | 27 |
| 9.1.5 Financial Statements | 28 |
| 9.1.6 Books and Records | 28 |
| 9.2 Tax Year and Accounting Method | 28 |

SECTION 10 RIGHTS, AUTHORITY, POWER, RESPONSIBILITIES AND DUTIES OF THE GENERAL MANAGER 28
10.1 General Manager 28
10.2 General Powers 28
10.2.1 Partnership and Limited Liability Company 28
10.2.2 Collateral 28
10.2.3 Execution of Documents 28
10.2.4 Borrowing Monies 28
10.2.5 Insurance 28
10.2.6 Employment of Persons 28
10.2.7 Appointment of Officers 29
10.2.8 Removal of Officers 29
10.2.9 Accounts at Banks and Brokerage Houses 29
10.2.11 Accounting Year 29
10.2.12 Filing of Documents 29
10.2.13 Other Actions 29
10.2.14 Powers of Attorney 29
10.3 Limitation on Authority of Members 29
10.4 Removal and/or Replacement of the General Manager 29
10.5 Action Without Meeting 29
10.6 Actions on Which Members May Vote 30
10.6.1 Continue Business 30
10.6.2 Amendments 30
10.7 Other Businesses and Transactions 30
10.8 No Requirement for Personal Services 30
10.9 Costs and Reimbursement 30
10.10 [INTENTIONALLY DELETED] 31
10.11 Power of Attorney 31
10.11.1 Grant of Power 31
10.11.2 Irrevocability 31
10.12 [INTENTIONALLY DELETED] 31
10.13 Indemnification of General Manager 31
10.14 Other Matters Concerning the General Manager 32
10.14.1 Reliance on Documents 32
10.14.2 Use of Affiliates and Consultants 32
10.14.3 Transactions With Affiliates 32
10.15 Tax Matters Partner 32
10.16 Tax Withholding 32
10.16.1 Withholding 32
10.16.2 Payments By the Company 33
10.16.3 Cooperation on Withholding 33

SECTION 11 LIMITATION ON MEMBERS RIGHTS 33

SECTION 12 TERMINATION AND DISSOLUTION OF THE COMPANY 33
12.1 Termination and Dissolution 33
12.1.1 Termination Date 33
12.1.2 Written Election 34
12.1.3 Judicial Decree 34
12.2 Liquidation and Distribution 34

12.2.1 Creditors 34
12.2.2 Payment of Obligations 34
12.2.3 Repayment of Member Loans 34
12.2.4 To Members 34

SECTION 13 MISCELLANEOUS 34
13.1 Arbitration 34
13.2 Assurances 35
13.3 Attorneys' Fees 35
13.4 Captions 35
13.5 Choice of Law 35
13.6 Complete Agreement and Amendment 35
13.7 Counterparts 35
13.8 Notifications 35
13.9 Number and Gender 35
13.10 Other Acts 36
13.11 Severability 36
13.12 Successors and Assigns 36
13.13 No Third-Party Beneficiaries 36
13.14 Time is of the Essence 36

SECTION 14 ACKNOWLEDGMENT OF SEPARATE LEGAL COUNSEL 36

SECTION 15 MEMBERS' AGREEMENTS AND ACKNOWLEDGMENTS 37
15.1 Received Full Copy of Agreement 37
15.2 Acquired for Long-term Investment 37
15.3 No Receipt of Advertisement 37
15.4 Pre-existing Relationship 37
15.5 Received Financial and Other Information 37
15.6 Understood This Agreement and Financial Information 38
15.7 Member Has Adequate Financial Condition 38
15.8 No Registration Under Securities Laws 38
15.9 No Reliance On Any Representation 38

**OPERATING AGREEMENT**
**of**
**YNEZ SHOPS LLC**
**a Delaware limited liability company**

This Operating Agreement (the "Agreement") of Ynez Shops LLC, a Delaware limited liability company (the "Company"), is made and entered into effective the date of the first filing of the company's Articles of Organization with the office of the Secretary of State of the State of Delaware, by and among its Members and the General Manager (defined in Section 10 as initially Temecula Town Center Manager LLC. The Company is formed pursuant to the Limited Liability Company Act of the State of Delaware (the "Act "). The parties hereto enter into this Operating Agreement as of the effective date hereof and agree as follows:

SECTION 1 FORMATION, NAME AND PRINCIPAL EXECUTIVE OFFICE

1.1 Formation of Company. The parties hereto enter into this Agreement upon the terms and conditions set forth herein for the purposes set forth in Section 3 hereof. To the extent the rights or obligations of the Members are different by reasons of any provision of this Agreement than they would be in the absence of such provisions, this Agreement shall, to the extent permitted by the Act, control. The rights and liabilities of the Members are as specified in the Act, the Articles of Organization, and this Agreement.

1.2 Name and Address of Company. The name of the Company is YNEZ SHOPS LLC, a Delaware limited liability company, and its principal executive office is located at 2790 E. Regal Park Dr, Anaheim, CA 92806, or such other place or places in the State of California as the General Manager may hereafter determine.

SECTION 2 DEFINITIONS

The following terms used in this Agreement shall (unless expressly provided herein or unless the context otherwise requires) have the following respective meanings:

2.1 "Accepting Offeree(s)" is defined in Paragraph 7.4.4.

2.2 "Act" shall mean the Limited Liability Company Act adopted by the State of Delaware.

2.3 "Additional Members" shall mean the Persons admitted to the Company as Additional Members pursuant to the provisions of Section 4 of this Agreement.

2.4 "Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2 (g) (1) and 1.704-2(i) (5) of the Regulations; and

(ii) Debit to such Capital Account the items described in Sections 1.704-1 (b) (2) (ii) (d) (4), 1.704-1 (b) (2) (ii) (d) (5) and 1.704-1 (b) (2) (ii) (d) (6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b) (2) (ii) (d) of the Regulations and shall be interpreted consistently therewith.

2.5 "Affiliate" shall mean with respect to a Person: (i) any Person directly or indirectly controlling, controlled by or under common control with such Person; (ii) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities or beneficial interest of such Person; (iii) any officer, director, partner or trustee of anyone acting in substantially similar capacity with respect to such Person; (iv) any Person who is an officer, director, partner or trustee, or holder of ten percent (10%) or more of the voting securities or beneficial interests of any of the foregoing; and (v) an entity of which any of the foregoing is an officer, director, partner, or trustee, or with respect to which such Person serves in a substantially similar capacity. For purposes of clarity, and without limiting the generality of the foregoing, partnerships which share a common general partner or which have general partners which are Affiliates of one another under the above definitions, are Affiliates.

2.6 " Agreement" shall mean this Operating Agreement, as amended from time to time pursuant to the provisions of this Agreement.

2.7 "Allocation (s)" shall mean the allocation (s) of the Company's Profits, Losses and other items of income, loss, gain or credit made for federal income tax purposes and shown on the Company's federal income tax return.

2.8 "Articles of Organization" shall mean the instruments, and any amendments thereto, required by the Act that must be executed and filed in the office of the Secretary of State of the State of Delaware by the Company, and in the appropriate public offices of other states in which the Company may do business, in order to create and preserve the limited liability of the Members provided for in this Agreement and available pursuant to the Act and the applicable laws of other states.

2.9 "Assignee" shall mean a Person who has acquired an Interest in compliance with Section 7, but who is not a Substituted Member.

2.10 "Assignee of Record" shall mean an Assignee who has been assigned the Interest in one or more Interests, or fraction thereof, by a Member pursuant to Section 7 of this Agreement who has not been admitted as a Substituted Member, and whose ownership of the Interest in the assigned Interests (i) has been recorded on the books of the Company and (ii) is the subject of a written instrument of assignment, the effective date of which assignment has passed.

2.11 "Attorney-In-Fact [li] is defined in Paragraph 10.11.

2.12 "Bankruptcy" shall mean, with respect to a Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy. " A "Voluntary Bankruptcy" means, with respect to any Person, the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; the filing of any petition or answer by such Person seeking to adjudicate it a bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a

receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property; or corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver, or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within ninety (90) days

2.13 "Capital Account" shall mean, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions;

(a) to each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's share of Profits allocated pursuant to Paragraph 5.1 any items in the nature of income or gain which are specially allocated pursuant to Paragraph 5.3 or Paragraph 5.4 of this Agreement, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b) to each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses allocated pursuant to Paragraph 5.2, any items in the nature of expenses or losses which are specially allocated pursuant to Paragraph 5.3 or Paragraph 5.4 of this Agreement, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company;

(c) in the event all or a portion of a Member's Interests in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interests; and

(d) in determining the amount of any liability for purposes of this definition of Capital Account, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the General Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or a General Manager), are computed in order to comply with such Regulations, the General Manager make such modification, provided that it will not have any effect on the amount of Distributions to any Person pursuant to this Agreement upon the dissolution of the Company. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Company by the maker of the note (or a person related to the maker of the note within the meaning of Regulation Section 1.704-1(b) (2) (ii) (c)) shall not be included in the Capital Account of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulation Section 1.704-1 (b) (2) (iv) (d) (2) .

The General Manager shall also (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company I s balance sheet, as computed for book purposes, in accordance with Regulation Section 1.7041 (b) (2) (iv) (q), and (ii) make appropriate modifications in the event unanticipated events that might otherwise cause this Agreement not to comply with Regulation Section 1.704-1(b)

2.14 "Capital Contribution (s)" means, with respect to any Member, the amount of money and the Gross Asset Value of any property (other than money) contributed to the Company with respect to the interest in the Company held by such Member. The Initial Capital Contribution of each Member is listed on Schedule A attached hereto.

2.15 "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

2.16 [INTENTIONALLY DELETED].

2.17 "Company" shall mean YNEZ SHOPS LLC, a Delaware limited liability company, formed pursuant to this Agreement.

2.18 "Company Minimum Gain" has the meaning set forth in Regulation Sections 1.704-2(b) (2) and 1.704-2(d). For purposes of Regulation Section 1.704, Company shall mean partnership where the context of such Regulation requires.

2.19 "Consultants" is defined in Paragraph 10.14.2.

2.20 "Contribution Date" is defined in Paragraph 4.4.

2.21 "Contribution Notice" is defined in Paragraph 4.3.

2.22 "Delinquent Contribution" is defined in Paragraph 4.4.

2.23 "Delinquent Interest Rate" is defined in Paragraph 4.4.2.

2.24 "Delinquent Member" is defined in Paragraph 4.4.

2.25 "Depreciation" shall mean, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Manager.

2.26 "Distributions" or "Distribution" shall mean any cash or other property distributed to Members arising from their Interests in the Company.

2.27 "Event of Dissolution" is defined in Section 12.

2.28 "Firm Offer" is defined in Paragraph 7.4.2.

2.29 "Fiscal Year" means the taxable year of the Company.

2.30 "General Manager" initially means the Person designated

2.31 "Gross Asset Value" means, with respect to any asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a) the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the General Manager;

(b) the Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values as determined by the General Manager as of the following times: (i) the acquisition of an additional Interest in the Company after the date of the initial Capital Contribution by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the Distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an Interest in the Company; and (iii) the liquidation of the Company within the meaning of Regulation Section 1.704-1 (b) (2) (ii) (g) ; provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the General Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative Interests of the Members in the Company;

(c) the Gross Asset Value of any Company assets distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of Distribution as determined by the General Manager; and

(d) the Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b) (2) (iv) (m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) to the extent the General Manager determines that an adjustment pursuant to subparagraph (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (a), (b) or (d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

2.32 "Initial Capital Contribution" shall mean the initial Capital Contribution amount by a Member to the Company for the Original Project. The Initial Capital Contribution for each Member is set forth on Schedule A.

2.33 "Interest" or "Interests" shall mean the Percentage Interest, or fraction thereof, including any Capital Contributions to the Company, evidencing a Member's total rights in the Company, including but not limited to a Member's Percentage Interest in Distributions unless

otherwise assigned pursuant to the provisions of this Agreement, any Member's right to vote contained in this Agreement, any Member’s right to information contained in this Agreement, and with respect to each Member, all powers granted pursuant to the Act or this Agreement.

2.34 "Majority Vote" shall mean the vote of more than fifty percent (50%) of the then total outstanding Percentage Interests owned by all of the Members (including the General Manager). A Majority Vote may be taken at a meeting of the Members or a Majority Vote shall be deemed given if more than fifty percent (50%) of the then total outstanding Percentage Interests consent in writing to the act requiring such Majority Vote (whether or not all of the Members have notice of such act, consent or vote or whether or not a meeting takes place) .

2.35 "Management Committee" is defined in Paragraph 10.12.

2.36 "Member" or "Members" shall mean the original Members, Additional Members or Substituted Members, and shall also include the General Manager. Reference to a "Member" shall be to anyone of the Members. Members shall mean all of the Members listed on the signature page hereto, plus the General Manager (unless otherwise stated).

2.38 "Member Nonrecourse Debt Minimum Gain" shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulation Section 1.704-2(i) (3). For purposes of applying Regulation Section 1.704, Member shall mean partner where the context of such Regulation requires.

2.39 “Member Nonrecourse Deductions” has the same meaning as the term “partner nonrecourse deductions “ set forth in Sections 1.704-2(i) (1) and 1.704-2(i) (2) of the Regulations.

2.40 “Net Cash Flow From Operations” shall mean total cash receipts of the Company from the operations of the Company including any distributions to the Company from partnerships or joint ventures, excluding receipts from the sale, financing or other disposition of the Company's property and any loans to the Company, less:

(a) all operating expenses of the Company, other than any expense not involving a cash expenditure (such as any amount charged for Depreciation or amortization) *i*

(b) all principal and interest payments made out of gross revenues on account of any loans made to the Company or secured by Company assets;

(c) any sums expended out of gross revenues by the Company for capital expenditures; and

(d) cash reserves for working capital, debt repayment or other purposes, the amounts of which shall be determined by the General Manager.

2.41 “Net Cash Flow From Refinancings” shall mean total cash receipts of the Company from the refinancing, financing or otherwise obtaining loans on the Company’s Property, less any sums expended in connection with obtaining such loans, use of proceeds for repayment of expenses, and less any cash reserves for working capital, debt payment or other purposes, the amounts of which shall be determined by the General Manager.

2.42 “Net Cash Flow From Sales” shall mean total cash receipts of the Company from the

sale of the Company's Property, less repayment of loans, expenses of such sale, and any cash reserves for working capital, debt repayment or other purposes, the amounts of which shall be determined by the General Manager.

2.43 [INTENTIONALLY DELETED] .

2.44 “Nonrecourse Deductions” has the meaning set forth in Regulations Section 1.704-2 (b) (1).

2.45 “Nonrecourse Liability” has the meaning set forth in Section 1.704-2 (b) (3) of the Regulations.

2.46 "Notice" is defined in Paragraph 13.8.

2.47 "Offer Notice" is defined in Paragraph 7.4.2.

2.48 "Offer Period" is defined in Paragraph 7.4.3.

2.49 "Offer Price" is defined in Paragraph 7.4.1.

2.50 "Offered Interest" is defined in Paragraph 7.4.

2.51 "Offerees" is defined in Paragraph 7.4.2.

2.52 "Option" is defined in Paragraph 4.4.1.

2.53 "Option Exercise Notice" is defined in Paragraph 4.4.1.

2.54 "Option Price" is defined in Paragraph 4.4.1.

2.55 [INTENTIONALLY DELETED].

2.56 "Percentage Interest and Percentage Interests" shall mean, as to a Member (including the General Manager), the percentage set forth after such Member I s name on Schedule A, attached hereto and incorporated herein, as amended from time to time; and as to any Assignee of Record, the Percentage Interest or part of the Percentage Interest that corresponds to the portion of a Member's Interest that the Assignee of Record has acquired, to the extent that the Assignee of Record has succeeded to a Member's Interest.

2.57 "Person" means any individual, partnership, joint venture, limited liability company, estate, trust, or other entity.

2.58 "Profits" or "Losses" shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a) (1) shall be included in taxable income or loss), with the following adjustments:

(a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this paragraph shall be added to such taxable income or loss;

(b) any expenditures of the Company described in Code Section 705 (a) (2) (B) or treated as Code Section 705 (a) (2) (B) expenditures pursuant to Regulation Section 1.704-1(b) (2) (iv) (i), and not otherwise taken into account in computing Profits or Losses pursuant to this paragraph shall be subtracted from such taxable income or loss;

(c) in the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the Asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(d) gain or loss from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e) in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of Depreciation above;

(f) to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulation Section 1.7041(b) (2) (iv) (m) (4) to be taken into account in determining Capital Accounts as a result of a Distribution other than in liquidation of a Mernber1s Interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(g) notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Paragraph 5.3 or Paragraph 5.4 of this Agreement shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Paragraphs 5.3 and 5.4 of this Agreement shall be determined by applying rules analogous to those set forth in this paragraph.

2.59 “Property” means all real and personal property acquired or owned by the Company, including cash, improvements, and tangible and intangible property.

2.60 “Purchase Offer” is defined in Paragraph 7.4.1.

2.61 “Purchaser” is defined in Paragraph 7.4.1.

2.61 “Purpose” the primary purpose of the Company shall be acquisition and management of certain assets including but not limited to financial instruments, notes, deeds of trust, real property and personal property (the “Collateral”).

2.62 “Regulation” or “Regulations” shall mean the Income Tax Regulations, including

Temporary Regulations, promulgated under the Code, as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations) .

2.63 “Required Additional Capital Contribution(s)” is defined in Paragraph 4.3.

2.64 [INTENTIONALLY DELETED].

2.65 “Seller” is defined in Paragraph 7.4.

2.66 [INTENTIONALLY DELETED].

2.67 “Substituted Member” shall mean any Person who becomes a substituted Member pursuant to the provisions of Section 8.

2.68 “Transfer” or “Transferred” shall mean when used as a noun, any sale, hypothecation, conveyance, pledge, assignment, attachment, or other transfer, and when used as a verb, to sell, hypothecate, pledge, assign or otherwise transfer.

2.69 “UCC” is defined in Paragraph 4.4.2.

2.70 “Unrepaid Invested Capital” shall mean with respect to any Member the amount of Capital Contributions (including any Required Additional Capital Contributions made to the Company).

SECTION 3 PURPOSE AND TERM

3.1 Purpose. The primary purpose of the Company is that more particularly described in paragraph 2.61 set forth above.

3.2 Term. The term of the Company commenced on the date the Articles of Organization were filed with the Office of the Secretary of State of the State of Delaware, and shall continue indefinitely, unless previously terminated in accordance with the provisions of this Agreement or as otherwise provided by law.

3.3 [INTENTIONALLY DELETED].

SECTION 4 ADDITIONAL CAPITAL CONTRIBUTIONS AND NEW MEMBERS

4.1 Capital Contributions. The Initial Capital Contribution of each of the Members is set forth on Schedule A attached hereto. No Initial Capital Contribution of the General Manager in its capacity as a general manager has been required.

4.2 Additional Members. Additional members ("Additional Members") may not be admitted to the Company except by the written consent of the General Manager (which consent the General Manager may give or withhold in the General Manager's sole and absolute discretion) and the execution of such documents and instruments as the General Manager may deem necessary or desirable to effect such admission. The General Manager shall have the power to allow Additional Members (and existing Members) to make Capital Contributions to the Company for Secondary Project(s).

4.3 Required Additional Capital Contributions. Each Member is obligated, upon written or electronic notice via email ("Contribution Notice") from the General Manger, to make additional Capital Contributions ("Required Additional Capital Contributions") to the Company for each Project as follows: For each Project, each Member can be required to make Required Additional Capital Contributions of up to three hundred percent (300%) multiplied times the amount of such Member's Initial Capital Contribution for the Original Project.

The General Manager may by a Contribution Notice require the Members as to a particular Project to contribute the Required Additional Capital Contributions to the Company in the form of monies up to such Members' Required Additional Capital Contributions' amount specified in this paragraph.

The provisions of this Paragraph 4.3 (and those of Paragraph 4.4) may not be invoked or enforced by any third party, including but not limited to any creditor of the Company or any trustee in bankruptcy, and no third party or creditor of the Company (including no trustee in Bankruptcy) may bring any action to enforce the provisions of this Paragraph 4.5 or Paragraph 4.4.

Notwithstanding any other provision of this Section 4.3, for purposes of the General Manager being able to require a Member to make Required Additional Contributions, references to the General Manager shall solely mean that Person then serving as the General Manager who is Temecula Town Center Manager LLC (but no other Person who is serving as General Manager).

4.3.1 Notice. A Contribution Notice from the General Manager to the Members shall specify the Required Additional Capital Contribution amount by each Member for such Project. All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the second day after mailing if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid, and properly addressed or may be given by facsimile or email transmission which shall be effective as of the date of such transmission.

4.3.2 Manner of Contribution. For each Required Additional Contribution amount which a Member is required to contribute to the Company for a Project the following provisions shall apply: (i) No Member shall be required to contribute amounts for a Project in excess of the amount described in the preamble of this Paragraph 4.3; and (ii) any Required Additional Contribution for a specific Project shall be required of all of the Members who Contributions to the Company for that Project (without considering any Required Additional Capital Contributions made by a Member for that Project).

4.4 Remedies if a Member is Delinquent in Making a Required Additional Capital Contribution. If a Member within three (3) days of the General Manager's Contribution Notice to such Member (“Contribution Date") fails to deliver to the Company such Member's Required Additional Capital Contribution then such delinquent Member ("Delinquent Member") shall continue to be obligated to make such delinquent Required Additional Capital Contribution ("Delinquent Contribution") to the Company and the General Manager, on behalf of the Company may elect in the General Manager's sole discretion to enforce any or all of the remedies in Paragraphs 4.4.1 through 4.4.2 hereof as to such Member's Delinquent Contribution:

4.4.1 Remedy of Purchase of a Delinquent Member's Interest.

a. Grant of Option. Each Member hereby grants to the General Manager under the following terms the irrevocable option ("Option") to purchase such Member's Interest in the Company at any time during which such Member is a Delinquent Member for a price (the "Option Price") equal to the greater of Ten Dollars ($10.00) or an amount equal to the balance of such Delinquent Member's Unrepaid Invested Capital determined on the day of the General Manager's Option Exercise Notice (as hereinafter defined). With respect to any Member who is a Delinquent Member, the Option may be exercised by the General Manager by the General Manager giving notice of such exercise (“Option Exercise Notice") to such Delinquent Member.

b. Effective Exercise of Option. Upon the General Manager giving to a Delinquent Member an Option Exercise Notice t and without the requirement of any further action or execution the Delinquent Member whose Interest is being purchased pursuant to an Option shall cease to be a Member in the Company and thereafter such Delinquent Member I s rights as against the Company shall be strictly limited to the rights provided hereby. Each Delinquent Member will take such other actions and exercise such instruments of transfer and any other agreements documents or assignments as counsel for the Company may determine is appropriate to further evidence and confirm such Delinquent Member's Interest being terminated and purchased on the date of the exercise of such Option.

c. Determination of Purchase Price on Option. As soon as practical after the giving of an Option Exercise Notice by the General Manager, the Option Price shall be determined by the Company's regular accounting firm, which determination shall be made without the requirements that the books of the Company be first reviewed, audited or certified. The Option Price shall equal such Delinquent Member's Unrepaid Invested Capital.

d. General Manager May Assign and Allocate Option Rights to Purchase a Delinquent Member’s Interest. The General Manager may, under this Paragraph 4.4.1, assign and allocate to the Company, among any or all of the non-Delinquent Members (which shall not be required to be in proportion to any of their Percentage Interests or by any other proportionality formula), including all in part to the General Manager itself or to any other Person, the Option right (or portion thereof) to purchase such Delinquent Member's Interest under this Paragraph 4.4.1. Such Delinquent Member's Interest may after its purchase then be sold by the Company, or any Member including the General Manager (if they are the purchaser), to any Member or any other Person.

e. Payment of the Option Price to the Delinquent Member. The Option Price shall be paid by the Company (or other applicable Person who has been assigned and exercises such Option) to the Delinquent Member within ninety (90) days following the date of the Option Exercise Notice by the General Manager to the Delinquent Member in the form of cash or other immediately available funds. Relief From Other Indebtedness. If the General Manager (or its assignee(s) of the Option) exercises the Option hereunder by delivering the Exercise Notice to the Delinquent Member, such Delinquent Member whose Membership Interest is redeemed by the Company or is purchased by any other Person pursuant to the Option under this Paragraph 4.4.1 shall, after such purchase of the Interest is completed and closed, be relieved of any obligation to contribute or pay any further Required Additional Capital Contributions under Paragraph 4.3. Person Exercising Option Required Additional Capital Contribution. Any Person or the Company purchasing the Interest of a Delinquent Member by the Option hereunder shall be required to make the Required Additional Capital

h. Allocation of Option Rights. It is specifically understood that the General Manager may allow more than one Person to purchase a Delinquent Member's Interest under the

Option hereof. The General Manager shall not be required to offer the opportunity to purchase the Delinquent Member's Interest under the Option to any or all of the existing Members (whether such Member is a non-Delinquent Member or a Delinquent Member), and the General Manager may elect for the General Manager itself to purchase the Delinquent Member's Interest in whole or in part under the Option (or may elect for one or more other Member's or outside Persons to do so) without any liability or accountability to any other Member.

4.4.2 Remedy of Election to Have Such Delinquent Contribution Treated as Recourse Debt. The General Manager may, by written notice to the Delinquent Member, elect to have such Delinquent Member's Delinquent Contribution classified as recourse debt owed by the Delinquent Member to the Company as follows: Each Member acknowledges and agrees that any of such Member's Delinquent Contribution resulting from such Member's failure to timely make a Required Additional Capital Contribution shall constitute such Member's full recourse personal liability debt owed by such Delinquent Member to the Company. Such debt may be collected by the Company by any legal means, unless and until the Company or the other Members shall have purchased (if at all) such Delinquent Member's Interest pursuant to Paragraph 4.4.1, above. Each Member hereby waives any right that such Member may have to require the Company to have an accounting as a condition precedent to any legal action to collect such debt. Such Member's Delinquent Contribution shall bear interest at the "Delinquent Interest Rate".

a. Delinquent Interest Rate. The "Delinquent Interest Rate" shall mean interest, compounded on the first day of each calendar quarter, occurring after the applicable delinquency date which is equal to the lesser of: (i) the prime rate of interest announced by Bank of America, N.T. & S.A. in Los Angeles, California as its prime rate plus four percent (4%), or (ii) the highest legal interest rate permitted under the laws of the State of California.

b. Pledge Agreement. Each Member hereby grants to the Company a first priority security interest in and to such Member's entire Interest in the Company, including, without limitation, any right to Distributions, in liquidation or otherwise, with respect to such Member's Interest, for the purposes of securing the Member's obligation to the Company to make any Required Additional Capital Contribution pursuant to Paragraph 4.3 becomes liable to the Company. Each Member on the date hereof represents and warrants to the Company that such Member has good and marketable title to such Member's Interest in the Company, and such Interest is free and clear of all liens, claims and encumbrances whatsoever, except for the security interest granted hereby. The Company shall have all of the rights and remedies of a secured party under the California Uniform Commercial Code ("UCC") as to the Company's security interest in such Member1s Interest. Each Member further agrees to execute and deliver to the Company such UCC financing statements and other documents and instruments (including, without limitation, a separate security agreement with respect to the security interest granted hereby), and to take such further actions as may be necessary or appropriate in the opinion of counsel to the Company to perfect and maintain the Company's first priority security interest in the Member's Interest granted hereby. The Company and any other non-delinquent Member shall be entitled to bid for and to purchase any and all of the Interests being sold in any sale conducted pursuant to, or as permitted under, this security agreement and the UCC.

4.5 No Interest on Capital Contributions. No Member shall be paid interest with respect to any Capital Contributions by such Member.

4.6 Return of Capital Contributions. Except as otherwise provided for in this Agreement, no Member shall have the right to receive the return of any Capital Contributions or withdraw from the Company any Capital Contributions. In the event that no Collateral is acquired within one year

of the filing of the articles of organization for the Company, the initial Capital Contribution of the Members, other than the General Manager shall be returned to each of the non-managing Members less $100.00 for each of said Members, to pay management costs and fees of the General Manager and the entire initial Capital Contribution of the General Manager will be returned to the General Manager without deductions.

4.7 Capital Accounts. A separate Capital Account shall be maintained for each Member.

4.8 Loans and Other Business Transactions. Any Member (including the General Manager) may at any time, by the approval of the General Manager in the General Manager's sole discretion, make a loan to the Company in such amounts on such terms as the General Manager determines *I* which loan proceeds may be used for the Company's operations, improvements and/or acquisition of any Secondary Project or the Original Project. Such loans shall be on such terms as the General Manager determines and shall be at an interest rate equal to the prime rate at Bank of American, N.T. & S.A. in Los Angeles, California plus two percent (2%) per annum (but not greater than the maximum rate permitted by law), with interest to begin to accrue thirty (30) days after such loan has been made and not repaid within such time period and to continue thereafter. Interest on such loan made under the immediately preceding sentence shall be paid monthly, and the principal shall be repaid at such time as the General Manager determines, in the General Manager's reasonable discretion. Any loan made by a Member to the Company under this Paragraph 4.8 shall be repaid to such Member prior to any Distributions being made to Members under the terms of this Agreement. Members may also transact business with the Company as the General Manager shall approve, and in doing so they shall have the same rights and shall be subject to the same obligations arising out of any such business transaction as would be enjoyed by and imposed upon any Person, not a Member, engaged in a similar business transaction with the Company. The provisions of this Paragraph 4.8 are in addition to the rights of the Company under Paragraphs 4.3 and 4.4 hereof, and the General Manager, in its sole and absolute discretion, may have the Members and other Persons make loans to the Company without invoking any of the provisions of Paragraph 4.4.

4.9 Limited Liability of Members. Members shall not be bound by, or be personally liable for, any judgment of a court, or in any other manner for the debts, expenses, liabilities, contracts, leases or obligations of the Company, except if same is guaranteed in writing by a specific written signed guaranty of such Member. No third party, including but not limited to any creditor of the Company, or any trustee in Bankruptcy may bring an action under this Agreement or otherwise to require any Member to make additional contributions of capital of any kind to the Company, nor may such Persons enforce any of the provisions of this Section 4.

## SECTION 5 PROFIT AND LOSS ALLOCATIONS

5.1 Profits. Profits for any Fiscal Year of the Company shall be allocated in the following order and priority:

5.1.1 First, to the Members in proportion to, and to the extent of, any deficit balances in their respective Capital Accounts until all such Capital Accounts have been restored to zero;

5.1.2 Second, after giving effect to the Allocations made pursuant to Paragraph 5.1.1, among the Members as necessary to cause the Capital Account balance of each Member to at least equal such Member1s Unrepaid Invested Capital; and

5.1.3 Third, among the Members in proportion to their Percentage Interests.

5.2 Losses. Losses for any Fiscal Year of the Company shall be allocated among the Members in proportion to their Percentage Interests.

5.3 Allocations in General.

5.3.1 Adjusted Capital Account Deficit. The Losses allocated pursuant to Paragraph 5.2 hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event that some, but not all, of the Members have an Adjusted Capital Account Deficit as a consequence of an Allocation of Losses pursuant to Paragraph 5.2, the limitation set forth in this Paragraph 5.3.1 shall be applied on a Member-by-Member basis so as to allocate the maximum permissible Losses to each Member under Regulation Section 1.704l(b) (2) (ii) (d). All Losses in excess of the limitation set forth in this Paragraph 5.3.1 shall be allocated to the General Manager.

5.3.2 Other Items. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other Allocations not otherwise provided for in this Agreement shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

5.3.3 Allocation Between Periods. For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any other items shall be determined on a daily, monthly, or other basis, as determined by the General Manager using any permissible method under Code Section 706 and the Regulations thereunder.

5.3.4 Intention. The intention of this Section 5 is to make Allocations in accordance with each Member's Interest in the Company in order to reflect the economic substance of each Member's Capital Account and Distributions.

5.4 Special Allocations. The following special Allocations shall be made in the following order:

5.4.1 Minimum Gain Chargeback. Except as otherwise provided in Regulation Section 1.704-2 (f), notwithstanding any other provisions of this Section 5, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain determined in accordance with Regulation Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulation Sections 1.704-2(f) (6) and 1.704-2(j) (2). This Paragraph 5.4.1 is intended to comply with the minimum gain chargeback requirement in such Regulations' sections and shall be interpreted consistently therewith.

5.4.2 Member Minimum Gain Chargeback. Except as otherwise provided in Regulations Section 1.704-2(i) (4), notwithstanding any other provisions of this Section 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i) (5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net

decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section **1.704-2** (i) (4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections **1.704-2** (i) (4) and **1.704-2** (j) (2). This Paragraph 5.4.2 is intended to comply with the minimum gain chargeback requirement of Regulations Section **1.704-2** (i) (4) and shall be interpreted consistently therewith.

5.4.3 Qualified Income Offset. In the event any Member who is not a General Manager unexpectedly receives any adjustments, Allocations, or Distributions described in Regulations Sections 1.704-1 (b) (2) (ii) (d) (4), 1.704-1 (b) (2) (ii) (d) (5) or 1.7041 (b) (2) (ii) (d) (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an Allocation pursuant to this paragraph 5.4.3 shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other Allocations provided for in this Section 5 have been tentatively made as if this Paragraph 5.4.3 were not in this Agreement.

5.4.4 Gross Income Allocation. In the event that any Member has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to the terms of this Agreement; and
(ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g) (1) and 1.704-2(i) (5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an Allocation pursuant to this Paragraph 5.4.4 shall be made if and only to the extent that such Member would have a deficit Capital Account in excess of such sum after all other Allocations provided for in this Section 5 have been tentatively made as if Paragraph 5.4.3 hereof and this Paragraph 5.4.4 were not in the Agreement.

5.4.5 Code Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743 (b) is required, pursuant to Regulations Section 1.704-1 (b) (2) (iv) (m), to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of such Member's Interest, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specifically allocated to the Members in accordance with their Member Interests in the event that Regulations Section 1.704-1 (b) (2) (iv) (m) (2) applies, or to the Member to whom such Distribution was made in the event that Regulations Section 1.704 -1 (b) (2) (iv) (m) (4) applies.

5.4.6 Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2 (i) (1).

5.5 Curative Allocations. The Members and the Company intend that the tax Allocation provisions of this Section 5 shall produce final Capital Account balances of the Members that will permit liquidating Distributions that are made in accordance with final Capital Account balances under Paragraph 12.2, to be made (after unpaid loans and interest thereon, including those owed to Members have been paid) in a manner identical to the order of priorities set forth in Paragraph 12.2. To the extent that the tax Allocation provisions of this Section 5 would fail to produce such final

Capital Account balances (i) such provisions shall be amended by the General Manger if and to the extent necessary to produce such result and (ii) taxable income and taxable loss of the Company for prior open years (or items of gross income and deduction of the Company for such years) shall be reallocated by the General Manager among the Members to the extent it is not possible to achieve such result with Allocations of items of income (including gross income) and deduction for the current year and future years, as determined by the General Manager. This Paragraph 5.5 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority. The General Manager shall have the power to amend this Agreement without the consent of the Members, as the General Manager reasonably considers advisable, to make the Allocations and adjustment described in this Paragraph 5.5. To the extent that the Allocations and adjustments described in this Paragraph 5.5 result in a reduction in the Distributions any Member will receive under this Agreement compared to the amount of the Distributions such Member would receive if all such Distributions were made pursuant to the order of priority set forth in Paragraph 12.2, the General Manager may, in its discretion (but is not required to), have the Company make a guaranteed payment (within the meaning of Code Section 707(c)) to such Member (to be made at the time such Member would otherwise receive the Distributions that have been reduced) to the extent such payment does not violate the requirements of Code Sections 704 (b) and 514 (c) (9) (E), or the General Manager may take such other action as determined by the General Manager in its discretion to offset such reduction.

5.6 Allocations Relating to Taxable Issuance of a Member Interest. Any income, gain, loss, or deduction realized as a direct or indirect result of the issuance of a Member Interest by the Company to a Member (the "Issuance Items") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other Allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

5.7 Tax Allocations: Code Section 704 (c). In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for Federal income tax purposes and its initial Gross Asset Value (computed in accordance with subparagraph (a) of the definition of Gross Asset Value under Section 2 hereof). In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (b) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such Allocations and Code Section 704(c) shall be made by the General Manager in its sole discretion.

SECTION 6 DISTRIBUTIONS

6.1 Distributions. The Members shall receive from the Company Distributions from each Project the following amounts in the following priorities:

6.1.1 Distributions of Net Cash Flow From Operations.
Net Cash Flow From Operations, if any, shall be distributed to the Members in proportion to the Members' Percentage Interests.

6.1.2 Distributions From Net Cash Flow From Refinancings. Net Cash Flow From Refinancings shall be distributed to the Members in proportion to the Members' Percentage Interests.

6.1.3 Distributions From Net Cash Flow From Sales. Net Cash Flow From Sales shall be distributed to the Members in the following order of priority:

a. Unrepaid Invested Capital. First, to the Members in order to pay the Members the Members' Unrepaid Invested Capital (and among the Members in proportion to each Member's then Unrepaid Invested Capital); and

b. Percentage Interests. Second, to the Members in proportion to the Members' Percentage Interests.

For purposes of this Agreement, the sale of the Company assets shall include a sale or taking pursuant to or under the threat or power of eminent domain. In addition, references to Net Cash Flow from Sales shall include any property casualty insurance payments (other than rental or business interruption insurance, which shall be treated as part of Net Cash From Operations) paid as a result of damage or destruction of Company Property which is received by the Company, to the extent those payments are not otherwise used to replace or rebuild those assets, or to pay other Company debts or liabilities, as determined by the General Manager.

6.1.4 Distributions to General Manager. The General Manager of the Company shall be entitled to receive, on an annual basis, 25% of the Net Cash Flow From Operations, Refinancing or otherwise of the Company payable when the Net Cash Flow of the Company is distributed to all members of the Company and shall be entitled to receive 25% of the Net Cash Flow From Sales or otherwise received from the sale of assets of the Company when the Net Cash Flow of the Company are distributed to all members of the Company. Said payments shall be in addition to other payments to be received by the General Managerpursuant to the terms of the operating agreement of the Company.

6 .2 True Up on Sale of Property. Upon the sale of the Company's Property for a particular Project, the Company shall adjust the Distributions to the Members so that each Member receives Distributions attributable to such Property for that Project in the Distribution amounts for such Project specified under Paragraph 6.1, above (“True Up “ ) . Upon the sale of a Project 's Property, if it is determined that a Member has been distributed more than such Member is otherwise entitled to receive under Paragraph 6.1, then such Member agrees that such Member shall immediately pay back to the Company any amounts that the Member was distributed by the Company in excess of the amounts that such Member is otherwise entitled to receive under Paragraph 6.1 (and/or the Company may in its discretion offset against any other Distributions owed to such Member for such excess amounts paid to such Member) in order that the Company can make the correct True Up for that Project. The Company, upon a Project's Property's sale, shall make Distributions to the Members so that the Members receive the amounts that the Members are otherwise entitled to receive as Distributions under Paragraph 6.1. Any amounts paid by a Member to the Company under this Paragraph 6.2 or amounts paid to a Member by the Company under this Paragraph 6.2 shall be paid to or by such Member without interest. The True Up of the Distributions under this Section 6 shall be determined by the General Manager, in the General Manager's discretion, upon the sale of a Project's Property.

6.3 Distributions. The time and amount of Distributions shall be made in the sole discretion of the General Manager. This Section 6 is subject to the provisions of Paragraph 3.3.

6.4 Rights of the Company to Offset. If a Member is entitled to a Distribution under this Section 6 or under Section 12, and such Member owes any amounts to the Company, then the Company shall be entitled to deduct from the amount of Distribution that such Member is otherwise entitled to receive from the Company the amount that such Member otherwise owes to the Company.

SECTION 7 TRANSFERS

7.1 Restrictions on Transfers. Except as otherwise permitted by this Agreement, no Member shall Transfer all or any portion of its Interest.

7.2 Permitted Transfers. Subject to the conditions and restrictions set forth in Paragraphs 7.3.2 through 7.3.5 hereof, a Member may at any time Transfer all or any portion of such Member's Interest to: (a) any other Member, (b) any spouse or issue of such Member, or revocable living trust for their benefit, or (c) such Member's executor or administrator to whom such Interest is transferred involuntarily by operation of law, such as by such Member's death. Any such permitted Transfer is referred to in this Agreement as a "Permitted Transfer." A Permitted Transfer must also satisfy the provisions of Paragraphs 7.3.2 through 7.3.5 hereof.

7.3 Conditions to Permitted Transfers. Any Transfer of a Member's Interest must satisfy each and all of the following conditions:

7.3.1 Consent of General Manager. Except in the case of a Transfer involuntarily by operation of law, a Member may not Transfer all or any portion of such Member's Interest without the prior consent of the General Manager, which consent may be withheld in the General Manager's absolute discretion.

7.3.2 Documents to Effect Transfer. Except in the case of a Transfer involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer. In the case of a Transfer of an Interest involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that the Company reasonably incurs in connection with such Transfer.

7.3.3 Tax Information. The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Interest transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any Distribution otherwise provided for in this Agreement with respect to any transferred Interest until it has received such information.

7.3.4 Securities Laws Compliance. Except in the case of a Transfer of an Interest involuntarily by operation of law, either: (i) such Interest shall be registered under the Securities

Act of 1933 and any applicable state securities laws, (ii) the Transferor is exempt from all applicable registration requirements and that such Transfer will not violate any applicable federal or state securities laws regulating the Transfer of securities, or (iii) the General Manager waives in writing the provisions of this Paragraph 7.3.4.

7.3.5 No Termination of Company. Unless otherwise approved by the General Manger, no Transfer of an Interest shall be made except upon terms that would not, in the opinion of counsel chosen by and mutually acceptable to the General Manager and the transferor Member, result in the termination of the Company within the meaning of Code Section 708.

7.4 Right of First Refusal. In addition to the other limitations and restrictions set forth in this Section 7, except for a Permitted Transfer under Paragraph 7.2 hereof, no Member shall Transfer all or any portion of such Member's Interest ("Offered Interest") unless such Member (the "Seller") first offers made under this Paragraph 7.4

7.4.1 Limitation on Transfers. No Transfer may be made under this Paragraph7.4 unless the Seller has received a bona fide written offer ("Purchase Offer") from a Person (the "Purchaser") to purchase the Offered Interest for a purchase price ("Offer Price") denominated and payable in United States dollars at closing or according to specified terms, with or without interest, which offer shall be in writing signed by the Purchaser and shall be irrevocable for a period ending no sooner than the business day following the end of the Offer Period, as hereinafter defined.

7.4.2 Offer Notice. Prior to making any Transfer that is subject to the terms of this Paragraph 7.4, the Seller shall give to the General Manager written notice ("Offer Notice") which shall include a copy of the Purchase Offer and an offer ("Firm Offer") to sell the Offered Interest to the General Manager and/or the Company and/or the other Members or any other Person as appointed by the General Manager (collectively "Offerees") for the Offer Price, payable according to the same terms as (or more favorable terms than) those contained in the Purchase Offer, provided that the Firm Offer shall be made without regard to the requirement of any earnest money or similar deposit required of the Purchaser prior to closing, and without regard to any security (other than the Offered Interest) to be provided by the Purchaser for any deferred portion of the Offer Price.

7.4.3 Offer Period. The Firm Offer shall be irrevocable for a period (“0ffer Period") ending at 11: 59 p.m. local time at the Company's principal place of business, on the ninetieth (90th) day following the day of the Offer Notice.

7.4.4 Acceptance of First Offer. At any time during the Offer Period, the General Manager may accept all or part of the Firm Offer or may allow by written notice the Company and/or any Member or other Person to accept all or part of the Firm Offer as to all or any portion of the Offered Interest, by giving written notice of such acceptance to the Seller, which notice shall indicate the amount of the Offered Interest that such accepting offeree is willing to purchase. The General Manager or the Company or any Member or other Person appointed by the General Manager to accept all or a portion of the Firm Offer is herein sometimes referred to as the "Accepting Offeree(s)." In the event that the General Manager and the other Accepting Offerees (by the General Manager1s written notice or otherwise) accept the Firm Offer with respect to all of the Offered Interest, the Firm Offer shall be deemed to be accepted and each Accepting Offeree shall be deemed to have accepted the Firm Offer as to that portion of the Offered Interest which such Accepting Offeree indicated a willingness to purchase. If the General Manager does not accept the Firm Offer

(by itself or by notice on behalf of the Company or any of the other Members or other Person) as to all of the Offered Interest during the Offer Period, the Firm Offer shall be deemed rejected in its entirety.

7.4.5 Closing of Purchase Pursuant to Firm Offer. In the event that the Firm Offer is accepted, the closing of the sale of the Offered Interest shall take place within thirty (30) days after the Firm Offer is accepted; or, if later, the date of closing set forth in the Purchase Offer. The Seller and all Accepting Offerees shall execute such documents and instruments as may be necessary or appropriate to effect the sale of the Offered Interest pursuant to the terms of the Firm Offer and this Section 7.

7.4.6 Sale Pursuant to Purchase Offer if Firm Offer Rejected. If the Firm Offer is not accepted in the manner hereinabove provided, the Seller may sell the Offered Interest to the Purchaser at any time within sixty (60) days after the last day of the Offer Period, provided that such sale shall be made on terms no more favorable to the Purchaser than the terms contained in the Purchase Offer and, provided further, that such sale complies with other terms, conditions and restrictions of this Agreement that are not expressly made inapplicable to sales occurring under this Paragraph 7.4. In the event that the Offered Interest is not sold in accordance with the terms of the preceding sentence, the Offered Interest shall again become subject to all of the conditions and restrictions of this Paragraph 7.4.

7.4.7 No Duty of General Manager. The General Manager may allow one or more Members or the Company, or any other Person, to purchase a Seller Member's Interest hereunder or may elect to purchase the entire Seller Member Interest itself. Specifically, the General Manager is not required to offer the opportunity to purchase the Seller Member's Interest to any or all of the existing Members, and the General Manager may elect for the General Manager itself or any other Person to purchase all or any portion of the Seller's Offered Interest without any liability or accountability of the General Manager to any other Member or the Company.

7.5 Prohibited Transfers. Any purported Transfer of an Interest in violation of this Section 7 shall be null and void and of no force or effect whatsoever, provided that if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the General Manager, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the Interest Transferred shall be strictly limited to the transferor's rights to Allocations and Distributions as provided by this Agreement with respect to the transferred Interest, which Allocations and Distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of such Interest may have to the Company. In the case of a Transfer or attempted Transfer of an Interest that is in violation of this Section 7, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all costs, liabilities and damages that any of such indemnified Members may incur (including, without limitation, incremental tax liabilities, attorneys' fees, and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby. No charging order against a Member's Membership Interest shall be a lien or claim against any of the Company's assets or property.

7.6 Rights of Unadmitted Assignees. A Person who acquires an Interest but who is not admitted as a Substituted Member pursuant to Section 8 hereof shall be entitled only to Allocations and Distributions with respect to such Interest in accordance with accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

7.7 Representations Regarding Transfers; Legend.

7.7.1 No Violation of Securities Laws. Each Member hereby covenants and agrees with the Company for the benefit of the Company and all Members, that (i) such Member is not currently making a market in its Interests and will not in the future make a market in its Interests, and (ii) such Member will not Transfer its Interest on an established securities market or a secondary securities market. Each Member further agrees that it will not Transfer any Interest to any Person unless such Person agrees to be bound by this Section 7 and to Transfer such Interest only to Persons who agree to be similarly bound.

7.7.2 Legend. Each Member hereby represents and warrants to the Company and the other Members that such Member's acquisition of an Interest hereunder is made as principal for such Member's own account and not for resale or distribution of such Interest. Each Member further hereby agrees that the following legend may be placed upon any counterpart of this Agreement or any other document or instrument evidencing ownership of an Interest:

“The Interest represented by this document has not been registered under any securities laws and the transferability of such Interest is restricted. Such Interest may not be sold, assigned or transferred, nor will any assignee, vendee, transferee or endorsee thereof be recognized as having acquired any such Interest by the issuer for any purposes, unless (1) a registration statement under the Securities Act of 1933, as amended, with respect to such Interest shall then be in effect and such transfer has been qualified under all applicable state securities laws, or (2) the availability of an exemption from such registration and qualification shall be established to the satisfaction of counsel to the Company. The Interest represented by this document is subject to further restriction as to its sale, transfer, hypothecation or assignment as set forth in the Operating Agreement and agreed to by each Member. Said restriction provides, among other things, that no Interest may be transferred without first offering such Interest to the other Members, and that no vendee, transferee or assignee of a Member shall have the right to become a substituted Member without the consent of the General Manager, which consent may be given or withheld in the sole and absolute discretion of the General Manager.”

7.8 Distributions and Allocations in Respect of a Transferred Interest. If any Interest is Transferred during any Fiscal Year in compliance with the provisions of this Section 7, Profits, Losses, each item thereof, and all other items attributable to the Transferred Interest for such Fiscal Year shall be divided and allocated between the transferor and the transferee by taking into account their varying Percentage Interests during the Fiscal Year in accordance with Code Section 706, using any conventions permitted by the Code and selected by the General Manager. All Distributions on or before the date of such Transfer shall be made to the transferor, and all Distributions thereafter shall be made to the transferee. Solely for purposes of making such Allocations and Distributions, the Company shall be required to recognize such Transfer only after the Company is given notice of such Transfer. Neither the Company nor the General Manager shall incur any liability for making Allocations and Distributions in accordance with the provisions of this Paragraph 7.8, whether or not the General Manager or the Company has knowledge of any Transfer of ownership of any Interest.

## SECTION 8 SUBSTITUTED MEMBERS

8.1 Becoming a Substituted Member. In addition to the provisions and restrictions of

Section 7, no Assignee of any Interest shall have the right to become a substituted Member ("Substituted Member") in place of such Assignee's assignor unless all of the following conditions are first satisfied:

8.1.1 Acceptable Form of Assignment. The provisions of Section 7 hereof have been complied with and a duly executed and acknowledged written instrument of assignment in a form acceptable to the Company shall have been filed with the Company, which instrument shall specify the Percentage Interests being assigned and set forth the intention of the assignor that the Assignee succeed to assignor I s interest as a Substituted Member in the assignor's place;

8.1.2 Other Instruments. The assignor and Assignee shall have executed and acknowledged such instruments as the Company may deem necessary or desirable to effect such substitution, including the written acceptance and adoption by the Assignee of the provisions of this Agreement;

8.1.3 Consent of General Manager. The written consent of the General Manager to such substitution shall have been obtained, the granting or denial of which shall be within the absolute discretion of the General Manager; and

8.1.4 Reimbursement of Fees. The Assignee pays and reimburses the Company for all legal fees, filing fees and publication fees that the Company incurs in connection with the admission of the Assignee as a Member with respect to the transferred Interest.

8.2 Rights of Assignee. An Assignee of a Member's Interest shall not hold any non-economic rights in the Company until such Assignee becomes a Substituted Member under the terms of this Section 8. By way of example, and not by way of limitation, an Assignee who is not a Substituted Member shall have no right to vote or consent as a Member to any action under the terms of this Agreement, and shall have no rights to receive or review the Company's books, records, reports or other information.

## SECTION 9 BOOKS, RECORDS, ACCOUNTING AND REPORTS

9.1 Maintenance of Books and Records. The Company shall keep at its principal executive office in California the following Company documents:

9.1.1 List of Members. A current list of the full name and last known business or residence address of each Member and any Assignee together with the Capital Contribution and share in Profits and Losses of each Member and any Assignee.

9.1.2 Articles of Organization. A copy of the Company's Articles of Organization and all amendments thereto, and executed copies of any powers of attorney pursuant to which the Articles of Organization or amendments thereto have been executed;

9.1.3 Tax Returns. Copies of the Company's federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years;

9.1.4 Operating Agreement. Copies of the original Agreement and all amendments to the Agreement and executed copies of any powers of attorney pursuant to which the Agreement or amendments thereto have been executed;

9.1.5 Financial Statements. Financial statements of the Company, if any, for the Company's six (6) most recent Fiscal Years;

9.1.6 Books and Records. The Company's books and records for at least the current and past four Fiscal Years; and

9.2 Tax Year and Accounting Method. The General Manager shall elect the Company's tax year and method of accounting as permitted by the Code.

## SECTION 10 RIGHTS, AUTHORITY, POWER, RESPONSIBILITIES AND DUTIES OF THE GENERAL MANAGER

10.1 General Manager. The Company shall be managed by a General Manager who may be, but does not have to be, a Member. Temecula Town Center Manager LLC is hereby designated to serve as the initial General Manager.

10.2 General Powers. The General Manager shall have the full, exclusive and complete discretion, power and authority, subject in all cases to other provisions of this Agreement, to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs without the consent, vote or approval of any Member, including, without limitation, the power to:

10.2.1 Partnership and Limited Liability Company. Exercise and carry out any and all of the powers and duties of any partnership or limited liability company of which the Company is a partner or member;

10.2.2 Collateral. Acquire, purchase, own, sell, grant options, develop, improve, exchange and lease the Collateral (any assets including but not limited to financial instruments, notes, deeds of trust, real property and personal property) chosen at the sole discretion of the General Manager, at the prices, rental amounts and terms as the General Manager may determine in the General Manager's sole discretion;

10.2.3 Execution of Documents. Execute by its sole signature any and all agreements, contracts, purchase and sale agreements, option agreements, documents, deeds, bills of sale, escrow instructions, deeds of trust, mortgages, promissory notes, loan documents, leases, certifications and instruments necessary or convenient in connection with the management, maintenance and operation of the properties of the Company, and to buy, sell, lease, exchange, borrow or encumber any Company Property;

10.2.4 Borrowing Monies. Borrow money and, if security is required therefore, to mortgage, encumber and pledge any Company Property on such terms and in such amounts as the General Manager may determine in the General Manager's sole discretion, and to execute all documents in connection therewith;

10.2.5 Insurance. Acquire and enter into any contract of insurance which the General Manager deems necessary or appropriate for the protection of the Company and its Property, for the conservation of Company assets, or for any purpose convenient or beneficial to the Company;

10.2.6 Employment of Persons. Employ or retain persons including officers and other employees of a Member or its Affiliates, in the operation and management of the business of the

Company including, but not limited to, supervisory managing agents, brokers, attorneys and accountants on such terms and for such compensation as the General Manager shall determine;

10.2.7 Appointment of Officers. Appoint officers at any time as determined in the sole discretion of the General Manager. The officers of the Company, if deemed necessary by the General Manager in its discretion, may include a president, vice president, secretary and/or treasurer. The officers shall serve at the pleasure of the General Manager, subject to all rights, if any, of an officer under any written contract of employment. Any individual may hold any number of offices. The officers shall exercise such powers and perform such duties as shall be determined from time to time by the General Manager;

10.2.8 Removal of Officers. Subject to the rights, if any, of an officer under a contract of employment, remove any officer, either with or without cause, at any time;

10.2.9 Accounts at Banks and Brokerage Houses. Open accounts and deposit, withdraw and maintain funds in the name of the Company in banks, savings and loan associations, thrift and loan associations, brokerage houses or other financial institutions on such signatures as the General Manager shall determine;

10.2.11 Accounting Year. Select as its accounting year such Fiscal Year as approved by the Code;

10.2.12 Filing of Documents. Cause Articles of Organization, fictitious business name statements and other documents in connection with the organization of the Company to be filed as required by applicable law;

10.2.13 Other Actions. Prepare, execute, acknowledge, record, file or deliver any and all reports, instruments or documents, and to take all actions required or deemed necessary, reasonable or desirable by the Company to effectuate any of the foregoing, to comply with requirements of applicable law or to comply with the provisions of this Agreement; and

10.2.14 Powers of Attorney. In furtherance of the foregoing, to give powers of attorney (general and/or limited) to whomsoever the General Manager shall determine to enable such attorney-in-fact to take any and all actions and to execute any and all documents on the Company's behalf.

10.3 Limitation on Authority of Members. No Member is an agent of the Company solely by virtue of being a Member, and no Member has the authority to act for the Company solely by virtue of being a Member.

10.4 Removal and/or Replacement of the General Manager. While Temecula Town Center Manager LLC is serving as the General Manager, the Members, at any time and from time to time, may by a Majority Vote of the Members other than the General Manager, remove for cause the General Manager then acting. Subject to the immediately preceding sentence all of the Members by a Majority Vote may appoint a new General Manager upon a vacation in the General Manager's position if there is no other provision for the appointment of the General Manager under this Agreement. “For cause” for purposes of this Paragraph 10.4 shall mean either: (i) the General Manager's conviction of a felony as determined by a final judgment of a court of competent jurisdiction; or (ii) the General Manager's embezzlement of the Company's Property.

10.5 Action Without Meeting. In lieu of holding a meeting, the Members may take any

action permitted of them by written consents specifying the action to be taken, which consents must be

10.6 Actions on Which Members May Vote. The following matters shall require the vote or consent of a Majority Vote of the Members:

10.6.1 Continue Business. A decision to continue the business of the Company after dissolution of the Company; and

10.6.2 Amendments. An amendment to the Articles of Organization or this Agreement.

The Members shall have no right to vote on the sale, exchange, purchase lease, financing, refinancing or encumbering of the Company's Property, and the General Manager shall solely decide to do such acts, in the General Manager's sole discretion.

10.7 Other Businesses and Transactions. The General Manager is not obligated to devote full time to the affairs of the Company. The General Manager and its Affiliates may become involved in other businesses, real estate projects (even those competing with the Company) and occupations, limited liability companies and partnerships. Any Member, General Manager, shareholder, officer, director, employee, partner, or other person holding a legal or beneficial interest in any entity which is a Member, or any Affiliate of any of the foregoing, may engage in or possess an interest in a business venture which may compete with the Company including, but not limited to, the ownership, financing, leasing, operation, development, management, syndication, brokerage or development of real property competing with the Company or any entity in which the Company may own an interest; and neither the Company nor the Members shall have any right by virtue of this Agreement in or to such independent ventures or to the income or profits derived there from. The General Manager and any other Member or their Affiliates shall have the right to hold any investment opportunity or prospective economic advantage for its own account and to recommend such opportunity to Persons other than the Company or any specific Members. Any Member, including the General Manager, may transact business with the Company and shall have the same rights with respect thereto as a person who is not a Member. No Member or the General Manager, nor any Affiliates thereof, shall be obligated to present to the Company any particular investment opportunity or the prospective economic advantage, even if the opportunity or the prospective economic advantage is of a character which if presented to the Company could be taken by the Company, and the General Manager and its Affiliates shall have the right to take for its own account or to recommend to other Persons any investment opportunity. Each Member and the Company hereby waive any rights they have against any other Member capitalizing on information learned as a consequence of its connection with the affairs of the Company.

10.8 No Requirement for Personal Services. No Member (other than the General Manager) shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the General Manager, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

10.9 Costs and Reimbursement. The General Manager shall be entitled to reimbursement for expenses incurred, costs of goods, outside services and materials, including any outside construction supervisor for any of the Company's Property (notwithstanding any provisions of Paragraph 10.10.2 hereof). The Company shall also payor reimburse the General Manager and its Affiliates for organizational expenses incurred to form the Company. Such organizational expenses shall include, but are not limited to, legal and accounting fees, and advances made in

furtherance of the business of the Company.

10.10 [INTENTIONALLY DELETED].

10.11 Power of Attorney.

10.11.1 Grant of Power. Each Member constitutes and appoints the General Manager as the Member's true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the Member's name, place and stead, to make, execute, sign, acknowledge and file:

a. Articles of Organization. One or more Articles of Organization;

b. Documents to Reflect Amendment. All documents (including amendments to Articles of Organization) which the Attorney-in-Fact deems appropriate to reflect any amendment, change, or modification of this Agreement;

c. Certificates and Other Instruments. Any and all other certificates or other instruments required to be filed by the Company under the laws of the State of Delaware or of any other state or jurisdiction, including, without limitation, any certificate or other instruments necessary in order for the Company to continue to qualify as a Limited Liability Company under the laws of the State of Delaware;

d. Fictitious Names. One or more fictitious trade name certificates; and

e. Documents to Dissolve. All documents which may be required to dissolve and terminate the Company and to cancel its Articles of Organization.

10.11.2 Irrevocability. The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member. It also shall survive the Transfer of a Member's Interest, except that if the Assignee is admitted as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge, and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate, or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

10.12 [INTENTIONALLY DELETED].

10.13 Indemnification of General Manager. The Company shall indemnify, hold harmless and defend (including all attorneys' fees, costs, judgments and claims) the General Manager, relating to any liability or damage incurred by reason of any act performed or omitted to be performed by any of them in connection with the Company and its business. The General Manager does not guaranty the return to any Member of such Member's investment or any profit from the operation of the Company, and the General Manager shall not be responsible to any other Member as a result of a loss of such Member's investment in the Company. The General Manager shall be liable to the Company only if it commits an act of gross and willful negligence against the Company. The obligations of the Company set forth in this Paragraph 10.13 are expressly intended to shall be protected in relying, acting, or refraining from acting on any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, document, debenture, or other paper or document believed by it to be genuine and to have

been signed or presented by the proper party or parties.

10.14 Other Matters Concerning the General Manager.

10.14.1 Reliance on Documents. The General Manager shall be protected in relying, acting, or refraining from acting on any resolution,certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, document, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

10.14.2 Use of Affiliates and Consultants. The General Manager may execute any of the powers granted or perform any of the duties imposed by this Agreement either directly or through agents, including without limitation any Affiliate of the General Manager. The General Manager may consult (at the Company's cost) with counsel, accountants, appraisers, management consultants, investment bankers, insurance agents and other consultants (collectively "Consultants") selected by it (who may also serve as Consultants for the Company or any Affiliate of the General Manager). An opinion by any consultant on a matter which the General Manager believes to be within its professional or expert competence shall be full and complete protection as to any action taken or omitted by the General Manager based on the opinion and taken or omitted in good faith. The General Manager shall not be responsible for the misconduct, negligence, acts or omissions of any consultant or of any agent or employee of the Company, the General Manager, or any Affiliate, and shall assume no obligations other than to use due care in the selection of all Consultants.

10.14.3 Transactions With Affiliates. Notwithstanding that it may constitute a conflict of interest, the General Manager may, and may cause the General Manager's Affiliates to, engage in any transaction (including, without limitation, the purchase, sale, lease, exchange, improvement, management or construction upon any of the Company's Property, or the rendering of any service, construction contracting service, property management service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company.

10.15 Tax Matters Partner. Temecula Town Center Manager LLC is hereby designated .as the initial "tax matters partner" under the Code. If Temecula Town Center Manager LLC is unable or unwilling to serve as tax matters partner, then the tax matters partner shall be designated by the other Members. The tax matters partner is authorized on behalf of the Company to represent the Company in any tax audit, proceeding or dispute with the Internal Revenue Service or state or local taxing authority including consenting to extending the statute of limitations for assessing tax against a Member attributable to a Company item, negotiating and entering into a settlement agreement, and contesting any proposed adjustment of a Company item. The General Manager may make all tax elections and execute all waivers and consents for tax purposes on behalf of the Company.

10.16 Tax Withholding.

10.16.1 Withholding. The General Manager is authorized to cause the Company to withhold from, or pay on behalf of, any Member the amount of federal, state, local or foreign taxes that the General Manager reasonably believes that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement, including, without limitation, any taxes required to be paid by the Company pursuant to Code Sections 1441, 1442, 1445 and 1446, and any taxes imposed by any state or other taxing

jurisdiction on the Company as an entity. Without limiting the foregoing, the General Manager may cause the Company to withhold (and remit to the appropriate governmental authority), from amounts otherwise distributable to a Member, any taxes that such Member notifies the General Manager in writing should be withheld, which Member notice shall be given by any Member who becomes aware of any withholding obligation to which such Member is subject and shall specifically set forth the rate at which tax shall be withheld and the name and address to which any amounts withheld should be remitted.

10.16.2 Payments By the Company. If the Company is required to withhold and pay over to taxing authorities amounts on behalf of a Member exceeding available amounts then remaining to be distributed to such Member, such payment to the taxing authorities by the Company shall constitute a loan by the Company to such Member that shall then be paid by the Member to the Company on demand of the Company, together with interest at the applicable Federal rate determined from time to time under Code Section 7872 (f) (2) or the maximum rate permitted under applicable law, whichever is less, calculated upon the outstanding principal balance of such loan as of the first day of each month. Any such loan shall be repaid to the Company, in whole or in part, as determined by the General Manager in the General Manager's sole discretion, either (i) out of Distributions from the Company which the Member is (or becomes) entitled to receive, or (ii) by the Member in cash upon demand by the General Manager (said Member shall bear all of the Company's costs of collection of such loan, including attorneys' fees, if payment is not promptly remitted by such Member to the Company after such demand for payment by the General Manager) .

10.16.3 Cooperation on Withholding. Each Member agrees to cooperate fully with all efforts of the Company to comply with the Company's tax withholding and information reporting obligations, and each Member agrees to provide the Company with such information as the General Manager may request from time to time in connection with such obligations.

## SECTION 11 LIMITATION ON MEMBERS RIGHTS

No Member shall have the right or power to: (i) withdraw, make a demand for withdrawal or reduce the Members' Interest or Capital Contribution, except as a result of the dissolution of the Company; (ii) bring an action for partition against the Company; (iii) cause the termination and dissolution of the Company by court decree or otherwise, except as set forth in this Agreement; or (iv) demand to receive Property other than cash in return for such Person's Capital Contribution. No Member shall have the priority over any other Member either as to the return of Capital Contributions or as to Profits, Losses, other items or Distributions except as provided in Sections 4, 6 or 12. Other than upon the termination and dissolution of the Company as provided by this Agreement, there has been no time agreed upon when the Capital Contribution of any Member may be returned.

## SECTION 12 TERMINATION AND DISSOLUTION OF THE COMPANY

12.1 Termination and Dissolution. The Company shall be dissolved upon the earlier to occur of the following ("Event of Dissolution"):

12.1.1 Termination Date. The termination date of the Company set forth at Paragraph 3.2 of this Agreement;

12.1.2 Written Election. The written election of the General Manager plus the Members by a Majority vote to dissolve the Company; or

12.1.3 Judicial Decree. When a judicial decree of dissolution has been issued.

Upon an Event of Dissolution, the General Manager shall promptly wind up the affairs of, liquidate and terminate the Company. In furtherance of such liquidation and winding up, the General Manager shall: (i) have all of the administrative and management rights and powers necessary to so liquidate and wind up the Company; (ii) be reimbursed for any Company expenses which the General Manager incurs.

12.2 Liquidation and Distribution. Upon a dissolution and termination of the Company for any reason, the Company shall distribute its assets in the following order of priority:

12.2.1 Creditors. First, to the payment of the creditors of the Company but excluding secured creditors whose obligations will be assumed or otherwise transferred on the liquidation of Company assets;

12.2.2 Payment of Obligations. Second, t o t he payments of all obligations that have not yet been paid and the establishment of any reserves which the General Manager determines is necessary for any liabilities or obligations (which remaining amount in such reserves shall then be distributed pursuant to Paragraphs 12.2.3 and 12.2.4, below);

12.2.3 Repayment of Member Loans. Third, to the Members in repayment of any outstanding loans; and

12.2.4 To Members. Finally, among the Members as provided in Paragraph 6.1.3 (including the application of Paragraph 6.2), each Member shall look solely to the assets of the Company for all Distributions with respect to the Company and such Member's share of Distributions, and shall have no recourse (upon dissolution or otherwise) against the other Members. Except as may be otherwise specified in Section 6 hereof, no Member shall have any obligation to other Members, creditors of the Company, or the Company to restore any negative balance in its Capital Account. Distributions upon dissolution and termination of the Company may be made in cash or in kind, or partly in cash and partly in kind, as determined by the General Manager.

## SECTION 13 MISCELLANEOUS

13.1 Arbitration. Any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association. The arbitration shall consist of one arbitrator appointed by the parties to the controversy from a list of arbitrators experienced with real estate. If the parties to such controversy cannot agree upon the one arbitrator, then the one arbitrator shall be appointed under the rules of American Arbitration Association from a list of arbitrators experienced with real estate. Any arbitration shall be held in Los Angeles County, California. The arbitration shall be conducted in accordance with the commercial arbitration rules then obtained from the American Arbitration Association, and the decision of the arbitrator shall be final, and judgment of the award on such arbitration may be entered into any court having jurisdiction thereof. The arbitrators may not modify any of the terms of this Agreement, and the arbitration shall be limited to the determination of the issues and facts presented. The prevailing party or parties in any

arbitration shall be reimbursed by the party or parties who do not prevail for their reasonable attorneys' fees and costs of arbitration.

13.2 Assurances. Each Member shall execute all certificates and other documents and shall do all such filings, recordings, publishings, and other acts to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

13.3 Attorneys' Fees. In the event it becomes necessary for any of the parties hereto to institute any action, suit, proceeding or arbitration to enforce the provisions of this Agreement, the non-prevailing party agrees to pay the prevailing party's costs and fees, including reasonable attorneys' fees, incurred in the enforcement of this Agreement.

13.4 Captions. Section and paragraph titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference. Such titles and captions in no way define, limit, extend or describe the scope of this Agreement nor the intent of any provision hereof.

13.5 Choice of Law. The parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of California and that the Act as now adopted shall govern the aspects of this Agreement.

13.6 Complete Agreement and Amendment. This Agreement constitutes the complete and exclusive statement of the agreement among the Members, and supersedes all prior written and oral statements, including any prior representations, statements, conditions or warranties. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of the General Manager and a Majority Vote of the Members; and in the event of such amendment, the Distributions to any Member may not be modified except if such amendment is consented to in writing by such Member.

13.7 Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together,

13.8 Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a “Notice”) required or permitted under this Agreement must be in writing and delivered by any of the following: (i) personal delivery; (ii) mailed by first-class mail, postage prepaid; (iii) overnight courier service by a recognized overnight air courier; or (iv) by facsimile transmission with a copy of such Notice simultaneously deposited in the United States mail. A Notice must be addressed or sent by facsimile to a Member at the Member's last known address or facsimile number, as the case may be, on the records of the Company. A Notice to the Company must be addressed to the Company's principal office or sent to its facsimile number, as the case may be. A Notice delivered will be deemed given upon actual delivery if personally delivered; three days after it is mailed if sent by first-class mail, postage prepaid; on the next business day if sent by overnight courier; and upon receipt at the recipient's facsimile machine (and not when the mailed copy is delivered) if sent by facsimile provided that confirmation of receipt of such facsimile is obtained and generated by the sender1s facsimile machine. Any party may designate, by notice to all of the others, substitute addresses or addresses for notices; or other facsimile numbers and thereafter, notices are to be directed to those substitute addresses or facsimile numbers.

13.9 Number and Gender. Whenever required by the context hereof, the singular shall

include the plural, and vice versa; and the masculine gender shall include the feminine and neuter genders.

13.10 Other Acts. Each party to this Agreement covenants on behalf of himself and his successors, heirs and assigns to execute, with acknowledgment, verification or affidavit, if required, any and all documents and writings and to perform any and all other acts, that may be necessary or expedient in connection with the creation of this Company, the achievement of its purposes, or the consummation of any matter covered by this Agreement.

13.11 Severability. In the event any sentence or paragraph of this Agreement is declared by a court of competent jurisdiction to be void, such sentence or paragraph shall be deemed severed from the remainder of the Agreement and the balance of the Agreement shall remain in effect.

13.12 Successors and Assigns. Subject to the provisions of this Agreement and all restrictions contained in this Agreement, the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the respective Members.

13.13 No Third-Party Beneficiaries. Except with regard to the Company's obligation to indemnify the General Manager, the Management Committee and the Committee Managers as specified in this Agreement, and except as specified in Section 14 hereof, the provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party and shall not give rise to a right on the part of any third party to: (i) enforce or demand enforcement of any Member's obligation to make Required Additional Capital Contributions, any obligation to return any Distributions to the Company, or for any Member to have any obligation to make any other payments to the Company as set forth in this Agreement; or (ii) demand that the Company or the General Manager issue any request for Required Additional Capital Contributions to be made by any Member.

13.14 Time is of the Essence. All times and dates of this Agreement shall be of the essence.

SECTION 14 ACKNOWLEDGMENT OF SEPARATE LEGAL COUNSEL

Each of the Members acknowledges and agrees that the Company's legal counsel, has participated in preparing this Agreement on behalf of and in the course of such attorney's representation of the Company, and covenants that:

(i) The Company's legal counsel has provided in the past and may provide in the future legal services for General Manager and his Affiliates;

(ii) The Company's legal counsel has not been engaged to protect or represent the interests of any Member vis-a-vis the Company or the preparation of this Agreement or any Member' s investment under this Agreement, and no other legal counsel has been engaged by the Company to act in such capacity;

(iii) Each Member has been advised to seek the advice of independent legal counsel;

(iv) Each Member has had the opportunity to seek the advice of separate and independent legal counsel and has represented and warranted to the Company and to The Company's legal

counsel that such Member has had the opportunity to seek the advice of separate legal counsel;

(v) Each Member has carefully considered the foregoing and hereby approves of The Company's legal counsel representation of the Company;

(vi) Each Member further acknowledges that actual or potential conflicts of interest could exist among the Members or regarding such Member's relationship with the Company and that such Member's interest is not and will not be represented by any of the Company's legal counsel;

(vii) Each Member agrees that in the event of a dispute between such Member and the Company, that The Company's legal counsel may represent the Company; and

(viii) Each Member agrees that this Agreement and the transactions hereunder do not create any attorney-client relationship or any fiduciary relationship of any kind between the Company's legal counsel and such Member, or any other relationship where such Member would have a right to object to the Company's legal counsel representation of the Company or the General Manager under any circumstances.
The Company's legal counsel is a beneficiary of and shall be entitled to obtain enforcement of this Section 14, and this Section 14 shall be treated as a supplement to, and not a substitution or replacement for, any other waiver, consent or other agreement regarding such waiver of conflict of interest. In the event of a Member's breach of this Section 14, then such Member shall defend, indemnify and hold harmless the Company, the General Manager and the Company's legal counsel (including the payment of attorneys' fees and costs).

## SECTION 15 MEMBERS' AGREEMENTS AND ACKNOWLEDGMENTS

Each of the Members hereby covenants, represents, warrants and certifies to the Company, the Company's attorneys and other professional advisors, and the General Manager that:

15.1 Received Full Copy of Agreement. The Member has received a full copy of this Agreement and is fully informed as to the proposed investments of the Company including any Property that the Company is acquiring;

15.2 Acquired for Long-term Investment. The Interest which the Member is acquiring in the Company is acquired as a long-term investment for the Member's own account and not with a view toward resale or distribution;

15.3 No Receipt of Advertisement. The Member has not seen or received any advertisement or general solicitation with respect to such Member's investment in the Company or receipt of its Member Interest;

15.4 Pre-existing Relationship. The Member currently has a pre-existing personal or business relationship with the General Manager and/or the Company;

15.5 Received Financial and Other Information. The Member, before acquiring such Member's Interest and prior to singing this Agreement, was provided with all financial information, property information and other information about the Company that the Member requested and that the Member was given an opportunity to obtain all information and ask questions concerning the Company, and that the Member received satisfactory information and

answers;

15.6 Understood This Agreement and Financial Information. The Member has read and/or had explained to that Member by the Member's own separate attorney and accountants this Agreement and Company's financial and property information. The Member, in reaching the Member's decision to invest in the Company and in signing this Agreement, carefully evaluated the Member's financial resources and investments and the risks associated with the investment in the Company, and the Member acknowledges that the Member is able to bear the economic risks of investment in the Company;

15.7 Member Has Adequate Financial Condition. The Member recognizes that the Member's entire investment in the Company could be lost and acknowledges that the Member's financial condition is such that the Member is not under any present necessity or constraint to dispose of such Member's Interest;

15.8 No Registration Under Securities Laws. The Member understands that the Member's Interests are not being registered with the Federal Securities and Exchange Commission or any other federal or state governmental agency and it is unlikely that the Member Interests will become liquid in the future; and

15.9 No Reliance On Any Representation. Such Member has not relied upon any representations from the Company or the General Manager not contained in this Agreement.

IN WITNESS WHEREOF *I* the parties hereto have executed this Agreement pursuant to the signature pages attached hereto and incorporated herein by reference which signature pages shall also set forth the Initial Capital Contribution and percentage of ownership of each of the Members.

(SIGNATURE PAGES TO FOLLOW)

SIGNATURE PAGE TO
OPERATING AGREEMENT
OF
YNEZ SHOPS LLC,
a Delaware limited liability company

IN WITNESS WHEREOF, the undersigned Managing Member has executed this Agreement as of the Effective Date.

**MANAGING MEMBER:**

Temecula Town Center Manager LLC

Vincent Paglia
Vincent Paglia (Jan 27, 2025 13:54 PST)
____________________________

By: Name: Vincent Paglia
Title: Manager

SIGNATURE PAGE TO
OPERATING AGREEMENT
OF
YNEZ SHOPS LLC,
a Delaware limited liability company

IN WITNESS WHEREOF, the undersigned Member has executed this Agreement as of the Effective Date.

| **Name of Member** | **Percentage of ownership** |
|---|---|
| **Member:** | **100%** |

Henkin Investor Group LLC,
a Delaware limited liability company

By: Weyl Manager, LLC
a Delaware limited liability company
Its: Managing Member

By: Jason Miller (Jan 28, 2025 17:58 PST)
Name: Jason Miller
Its: Manager

# EXHIBIT 3

# WRITTEN CONSENT OF SOLE MEMBER
# IN LIEU OF MEETING
# PURSUANT TO SECTION 10.5 OF OPERATING AGREEMENTS

**PRO TEMECULA TOWN CENTER LLC**
(a Delaware limited liability company)
*and*
**YNEZ SHOPS, LLC**
(a Delaware limited liability company)

The undersigned, being the sole Member of Pro Temecula Town Center LLC and Ynez Shops, LLC, each a Delaware limited liability company (each a "Company" and collectively, the "Companies"), holding 100% of the Percentage Interests in each Company, hereby takes the following actions by written consent in lieu of a meeting pursuant to Section 10.5 of the Operating Agreements of the Companies each dated January 27-28, 2025 (the "Operating Agreements"). Capitalized terms not defined herein shall have the meanings set forth in the Operating Agreements.

## RECITALS

**A.** Section 10.4 of each Operating Agreement provides that "the Members, at any time and from time to time, may by a Majority Vote of the Members other than the General Manager, remove for cause the General Manager then acting."

**B.** Section 10.4 defines "for cause" as: "(i) the General Manager's conviction of a felony as determined by a final judgment of a court of competent jurisdiction; or (ii) the General Manager's embezzlement of the Company's Property."

**C.** Section 2.59 of each Operating Agreement defines "Property" as "all real and personal property acquired or owned by the Company, including cash, improvements, and tangible and intangible property."

**D.** Henkin Investor Group LLC ("HIG") is the sole Member of each Company, holding 100% of the Percentage Interests. Temecula Town Center Manager LLC ("TTCM") serves as the General Manager of each Company but holds no Percentage Interest in either Company.

**E.** As the sole Member (excluding the General Manager, which holds no Percentage Interest), HIG constitutes 100% of the Members entitled to vote on removal under Section 10.4, which exceeds the Majority Vote required.

**F.** On December 16, 2025, Vincent Paglia, as sole member and manager of TTCM, executed a Joint Stipulation for Entry of Order Appointing Douglas Wilson as a Rents and Profits Receiver in *Nano Banc v. Ynez Shops, LLC*, Orange County Superior Court Case No. 30-2025-01529465-CU-OR-CJC, thereby surrendering control of Company Property to a court-appointed receiver.

**G.** Vincent Paglia personally guaranteed the $54.9 million in Nano Banc loans ($32.4 million to Pro Temecula Town Center LLC and $22.5 million to Ynez Shops, LLC), creating a direct conflict of interest. Upon information and belief, Paglia received relief from or modification of his personal guaranty obligations in exchange for stipulating to the receiver.

**H.** Such conduct — surrendering Company Property (rents, cash, and control of real property) to obtain personal benefit on Paglia's guaranty obligations — constitutes embezzlement of Company Property within the meaning of Section 10.4.

**I.** Additionally, the stipulation was executed in violation of the January 26, 2025 Joint Resolutions of HIG and the Henkin MOM Entities (which expressly prohibited stipulating to a receiver without HIG's prior written approval and declared any such action "void, unauthorized, ultra vires, and of no force or effect") and the December 5, 2025 written notice to Paglia that he had no authority to take legal action on behalf of the Companies.

**J.** The undersigned desire to act by written consent in lieu of a meeting to: (i) determine that "for cause" exists, (ii) remove TTCM as General Manager of the Company, and (iii) appoint a successor General Manager of the Company, all in accordance with the Operating Agreement and applicable law.

## RESOLUTIONS

**NOW, THEREFORE, BE IT RESOLVED**, that the sole Member hereby determines that TTCM, acting through Vincent Paglia, has embezzled Company Property within the meaning of Section 10.4 of each Operating Agreement by stipulating to the appointment of a receiver over Company Property in exchange for personal benefit regarding Paglia's guaranty obligations;

**RESOLVED FURTHER**, that TTCM's conduct, as described above, constitutes "for cause" under each Operating Agreement;

**RESOLVED FURTHER**, that pursuant to Section 10.4 of each Operating Agreement, Temecula Town Center Manager LLC is hereby removed as General Manager of Pro Temecula Town Center LLC and Ynez Shops, LLC for cause, effective immediately, and that TTCM shall have no further rights, authority, powers, responsibilities, or duties as General Manager of the Company from and after the Effective Date;

**RESOLVED FURTHER**, that the Manager of the sole Member is hereby authorized and directed to deliver written notice of such removal to Temecula Town Center Manager LLC and Vincent Paglia pursuant to Section 13.8 of each Operating Agreement;

**RESOLVED FURTHER**, that pending appointment of a successor General Manager, the sole Member, acting through its Managing Member (Weyl Manager LLC), shall have authority to manage the affairs of the Companies;

**RESOLVED FURTHER**, that all actions heretofore taken by the officers and authorized representatives of the sole Member in connection with the matters contemplated by these resolutions are hereby ratified, confirmed, and approved; and

**RESOLVED FURTHER**, that the officers and authorized representatives of the sole Member are hereby authorized and directed to execute and deliver any and all documents and instruments and to take any and all actions as may be necessary or appropriate to effectuate the foregoing resolutions.

## EFFECTIVE DATE

This Written Consent shall be effective as of the date set forth below.

**SOLE MEMBER:**

**HENKIN INVESTOR GROUP LLC**,
a Delaware limited liability company

By: **Weyl Manager LLC**, its Managing Member

By: ______________________________
Name: Jason Miller
Title: Manager

Date: January 6, 2026

# EXHIBIT 4

THE INTERESTS ACQUIRED PURSUANT TO THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS THEY HAVE BEEN REGISTERED UNDER SAID ACT OR UNLESS REGISTRATION UNDER SAID ACT IS NOT REQUIRED. THERE ARE SUBSTANTIAL RESTRICTIONS ON TRANSFER CONTAINED IN THIS AGREEMENT.

# OPERATING AGREEMENT

# OF

# HENKIN INVESTOR GROUP LLC

# OPERATING AGREEMENT OF HENKIN INVESTOR GROUP LLC

## TABLE OF CONTENTS

Page

1. DEFINITIONS ..... 1
1.1 Accredited Investor ..... 1
1.2 Act ..... 1
1.3 Additional Funds ..... 1
1.4 Additional Units ..... 1
1.5 Affiliates ..... 1
1.6 Book Value ..... 1
1.7 Capital Account ..... 2
1.8 Capital Proceeds ..... 2
1.9 Capital Transaction ..... 2
1.10 Cash Reserves ..... 2
1.11 Certificate of Formation ..... 3
1.12 Code ..... 3
1.13 Commitment ..... 3
1.14 Commitment Call ..... 3
1.15 Commitment Call Default ..... 3
1.16 Company ..... 3
1.17 Company Guarantor ..... 3
1.18 Company Minimum Gain ..... 3
1.19 Confidentiality Agreement ..... 3
1.20 Contribution ..... 3
1.21 Control ..... 3
1.22 Defaulting Member ..... 3
1.23 Distributable Cash ..... 3
1.24 Financing Guaranty ..... 4
1.25 Financing Guaranty Claims ..... 4
1.26 Fiscal Year ..... 4
1.27 Forfeited Units ..... 4
1.28 Forfeiture Provisions ..... 4
1.29 Funding Notice ..... 4
1.30 Holding Entity ..... 4
1.31 Indemnity Agreement ..... 4
1.32 Initial Contribution ..... 4
1.33 Initial Managing Member ..... 4
1.34 Joinder ..... 4
1.35 Management Fee ..... 4
1.36 Managing Member ..... 4
1.37 Member ..... 4
1.38 Member Nonrecourse Debt ..... 5
1.39 Member Nonrecourse Debt Minimum Gain ..... 5
1.40 Member Nonrecourse Deductions ..... 5
1.41 Membership Interest ..... 5

1.42 Membership Interest Pledge ..... 5
1.43 Non-Carried Interest Target Amount ..... 5
1.44 Non-Managing Member ..... 5
1.45 Non-Real Estate Asset ..... 5
1.46 Nonrecourse Deductions ..... 5
1.47 Operating Proceeds ..... 5
1.48 Participation Percentage ..... 5
1.49 Person ..... 6
1.50 Placement Fees ..... 6
1.51 Pre-Emptive Right ..... 6
1.52 Profits and Losses ..... 6
1.53 Project ..... 7
1.54 Property ..... 7
1.55 Regulations ..... 7
1.56 Remaining Commitment ..... 7
1.57 Returned Contribution ..... 7
1.58 Securities Act ..... 7
1.59 Subscription Agreement ..... 7
1.60 Tax Person ..... 7
1.61 Transfer ..... 7
1.62 True-Up Amount ..... 7
1.63 True-Up Reserve Account ..... 8
1.64 Unit ..... 8
1.65 Unreturned Contribution ..... 8

2. FORMATION OF LIMITED LIABILITY COMPANY ..... 8

3. NAME AND PLACE OF BUSINESS. ..... 8
3.1 Name ..... 8
3.2 Office; Agent for Service of Process ..... 8

4. PURPOSE ..... 8

5. TERM OF COMPANY; RECORDINGS ..... 8
5.1 Term ..... 8
5.2 Qualification ..... 8

6. CONTRIBUTIONS AND LOANS ..... 9
6.1 Initial Contributions ..... 9
6.2 Additional Contributions or Loans ..... 10
6.3 Interest on Contributions ..... 11
6.4 Return of Contributions ..... 11
6.5 Loans By a Member ..... 11
6.6 Tax Withholding ..... 11

7. ALLOCATIONS ..... 11
7.1 Allocation of Profits and Losses ..... 11
7.2 Allocation of Nonrecourse Deductions ..... 12

7.3 Member Nonrecourse Deductions ..... 12
7.4 704(c) Agreement ..... 12
7.5 Allocation of Tax Credits ..... 12
7.6 Qualified Income Offset ..... 12
7.7 Minimum Gain Chargeback ..... 12
7.8 Allocations of Tax Items ..... 13
7.9 No Deficit Restoration Obligation ..... 13

8. DISTRIBUTIONS. ..... 13
8.1 Distribution of Operating Proceeds ..... 13
8.2 Distribution of Capital Proceeds ..... 13
8.3 True-Up ..... 13
8.4 To Whom Distributions Are Made ..... 14

9. MANAGEMENT. ..... 14
9.1 Managing Member ..... 14
9.2 Power of Managing Member ..... 15
9.3 Non-Managing Members ..... 16
9.4 Certain Fees ..... 17
9.5 Tax Person ..... 17
9.6 Execution of Documents ..... 18
9.7 Liability/Indemnification ..... 18
9.8 Officers ..... 19
9.9 Other Business Ventures ..... 20
9.10 Financing Guaranty ..... 20

10. RESTRICTIONS ON TRANSFER; NEW MEMBERS. ..... 21
10.1 Limitations on Transfers ..... 21
10.2 Transfers Not Requiring Managing Member Consent ..... 22
10.3 No Dissolution ..... 22
10.4 New Members ..... 22

11. DISSOLUTION AND WINDING UP OF THE COMPANY. ..... 22
11.1 Dissolution of Company ..... 22
11.2 Winding Up of the Company ..... 22
11.3 Right To Receive Property ..... 23

12. BOOKS AND RECORDS; EXPENSES ..... 23
12.1 Books of Account ..... 23
12.2 Accounting and Reports. ..... 23
12.3 Banking ..... 24
12.4 Expenses of Company ..... 24
12.5 Member Information ..... 24

13. ADJUSTMENT OF BASIS ELECTION ..... 24

14. WAIVER OF ACTION FOR PARTITION ..... 24

15. AMENDMENTS ..... 24

16. EQUITABLE RELIEF ........ 25

17. NOTICES ........ 25

18. ATTORNEYS' FEES ........ 25

19. INVESTMENT REPRESENTATIONS OF THE MEMBERS ........ 25
19.1 Member Representations ........ 25

20. MISCELLANEOUS ........ 26
20.1 Applicable Law; Venue ........ 26
20.2 Severability ........ 27
20.3 Successors and Assigns ........ 27
20.4 Number and Gender ........ 27
20.5 Entire Agreement ........ 27
20.6 Waiver ........ 27
20.7 Counterparts ........ 27
20.8 Interpretation ........ 27
20.9 Parties in Interest ........ 27
20.10 Arbitration ........ 28

# OPERATING AGREEMENT OF HENKIN INVESTOR GROUP LLC

THIS OPERATING AGREEMENT OF HENKIN INVESTOR GROUP LLC (this "Agreement") is made and entered into as of December 8, 2020 (the "Effective Date"), by and among Weyl Manager LLC, a Delaware limited liability company (the "Initial Managing Member") and the other Persons executing signature pages to this Agreement (such other Persons, the "Non- Managing Members"), with reference to the following facts:

A. On December 8, 2020 (the "Formation Date"), a Certificate of Formation for Henkin Investor Group LLC (the "Company") was filed with the Delaware Secretary of State.

B. The Members desire to adopt and approve an operating agreement for the Company under the Act.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein contained, the parties agree as follows:

1. DEFINITIONS. When used in this Agreement, the following terms shall have the meanings set forth below:

1.1 Accredited Investor. "Accredited Investor" means an "accredited investor," as defined in Regulation D promulgated under the Securities Act.

1.2 Act. "Act" means the Delaware Limited Liability Company Act.

1.3 Additional Funds. "Additional Funds" has the meaning set forth in Section 6.2(a).

1.4 Additional Units. "Additional Units" has the meaning set forth in Section 6.2(d).

1.5 Affiliates. "Affiliates" of a Member means Persons Controlled by, Controlling or under common Control with such Member, or the family members of a Member.

1.6 Book Value. "Book Value" means for any asset the asset's adjusted basis for federal income tax purposes, except as follows:

(a) The initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Tax Person.

(b) The Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Tax Person, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution if the Tax Matters Partner reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company if the Tax Person reasonably determines that such adjustment is necessary or appropriate

to reflect the relative economic interests of the Members in the Company; and (iii) the liquidation of the Company within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g).

(c) The Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the Tax Person.

(d) The Book Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Book Values shall not be adjusted pursuant to this subsection to the extent the Tax Person determines that an adjustment pursuant to subsection (b) of this Section is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection.

(e) If the Book Value of an asset has been determined or adjusted pursuant to subsections (a), (b) or (d) of this Section, such Book Value shall thereafter be adjusted by the Book Depreciation (hereafter defined) taken into account with respect to such asset for purposes of computing Profits and Losses. "Book Depreciation" for any asset means for any fiscal year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such fiscal year or other period as the federal income tax depreciation, amortization or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the Tax Person.

1.7 Capital Account. "Capital Account" means an account established for each Member and determined in accordance with Section 1.704-1(b) of the Regulations. The Capital Accounts shall be adjusted in order to reflect allocations of depreciation, amortization, and gain and loss as computed for book purposes. Upon the transfer of any Member's interest in the Company, the Capital Account of the transferor Member shall carry over to the transferee Member.

1.8 Capital Proceeds. "Capital Proceeds" means Distributable Cash attributable to Capital Transactions. The Managing Member shall calculate Capital Proceeds separately with respect to each Project.

1.9 Capital Transaction. "Capital Transaction" means a sale, exchange, transfer, assignment or other disposition of any of the Company's assets or a recovery of a damage award or receipt of insurance proceeds affecting property owned by the Company, provided that a refinancing of the Company's debt shall not be treated as a Capital Transaction.

1.10 Cash Reserves. "Cash Reserves" means such amounts as may be estimated by the Managing Member for payment of costs, expenses and liabilities incident to the business of the Company and for which the cash to make such payments will not, in the sole discretion of the Managing Member, be expected to be available to the Company at or about the time such payments are required to be made, and which therefore, in the sole discretion of the Managing Member,

require that cash be set aside periodically to make such payments, including without limitation any fees payable by the Company.

1.11 Certificate of Formation. "Certificate of Formation" means the certificate of formation filed with the Delaware Secretary of State for the purpose of forming the Company.

1.12 Code. "Code" means the Internal Revenue Code of 1986, as amended from time to time.

1.13 Commitment. "Commitment" has the meaning set forth in Section 6.1(a).

Each Member's Commitment shall be as set forth in a separate agreement between such Member and the Managing Member, which may be in the form of Exhibit C attached hereto, such Member's Subscription Agreement or such other document as determined by the Managing Member.

1.14 Commitment Call. "Commitment Call" has the meaning set forth in Section 6.1(a).

1.15 Commitment Call Default. "Commitment Call Default" has the meaning set forth in Section 6.1(b).

1.16 Company. "Company" shall mean Henkin Investor Group LLC, a Delaware limited liability company.

1.17 Company Guarantor. "Company Guarantor" has the meaning set forth in Section 9.10.

1.18 Company Minimum Gain. "Company Minimum Gain" means "partnership minimum gain," as defined in the Regulations promulgated under Section 704(b) of the Code.

1.19 Confidentiality Agreement. "Confidentiality Agreement" means, for each Member, that Confidentiality Agreement entered into by such Member and the Initial Managing Member and/or its Affiliate(s).

1.20 Contribution. "Contribution" means any money or property, or a promissory note or other binding obligation to contribute money or property, or to render services as permitted by law, which a Member contributes to the Company as capital in that Member's capacity as a Member pursuant to this Agreement.

1.21 Control. "Control", "Controlled", and "Controlling" mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

1.22 Defaulting Member. "Defaulting Member" has the meaning set forth in Section 6.1(b).

1.23 Distributable Cash. "Distributable Cash" means for any period such portion of the cash in the Company's bank accounts that, in the sole discretion of the Managing Member, is

available for distribution to the Members after repayment of any loans made by the Managing Member and/or a Member to the Company and a provision has been made for Cash Reserves.

1.24 Financing Guaranty. "Financing Guaranty" means any guaranty, indemnity, or other recourse obligations incurred by a Company Guarantor in connection with or as a part of any financing of a Property, Non-Real Estate Asset or a Project, provided that (a) such guaranty, indemnity or other recourse obligation has been approved in writing by Managing Member and (b) no Member shall be required to provide any Financing Guaranty.

1.25 Financing Guaranty Claims. "Financing Guaranty Claims" has the meaning set forth in Section 9.10.

1.26 Fiscal Year. "Fiscal Year" means the calendar year.

1.27 Forfeited Units. "Forfeited Units" has the meaning set forth in Section 6.1(b).

1.28 Forfeiture Provisions. "Forfeiture Provisions" has the meaning set forth in Section 6.1(b).

1.29 Funding Notice. "Funding Notice" has the meaning set forth in Section 6.2(b).

1.30 Holding Entity. "Holding Entity" means a limited liability company or other entity directly and/or indirectly owned by the Company.

1.31 Indemnity Agreement. "Indemnity Agreement" has the meaning set forth in Section 9.10(b).

1.32 Initial Contribution. "Initial Contribution" has the meaning set forth in Section 6.1(a).

1.33 Initial Managing Member. "Initial Managing Member" has the meaning set forth in the first paragraph of this Agreement.

1.34 Joinder. "Joinder" means the Joinder Agreement set forth on Exhibit B attached hereto or such other signature page (which may be included in a Subscription Agreement), in each case consented to by the Managing Member.

1.35 Management Fee. "Management Fee" has the meaning set forth in Section 9.4(b).

1.36 Managing Member. "Managing Member" has the meaning set forth in Section 9.1.

1.37 Member. "Member" means any Person admitted to the Company as a Member in accordance with this Agreement, or a Person who has been admitted as a Member pursuant to applicable law.

1.38 Member Nonrecourse Debt. "Member Nonrecourse Debt" has the meaning ascribed to the term "partner nonrecourse debt" in Regulations Section 1.704-2(b)(4).

1.39 Member Nonrecourse Debt Minimum Gain. "Member Nonrecourse Debt Minimum Gain" means an amount, with respect each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability (as defined in Regulations Section 1.704-2(b)(3)), determined in accordance with Regulations Section 1.704-2(i)(3).

1.40 Member Nonrecourse Deductions. "Member Nonrecourse Deductions" means the Company deductions that are characterized as "partner nonrecourse deductions" pursuant to the Regulations promulgated under Section 704(b) of the Code.

1.41 Membership Interest. "Membership Interest" means the interest of a Member in the Company.

1.42 Membership Interest Pledge. "Membership Interest Pledge" has the meaning set forth in Section 9.10(d).

1.43 Non-Carried Interest Target Amount. "Non-Carried Interest Target Amount" means an amount equal to the sum of (a) the aggregate Contributions made by the Members (other than Defaulting Members) and (b) an amount equal to (i) 75%, multiplied by (ii) the excess (if any) of (A) the aggregate distributions made to the Members pursuant to Sections 8.1 and 8.2 (including, for the avoidance of doubt, amounts that would otherwise have been distributed to the Members but were instead deposited into the True- Up Reserve Account), over (B) the aggregate Contributions made by the Members (other than Defaulting Members).

1.44 Non-Managing Member. "Non-Managing Member" means each Member other than the Managing Member.

1.45 Non-Real Estate Asset. "Non-Real Estate Asset" means any direct or indirect, current or contingent interest in, option or commitment to acquire, or other contract right relating to, an asset other than real estate, a loan relating to an asset other than real estate asset or real estate-related assets. The Managing Member shall track each Non-Real Estate Asset separately.

1.46 Nonrecourse Deductions. "Nonrecourse Deductions" mean the Company deductions that are characterized as "nonrecourse deductions" pursuant to the Regulations promulgated under Section 704(b) of the Code.

1.47 Operating Proceeds. "Operating Proceeds" means all Distributable Cash other than Capital Proceeds. For the avoidance of doubt, Operating Proceeds shall include Distributable Cash attributable to each refinancing of the Company's debt. The Managing Member shall calculate Operating Proceeds separately with respect to each Project.

1.48 Participation Percentage. "Participation Percentage" of a Member shall mean that percentage obtained by dividing (a) the total number of issued and outstanding Units held by such Member and (b) the total number of issued and outstanding Units held by all of the Members, subject to adjustment set forth in this Agreement.

1.49 Person. "Person" means an individual, partnership, limited partnership, corporation, trust, estate, association, limited liability company or other entity, whether foreign or domestic.

1.50 Placement Fees. "Placement Fees" has the meaning set forth in Section 9.4(a).

1.51 Pre-Emptive Right. "Pre-Emptive Right" has the meaning set forth in Section 6.2(d).

1.52 Profits and Losses. "Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(a) All items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(b) Any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(c) Any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(1)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(d) In the event the Book Value of any Company asset is adjusted pursuant to Section 1.6(b), Section 1.6(d) or Section 1.6(e), the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(e) Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(f) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Regulations Section 1.704(b)(2)(iv)(m)(4), to be taken into account in determining the Capital Account as a result of a distribution other than in liquidation of a Membership Interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(g) Any items which are specially allocated pursuant to Sections 7.2, 7.3, 7.6 and 7.7 hereof shall not be taken into account in computing Profits or Losses.

1.53 Project. "Project" means the acquisition, foreclosure, development, ownership, improvement, construction, marketing, management and/or disposition of a Property or Non-Real Estate Asset which may be carried out directly by the Company and/or indirectly through one or more Holding Entities as determined by the Managing Member. The term "Project" in reference to a particular Property or Non-Real Estate Asset, shall include such Property or Non-Real Estate Asset, as applicable, and all Holding Entities (if any) utilized in connection with such Property or Non-Real Estate Asset, as applicable. The Managing Member shall track each Project separately.

1.54 Property. "Property" means any direct or indirect, current or contingent interest in, option or commitment to acquire, or other contract right relating to, a real estate asset, a loan relating to a real estate asset or any other real estate-related asset. The Managing Member shall track each Property separately.

1.55 Regulations. "Regulations" means the Income Tax Regulations promulgated under the Code, including Temporary and Proposed Regulations, as such Regulations may be amended from time to time, including corresponding provisions of succeeding Regulations.

1.56 Remaining Commitment. "Remaining Commitment" means with respect to each Member at any time an amount equal to the excess of (a) such Member's Commitment, over (b) the aggregate Contributions made by such Member to the Company as of such time, including, for the avoidance of doubt, such Member's Initial Contribution, provided that, a Member's Remaining Commitment shall be increased by the amount of Returned Contributions made to such Member

1.57 Returned Contribution. "Returned Contribution" has the meaning set forth in Section 6.1(d).

1.58 Securities Act. "Securities Act" means the Securities Act of 1933, as amended.

1.59 Subscription Agreement. "Subscription Agreement" means, for each Member, the Subscription Agreement executed by such Member with respect to the purchase by and sale of Units to such Member. Each Member's number of Units and Commitment shall be as set forth on such Member's Subscription Agreement.

1.60 Tax Person. "Tax Person" has the meaning set forth in Section 9.5(c).

1.61 Transfer. "Transfer" means any encumbrance, gift, assignment, pledge, hypothecation, sale or other transfer of all or any portion of a Membership Interest.

1.62 True-Up Amount. "True-Up Amount" means an amount, determined upon dissolution of the Company and after all distributions have been made to the Members pursuant to Sections 8.1 and 8.2, equal to the lesser of the following amounts:

(a) the remaining balance in the True-Up Reserve Account; or

(b) the excess (if any) of (i) the Non-Carried Interest Target Amount, over (ii) the aggregate distributions made to the Members pursuant to Sections 8.1(a), 8.2(a) and

8.2(b)(i) (excluding for the avoidance of doubt, amounts that would otherwise have been distributed to the Members but were instead deposited into the True-Up Reserve Account).

1.63 True-Up Reserve Account. "True-Up Reserve Account" has the meaning set forth in Section 8.3(a).

1.64 Unit. "Unit" means a unit of Membership Interest held by a Member, which the Managing Member may determine to denominate in separate classes. Each Member's Units shall be as set forth in a separate agreement between such Member and the Managing Member, which may be in the form of Exhibit C attached hereto, such Member's Subscription Agreement or such other document as determined by the Managing Member.

1.65 Unreturned Contribution. "Unreturned Contribution" means for each Member and calculated separately with respect to each Project, an amount equal to such Member's Contributions (other than Returned Contributions) to the Company in respect of such Project, reduced (but not below zero) by all distributions by the Company to such Member pursuant to Section 8.2(a) in respect of such Project.

2. FORMATION OF LIMITED LIABILITY COMPANY. The Company has been formed by the filing of the Certificate of Formation with the Delaware Secretary of State pursuant to the provisions of the Act.

3. NAME AND PLACE OF BUSINESS.

3.1 Name. The name of the Company shall be Henkin Investor Group LLC.

3.2 Office; Agent for Service of Process. The address of the Company's registered office in Delaware is c/o Capitol Services, Inc., 1675 S. State St., Suite B, Dover, Delaware 19901. The name and address of the registered agent in Delaware for service of process are Capitol Services, Inc., 1675 S. State St., Suite B, Dover, Delaware 19901. The Managing Member may change the registered office and the registered agent of the Company as the Managing Member may deem appropriate upon written notice to the Non-Managing Members. The Company shall maintain a principal place of business and office(s) at such place or places as the Managing Member may from time to time designate.

4. PURPOSE. The purpose of the Company is to acquire Properties and, if determined by the Managing Member in its sole and absolute discretion, Non-Real Estate Assets, to undertake Projects and to engage in any and all general business activities related or incidental thereto permitted under the Act.

5. TERM OF COMPANY; RECORDINGS.

5.1 Term. The Company commenced as of the Formation Date and shall continue until dissolved, unless sooner terminated as herein provided or by operation of law.

5.2 Qualification. The Company shall file any documents with any other appropriate governmental agencies as may be required by applicable law. The Company shall qualify to do business in any other jurisdiction as may be required under the laws of such jurisdiction.

6. CONTRIBUTIONS AND LOANS.

6.1 Initial Contributions.

(a) The Company is conducting an offering of Units pursuant to which the Company will be accepting Subscription Agreements from Members. The Unit Price for each member will be determined on a member by member basis by the Managing Member in its sole discretion (the "Unit Price"). Each Member's Subscription Agreement which will consist of an irrevocable commitment to make cash Contributions in amounts up to (i) the number of Units for which such Member has subscribed, multiplied by (ii) the Unit Price (for each such Member, its "Commitment"). The initial portion of each Member's Commitment due at the time such Member executes a counterpart to this Agreement shall be an amount determined by the Managing Member (such Member's "Initial Contribution"). The Managing Member shall provide each Member with written notice of each additional increment after the Initial Contribution making up such Member's Commitment (each, a "Commitment Call") specifying the amount of each such Contribution and a due date not less than ten (10) days following delivery of such notice.

(b) If a Member (a "Defaulting Member") fails to make its Commitment Call when due (a "Commitment Call Default"), then as of such Commitment Call Default, (i) such Defaulting Member shall be deemed to have automatically forfeited all of such Defaulting Member's Units ("Forfeited Units"), (ii) such Forfeited Units shall be deemed to have automatically been extinguished and shall thereafter cease to be treated as outstanding Units, (iii) such Defaulting Member's Participation Percentage shall automatically be reduced to zero percent (0%) and (iv) such Defaulting Member's Unreturned Contribution shall automatically be reduced to zero dollars ($0) (collectively, the "Forfeiture Provisions"). Notwithstanding the foregoing, and for the avoidance of doubt, but subject to Sections 6.6 and 9.10, no Member shall be required to make Contributions at any time in excess of such Member's Remaining Commitment as of such time.

(c) Each Member acknowledges, understands and agrees that (i) the Company, the Managing Member and the other Members are relying on each of the Members to make Contributions pursuant to Commitment Calls when due so that the Company can effectively operate its business, (ii) a Commitment Call Default will disrupt the operation of the Company's business and limit its ability to operate as intended, (iii) the actual damages likely to result to the Company and the other Members from a Commitment Call Default are difficult to estimate and would be difficult for the Managing Member to prove, (iv) the Forfeiture Provisions are intended as liquidated damages and not as a penalty, (v) the Forfeiture provisions will serve to compensate the Company and the other Members for any Commitment Call Default by a Defaulting Member and (vi) the Members do not intend for the Forfeiture Provisions to serve as punishment for any Commitment Call Default by a Defaulting Member.

(d) If, after the Members have made their Initial Contributions and/or other Contributions made pursuant to Commitment Calls, the Manager Member determines in its sole and absolute discretion that all or any portion of such Initial Contributions and/or other Contributions are in excess of the amount of funds needed by the Company, the Managing Member may return all or any portion of such Initial Contributions and/or other Contributions to the Members (such Initial Contributions and/or other Contributions returned to each such Member, its "Returned Contributions").

6.2 Additional Contributions or Loans.

(a) General. The Managing Member may, at any time and from time to time determine that the Company requires additional funds ("Additional Funds") for Company purposes as the Managing Member may determine, including without limitation to cover Commitment Call Defaults. Additional Funds may be raised by the Company, at the election of the Managing Member, in any manner provided in, and in accordance with, the terms of this Section 6.2. No Person shall have any preemptive, preferential or similar right or rights to subscribe for or acquire any Units, except as set forth in this Section 6.2.

(b) Funding Notice. The Managing Member shall give written notice (the "Funding Notice") to the Non-Managing Members setting forth in reasonable detail (i) the amount and purpose of the Additional Funds, (ii) the date on which Additional Funds are required to be contributed to the Company.

(c) Issuance of Additional Units. Upon delivery of a Funding Notice to the Non-Managing Members, subject to Section 6.2(d), the Managing Member, in its sole and absolute discretion, may raise all or any portion of the remaining Additional Funds by accepting additional Contributions. In connection with any such additional Contributions, the Managing Member is hereby authorized to cause the Company from time to time to issue to Members (including the Managing Member) or other Persons additional Units in one or more classes, or one or more series of any of such classes, with such designations, preferences and relative, participating, optional or other special rights, powers, and duties, including rights, powers, and duties senior to then existing Units, all as shall be determined by the Managing Member in its sole and absolute discretion subject to applicable law, including without limitation, (i) the allocations of items of Company income, gain, loss, deduction, and credit to such class or series of Units; (ii) the right of each such class or series of Units to share in Company distributions; and (iii) the rights of each such class or series of Units upon dissolution and liquidation of the Company. In the event that the Company issues additional Units pursuant to this Section 6.2, the Managing Member shall make such revisions to this Agreement as it determines are necessary to reflect the issuance of such additional Units.

(d) Pre-Emptive Rights. Prior to issuing any additional Units in exchange for Contributions ("Additional Units"), each of the Members (other than Defaulting Members) then holding Units shall have the right to contribute to the capital of the Company its proportionate share (based on its Participation Percentage immediately prior to the issuance of such Additional Units) of the capital desired to be raised by such issuance, upon the same terms as such Additional Units are proposed to be issued (such right is referred to herein as a "Pre- Emptive Right") in the following manner:

(i) Terms of Additional Units. The Funding Notice shall be delivered to each of the Members at least 15 days prior to any such proposed issuance of Additional Units, specifying in reasonable detail the terms of such proposed issuance and the proposed date of funding thereof.

(ii) Exercise of Pre-Emptive Rights. Each Member who intends to exercise its Pre-Emptive Right and make a Contribution pursuant to this Section 6.2(d) shall within ten (10) days of its receipt of a Funding Notice from the Managing Member deliver written

notice of such intention to the Managing Member. The failure of a Member to give such a notice of its intention to exercise its Pre-Emptive Right or to make a Contribution pursuant to the foregoing provisions of this Section 6.2(d), or the failure of a Member to exercise its Pre- Emptive Right in full with respect to such issuance, shall be deemed to be a waiver of such Member's Pre-Emptive Right in connection with such issuance, and the Managing Member shall, in its sole discretion, be free to issue the Additional Units described in the applicable Funding Notice to any Person (including, without limitation, one or more Members).

(iii) Closing of Additional Units. The closing of a Member's Contributions for Additional Units pursuant to this Section 6.2(d) shall be held at such time and place as the Managing Member shall determine.

(iv) Rights Relating to Additional Units. The Managing Member shall have the sole and complete discretion to determine the consideration, the terms and conditions, and the rights, powers, privileges and preferences of all Additional Units.

(e) Other Contributions and Loans. Except as set forth in this Section 6, the Members shall not be required to make any additional Contributions or loans to the Company.

6.3 Interest on Contributions. No interest shall be paid by the Company on any Contribution made by any Member to the Company.

6.4 Return of Contributions. Except as otherwise provided in this Agreement, no Member shall have the right to withdraw or reduce such Member's Contribution or to receive any distributions, except as a result of dissolution. No Member shall have the right to demand or receive property other than cash in return for such Member's Contributions.

6.5 Loans By a Member. Loans by a Member to the Company shall not be considered Contributions for purposes of this Agreement, increase such Member's Capital Account or entitle such Member to any greater share of the Profits, Losses or distributions of the Company than such Member is otherwise entitled to under this Agreement. No loan shall be made by a Member to the Company unless approved by the Managing Member.

6.6 Tax Withholding. If the Company is required to withhold or otherwise pay taxes with respect to the Profits, distributions or Units of a Member, the Managing Member may require an additional Contribution (without adjustment to Units or Participation Percentages) of such Member in the amount of the required tax and/or the Company may withhold such taxes from any distribution to such Member.

7. ALLOCATIONS.

7.1 Allocation of Profits and Losses. After giving effect to the special allocations set forth in Sections 7.2, 7.3, 7.6 and 7.7, Profits and Losses in respect of each Fiscal Year of the Company (and, in each case, each item of income, gain, loss, deduction and tax preference, required to be taken into account by the Members separately under Section 702(a) of the Code, which are included in the computation of such Profits and Losses for such year) shall be allocated to the Members in a manner such that the Capital Account of each Member is, as nearly as possible, equal (proportionately) to the excess of:

(a) the distributions that would be made to that Member pursuant to Sections 8.1 and 8.2 if:

(i) the Company were dissolved, its affairs wound up and its assets sold for an amount of cash equal to their Book Values;

(ii) all liabilities of the Company were satisfied (limited with respect to each non-recourse liability to the Book Value of the assets securing such liability); and

(iii) the assets of the Company were distributed to the Members in accordance with Sections 8.1 and 8.2 immediately after making such allocation; over

(b) the sum of (i) the Member's respective share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain; and (ii) the amount, if any, that such Member is obligated (or deemed obligated) to contribute, in its capacity as a Member, to the Company, computed immediately prior to the hypothetical sale of assets described in Section 7.1(a).

7.2 Allocation of Nonrecourse Deductions. Nonrecourse Deductions for each Fiscal Year shall be allocated among the Members as determined by the Managing Member in a manner consistent with the Code and Regulations.

7.3 Member Nonrecourse Deductions. Member Nonrecourse Deductions for each Fiscal Year shall be allocated as required by the Regulations promulgated under Section 704(b) of the Code.

7.4 704(c) Agreement. The Members agree that items attributable to contributed property shall be allocated as required by Section 704(c) of the Code.

7.5 Allocation of Tax Credits. Except as may otherwise be required by law, any tax credits to which the Company may be entitled shall be allocated among the Members as determined by the Managing Member in a manner consistent with the Code and Regulations.

7.6 Qualified Income Offset. Except as provided in Section 7.7 of this Agreement, if any Member unexpectedly receives an adjustment, allocation or distribution described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, any deficit in said Member's Capital Account as quickly as possible. For purposes of this Section 7.6, the Member's Capital Account, as of the end of the relevant Fiscal Year, shall take into account the adjustments described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6), any amount of any deficit Capital Account balance which the Member is obligated to restore, and any amount of any deficit Capital Account balance which the Member is deemed obligated to restore pursuant to the Regulations promulgated under Section 704(b) of the Code.

7.7 Minimum Gain Chargeback. Prior to any allocation hereunder, if there is a net decrease in the Company Minimum Gain during a Company taxable year, each Member shall be allocated items of income and gain in accordance with the Regulations promulgated under Section 704(b) of the Code and its requirements for a "minimum gain chargeback." If there is a net

decrease in minimum gain attributable to debt associated with Member Nonrecourse Deductions, income and gain shall be allocated to the Members in accordance with the Regulations.

7.8 Allocations of Tax Items. For federal income tax purposes, every item of income, gain, loss and deduction shall be allocated among the Members in accordance with the foregoing allocations. Whenever items of income or loss of the Company allocable hereunder consist of items of different character for tax purposes (i.e., ordinary income, long-term capital gain, depreciation recapture, interest expense, etc.) the items of income or loss of the Company allocable to each Member shall include, to the extent possible, its pro rata share of each such item; provided, however, in making allocations of depreciation recapture under Section 1245 or Section 1250 of the Code, or unrecaptured Section 1250 gain under Section 1(h) of the Code, principles consistent with those of Regulations Section 1.1245-1(e) shall be followed such that amounts treated as ordinary income shall be allocated first to the Member that was allocated the related ordinary deduction.

7.9 No Deficit Restoration Obligation. At no time during the term of the Company or upon dissolution and liquidation thereof shall a Member with a negative balance in its Capital Account have any obligation to the Company or the other Members to restore such negative balance, except as may be required by law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

8. DISTRIBUTIONS.

8.1 Distribution of Operating Proceeds. Subject to Section 8.3, all Operating Proceeds in respect of a Project shall be distributed (at such times, no less often than quarterly, and in such amounts, not less than 100% in the aggregate of the Operating Proceeds, as the Managing Member shall determine in its sole discretion) to the Members (other than Defaulting Members) as follows: (a) 75% shall be distributed to the Members pro rata in proportion to their Participation Percentages and (b) 25% shall be distributed to the Managing Member.

8.2 Distribution of Capital Proceeds. Subject to Section 8.3, Capital Proceeds in respect of a Project shall be distributed (at such times, but not less often than quarterly, as the Managing Member shall determine in its sole discretion) to the Members (other than Defaulting Members) as follows:

(a) First, to the Members with positive Unreturned Contribution balances in respect of such Project, pro rata in accordance with such balances, until the Unreturned Contribution balance of each such Member in respect of such Project is reduced to zero;

(b) Thereafter, (i) 75% shall be distributed to the Members pro rata in proportion to their Participation Percentages and (ii) 25% shall be distributed to the Managing Member.

8.3 True-Up.

(a) True-Up Reserve Account. Notwithstanding anything to the contrary in Section 8.1 or Section 8.2, and only in the event that the Company acquires more than one Project, 10% (or such higher percentage as determined by the Managing Member in its sole and absolute discretion) of all distributions that would otherwise be distributed directly to the Members

pursuant to Sections 8.1 and 8.2(b) shall instead be deposited by the Managing Member in a bank account held in the name of the Company (the "True-Up Reserve Account"). For purposes of this Agreement, amounts that would otherwise have been distributed to the Members but were instead deposited into the True-Up Reserve Account shall be treated as having been distributed to the Members pursuant to Sections 8.1 and 8.2(b), as applicable.

(b) Final Distribution of True-Up Reserve Account. Upon dissolution of the Company, and after all distributions have been made to the Members pursuant to Sections 8.1 and 8.2, the Managing Member shall cause the Company to distribute the balance of the True-Up Reserve Account as follows:

(i) if the balance of the True-Up Reserve Account is greater than the True-Up Amount, then (A) an amount equal to the True-Up Amount shall be distributed to the Members (including the Managing Member) pro rata in proportion to their Participation Percentages and (B) the remainder shall be distributed to the Managing Member; and

(ii) if the balance of the True-Up Reserve Account is equal to the True-Up Amount (the Members understand and acknowledge that the True-Up Amount cannot exceed the True-Up Reserve Account), then the entire True-Up Reserve Account shall be distributed to the Members (including the Managing Member) pro rata in proportion to their Participation Percentages.

8.4 To Whom Distributions Are Made. Unless named in this Agreement or unless admitted as a Member as provided in this Agreement, no Person shall be considered a Member in the Company. Any distribution by the Company to the Person shown on the Company records as a Member, or to such Member's legal representatives, or to a named assignee of the right to receive distributions, shall acquit the Company and the Members of all liability to any other Person who may be interested in such distribution by reason of an assignment by a Member or for any other reason.

9. MANAGEMENT.

9.1 Managing Member.

(a) The Company shall be managed by a Person acting as a "manager" as that term is defined under the Act (the "Managing Member"). The Initial Managing Member is hereby designated as the Managing Member, which shall hold the office of Managing Member for an indefinite term unless and until the Managing Member resigns. The Managing Member is not subject to removal. The Managing Member shall be a Member.

(b) The Managing Member may resign, without liability of any nature to the Company or any of its Members, from its position as Managing Member at any time upon giving notice to the Members. Such resignation shall become effective as set forth in such notice. Such resignation shall not affect in any manner the Managing Member's interest in the Company as a Member.

(c) The Initial Managing Member may designate any Person as a successor Managing Member.

(d) Subject to the remaining provisions of this Agreement, the Company's business shall be managed by the Managing Member. The Managing Member shall be responsible for the day to day management of the Company's business and shall have all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith. The Managing Member shall devote such time to the Company as shall be necessary in its sole and absolute discretion to conduct the Company's business and to carry out its duties and responsibilities under this Agreement for the furtherance of the Company's business. To the fullest extent permitted by law, the Members acknowledge and agree that the Managing Member owes no fiduciary duties to the Members or the Company.

9.2 Power of Managing Member. Except as otherwise specifically provided herein, the Managing Member shall have authority to cause the Company to engage in any transaction without first obtaining the approval of any of the Members, including without limitation:

(a) To make all decisions and take all actions on behalf of the Company and the Holding Entities with respect to each Project;

(b) To direct the formulation of investment policies and strategies for the Company and the Holding Entities;

(c) To investigate, select, negotiate, structure, purchase, invest in, hold, pledge, exchange, transfer and sell or otherwise dispose of each Project;

(d) To monitor the performance of each Project, to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to each Project as may be necessary or advisable as determined by the Managing Member in its sole and absolute discretion;

(e) To form Holding Entities in connection with the Company business;

(f) To enter into any kind of activity and to enter into, perform and carry out contracts of any kind necessary to, in connection with, or incidental to the accomplishment of the purposes of the Company;

(g) To open, maintain and close bank accounts and draw checks or other orders for the payment of money and open, maintain and close brokerage, money market fund and similar accounts;

(h) To hire, for usual and customary payments and expenses, consultants, brokers, attorneys, accountants and such other agents for the Company and the Holding Entities as it may deem necessary or advisable, and authorize any such agent to act for and on behalf of the Company and the Holding Entities;

(i) To purchase insurance policies, including for director and officer liability and other liabilities for the Company and the Holding Entities;

(j) To confess a judgment against the Company and/or any Holding Entity

(k) To pay all fees and expenses of the Company, the Holding Entities and the Managing Member in accordance with Sections 9.4 and 12.4 hereof;

(l) To cause the Company and/or any Holding Entity to borrow money, or enter into other similar credit, financing or refinancing arrangements for any purpose, from any Person, including the Managing Member and its Affiliates, which borrowings may be secured directly or indirectly by all or any portion of the Projects.

(m) To cause the Company and/or any Holding Entity to guarantee loans or other extensions of credit;

(n) To engage in development activities relating to Projects;

(o) To authorize Financing Guaranties and cause the Company to enter into Indemnity Agreements with Company Guarantors; and

(p) To take any and all other actions which are determined by the Managing Member to be necessary, convenient or incidental to the conducting of the Company business.

9.3 Non-Managing Members.

(a) Non- Managing Member Meetings. The Managing Member may hold meetings of Non-Managing Members at such place as the Managing Member may determine or may at any time call for a vote without a meeting of the Non-Managing Members on matters on which they are entitled to vote as specifically provided in this Agreement. Written notice of a meeting or vote shall be given to the Non-Managing Members not less than ten (10) business days before the date of the meeting or vote. Each notice of meeting or vote, if any, shall contain a detailed statement of any resolution to be adopted by the Non-Managing Members and any proposed amendment to the Agreement. The voting ballot shall provide Non-Managing Members a specific choice between approval, disapproval or abstention for each matter to be voted upon at the meeting. If a vote of Non-Managing Members is taken at any meeting or otherwise, each Non-Managing Member shall be entitled to cast a number of votes corresponding to such Non-Managing Member's Participation Percentage, as determined by the Managing Member. A Non-Managing Member shall be entitled to vote at a meeting in person or by written proxy delivered to the Managing Member prior to the meeting. Nothing in this Section 9.3 shall be deemed to give any Non-Managing Member the right to vote on any matters other than those specifically set forth in the other provisions of this Agreement.

(b) Action by Written Consent. The Managing Member may allow the Non-Managing Members to take action without any meeting of the Non-Managing Members by written consent setting forth the action to be approved.

(c) No Authority of Members to Act on Behalf of the Company. Unless authorized to do so by the Managing Member, no Member, agent, or employee of the Company shall have any power or authority to act on behalf of the Company, to bind the Company in any way, to execute any instrument on behalf of the Company or to render the Company liable in any way. No Member other than the Managing Member shall have a right to participate in the control, operation, management or direction of the Company.

9.4 Certain Fees.

(a) Placement and/or Finder Fees. The Managing Member may cause the Company to enter arrangements with Persons, pursuant to which the Company will pay such Persons placement and/or finder fees in connection with the acquisition of Units by Members ("Placement Fees"). Placement Fees shall, in the aggregate, not to exceed ten percent (10%) of the total Commitments. Placement Fees may be paid to Persons that may or may not be Affiliates of the Managing Member, as determined by the Managing Member in its sole and absolute discretion.

(b) Management Fee. In consideration for services to the Company in respect of the Projects, the Company shall pay to the Managing Member and/or its Affiliate as designated by the Managing Member an annual management fee (the "Management Fee") equal to two percent (2%) of the aggregate Unreturned Contribution balances of all of the Members. The Management Fee shall be payable in advance in quarterly installments commencing on the Effective Date. The Management Fee shall be calculated as of the beginning of each quarter, provided that the initial Management Fee shall be calculated based on the initial Contributions of the Members.

(c) Guaranty Fees. The Managing Member may cause the Company to pay fees ("Guaranty Fees") to Company Guarantors in consideration for providing Financing Guaranties, provided that the aggregate Guaranty Fees paid to all Company Guarantors shall not exceed 5% of the aggregate original principal balances of all loans to the Company.

9.5 Tax Person.

(a) Tax Matters Partner. The Managing Member shall serve as the "tax matters partner" as that term is defined in Section 6231(a)(7) of the Code (as in effect prior to the enactment of the New Audit Procedures) and the Regulations promulgated thereunder (the "Tax Matters Partner"). If Managing Member is subsequently unable or unwilling to serve as the Tax Matters Partner, then another Member designated by Managing Member (and consented to by such Member) shall serve as the Tax Matters Partner. The Tax Matters Partner shall have all powers necessary and appropriate in connection with such role, including without limitation representing the Company in any tax audit, proceeding or dispute with the Internal Revenue Service or state or local tax authority, consenting to extending the statute of limitations for assessing tax against a Member and/or the Company attributable to a Company item, negotiating and entering into a settlement agreement and contesting any proposed adjustment of a Company item (the "Tax Person Responsibilities")

(b) Tax Representative. The Members acknowledge the recent passage of the Bi-Partisan Budget Act of 2015, H.R. 1314, which contains, among other things, revisions to the audit procedures for Persons treated as partnerships for U.S. federal income tax purposes (the "New Audit Procedures"). The New Audit Procedures generally are effective for federal tax returns filed for partnership tax years commencing after December 31, 2017. The Managing Member shall serve as the "partnership representative" as that term is defined in Section 6223 of the Code (as in effect under the New Audit Procedures) (the "Tax Representative"). If the Managing Member is subsequently unable or unwilling to serve as the Tax Representative, then another Person designated by the Managing Member (and consented to by such Person) shall serve as the Tax Representative. The Tax Representative shall have all Tax Person Responsibilities in connection

with its role as Tax Representative, including without limitation the payment of any tax liability imposed by the New Audit Procedures or the allocation of such liability pursuant to the New Audit Procedures. Each Member shall be charged and shall indemnify the Company for the portion of any imputed underpayment paid by the Company attributable to such Member as determined by the Tax Representative. This indemnity shall survive each Member's withdrawal as a Member of the Company, the sale of any Company assets and the dissolution of the Company. Prior to any withdrawal of a Member or transfer of a Membership Interest by a Member, the Managing Member in its sole and absolute discretion may withdraw amounts otherwise payable to such Member or require such Member to deposit amounts with the Company, which amounts shall be determined by Managing Member, in each case to reserve against any potential future obligation of such Member pursuant to this Section 9.5(b).

(c) Tax Person. The Person acting as the Tax Matters Partner or Tax Representative at any given time (the "Tax Person") may make all tax elections and execute all waivers and consents for tax purposes on behalf of the Company

9.6 Execution of Documents. Each check, contract, deed, lease, promissory note, deed of trust, escrow instruction, bond, release or any other documents of any nature whatsoever, in any way pertaining to the Company or on behalf of the Company, shall be signed by the Managing Member or the Person or Persons designated from time to time by the Managing Member.

9.7 Liability/Indemnification.

(a) For purposes of this Agreement, "Indemnified Persons" means the Managing Member and its successors, officers, directors, managers, members, partners, employees, agents and affiliates.

(b) No Indemnified Person shall be liable, responsible or accountable in damages or otherwise to the Company or to the Members for any acts performed within the scope of the authority conferred on the Managing Member by this Agreement, except for the Managing Member's intentional fraud or willful misconduct.

(c) The Company shall indemnify and hold harmless the Indemnified Persons from and against any and all losses, claims, demands, costs, damages, liabilities, expenses of any nature (including reasonable attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, brought against, or threatened against, such Indemnified Person by reason of any act performed or omitted to be performed by any Indemnified Person in connection with the business of, or on behalf of, the Company or by reason of the fact such Indemnified Person was the Managing Member or an officer of the Company, except for the Managing Member's intentional fraud or willful misconduct. Such indemnification shall be provided regardless of whether the Managing Member continues to act as Managing Member (or the other Indemnified Person continues to act in his or her capacity with respect to the Managing Member or the Company) at the time any such liability or expense is paid or incurred.

(d) The Company shall indemnify and hold harmless any Person which provides a guaranty of any obligation of the Company from and against any and all losses, claims, demands, costs, damages, liabilities, expenses of any nature (including reasonable attorneys' fees

and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, brought against, or threatened against, such Person under such guaranty.

(e) Expenses incurred by an Indemnified Person in defending any claim, demand, action, suit or proceeding subject to indemnification pursuant to this Section 9.7, shall from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking in a form satisfactory to the Company by or on behalf of the Indemnified Person to repay such amount if it shall be determined that such Person is not entitled to be indemnified under Section 9.7.

(f) The indemnification provided by Section 9.7 shall be in addition to any other rights to which the Indemnified Person may be entitled under any agreement, vote of the Members, as a matter of law or equity or otherwise and shall inure to the benefit of the heirs, successors, assigns and administrators of the Indemnified Person.

(g) The Company may purchase and maintain insurance, at the Company's expense, on behalf of the Indemnified Persons as the Managing Member shall determine, against any liability that may be asserted against, or any expense that may be incurred by, such Persons in connection with the activities of the Company and/or the acts or omissions of such Persons regardless of whether the Company would have the power to indemnify such Persons against such liability under the provisions of this Agreement.

(h) Any indemnification under Section 9.7 shall be satisfied solely out of the assets of the Company. No Member shall be subject to personal liability or required to provide any funds, or to cause any funds to be provided, to Company to satisfy any indemnification obligation of the Company under Section 9.7.

(i) Except as set forth in the Act, no Member shall be liable under a judgment, decree or order of a court, or in any other manner, for the debts, liabilities, or obligations of the Company; provided, however, nothing contained in this section shall limit the liability of a Member for making Contributions pursuant to Section 6.1.

9.8 Officers. The Managing Member may, from time to time, appoint one or more persons to be officers of the Company. Unless the Managing Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office, subject to the terms of this Agreement and any written employment agreement of such individual with the Company. No such appointment and no prescribed duties will reduce or dilute the power of the Managing Member as set forth herein or at law. The Managing Member may remove any officer from office with or without cause; provided, however, that no removal will impair the contract rights, if any, of the officer removed or of the Company or of any other Person. Any officer may resign at any time by giving written notice to the Managing Member. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Company under any contract to which the officer is a party.

9.9 Other Business Ventures.

(a) The Members and the Managing Member may engage in or possess an interest in other business ventures of every nature and description, independently or with others, and neither the Company, the Managing Member nor the other Members shall have, and each of them hereby expressly waives, relinquishes and renounces, any right by virtue of this Agreement in and to such independent ventures or to the income or profits derived therefrom.

(b) The Managing Member shall not be obligated to present any particular investment opportunity to the Company, even if such opportunity is of a character which, if presented to the Company, could be taken by the Company, and the Managing Member shall have the right to take for its own account, for the account of other business entities of which it is an owner, or to recommend to others any such particular investment opportunity.

(c) Notwithstanding the foregoing provisions of this Section 9.9 or any other provision in this Agreement, each Member hereby acknowledges and agrees that such Member is subject to the terms of its Confidentiality Agreement and with respect to any provision in this Agreement which conflicts with such Confidentiality Agreement, the terms of such Confidentiality Agreement shall control.

9.10 Financing Guaranty. Notwithstanding anything to the contrary in this Agreement, including without limitation the last sentence of Section 6.1(b), if a Person providing a Financing Guaranty on behalf of the Company (a "Company Guarantor") incurs any liability under any Financing Guaranty, whether by execution of a guaranty, Environmental Indemnity Agreement, nonrecourse carveouts, or the like, the Company shall, as between the Company, each Guarantor and their respective successors and assigns, assume all liability of each such Guarantor, and in all respects indemnify and hold each such Guarantor harmless for, from and against, any and all claims, liability and damages (including costs and reasonable attorneys' fees), arising under or pursuant to the Financing Guaranty ("Financing Guaranty Claims"), subject to all of the following:

(a) The Managing Member shall, upon receipt of any demand or claim under a Financing Guaranty Claim, promptly notify the Members thereof.

(b) If and when requested by a Guarantor, the Company shall arrange for such Financing Guaranty Claims and pay all fees and costs of legal representation of Guarantor with respect to any Financing Guaranty Claims by counsel reasonably acceptable to such Guarantor, which may be counsel for the Company in connection with any such Financing Guaranty Claims, provided such dual representation is reasonably acceptable to such Guarantor and the Company, and does not create a conflict of interest or other like legal or ethical issue.

(c) The Company may enter into a separate indemnity agreement with any Company Guarantor pursuant to which the Company will agree to indemnify such Company Guarantor for Financing Guaranty Claims (an "Indemnity Agreement").

(d) In order to induce Company Guarantors to provide Financing Guaranties, the Members hereby authorize the Managing Member to pledge their Membership Interests in the Company as collateral for the Company's obligations under Indemnity Agreements (with respect to each such Member, a "Membership Interest Pledge"). Each Member hereby grants to the Managing Member a power of attorney to act on behalf of such Member to take all such

actions as are necessary to effect a Membership Interest Pledge with respect to each such Member, which power of attorney shall include without limitation, the power to sign all documents on behalf of such Member necessary to effect such Membership Interest Pledge.

(e) If the Managing Member in its sole and absolute discretion determines that the Company has insufficient proceeds to pay any Financing Guaranty Claims (such shortfall, a "Financing Guaranty Claim Shortfall"), then the Managing Member in its sole and absolute discretion may deliver written notice to the Members ("Financing Guaranty Claim Shortfall Notice") that each such Member shall be personally obligated to pay such Member's Participation Percentage of such Financing Guaranty Claim Shortfall. Each Member shall pay to the Managing Member such Member's share of the Financing Guaranty Claim Shortfall as so determined within 10 business days following delivery of the Financing Guaranty Claim Shortfall Notice.

(f) If the Managing Member in its sole and absolute discretion decides to deliver Financing Guaranty Claim Shortfall Notices, then the Company shall be treated as a creditor (including all rights associated therewith) with respect to each Member and each such Member's obligation to fund Financing Guaranty Claim Shortfall pursuant to this Section 9.10 and such obligation amount shall be treated as a loan to each such Member which loan shall (i) bear interest at the lesser of (A) 15% per annum, or (B) the maximum rate permitted by law; and (ii) be repaid prior to the making of any distributions to each such Member under this Agreement.

(g) Notwithstanding anything to the contrary in this Agreement, neither the Company Guarantors nor any other Persons shall be deemed third party beneficiaries of this Section 9.10 or otherwise be entitled to enforce any of the provisions hereof. For the avoidance of doubt, no Company Guarantor shall be entitled to enforce the provisions clauses (e) or (f) of this Section 9.10, which provisions shall be enforced in the Managing Member's sole and absolute discretion.

## 10. RESTRICTIONS ON TRANSFER; NEW MEMBERS.

### 10.1 Limitations on Transfers.

(a) Except as set forth in Section 10.2, no Member shall for any reason, whether voluntarily, involuntarily or by operation of law, Transfer all or any of such Member's Unit, without the prior written consent of the Managing Member (which consent shall not be unreasonably withheld). Any Transfer not expressly permitted in this Agreement shall be null and void. Whether or not the consent of the Managing Member is required for a transfer, a transferee of a Unit shall have the right to become a substitute Member only if (i) such Person is an Accredited Investor (this clause shall not apply to a permitted transferee under Section 10.1(b)), (ii) such Person executes an instrument satisfactory to the Managing Member accepting and adopting the terms and provisions of this Agreement, and (iii) such Person pays any reasonable expenses in connection with his or her admission as a substitute Member. The admission of a substitute Member (or any transfer permitted under Section 10.2) shall not release the Member who assigned the Unit from any liability that such Member may have to the Company.

(b) No Transfer of any Unit may be made which (i) could cause a termination of the Company for federal income tax purposes; (ii) alone or in conjunction with any other Transfer, might adversely affect, or tend to affect adversely, the characterization of the

Company as a partnership for federal income tax purposes; (iii) could result in the assets of the Company being considered by law to be assets of employee benefit plans and therefore subjecting those assets to the fiduciary standards of the Employee Retirement Income Security Act of 1974, as amended; or (iv) violates the Securities Act and any rules promulgated thereunder and any similar state "Blue Sky" laws. In addition, in no event may a Transfer occur which results in more than ninety-nine (99) beneficial owners of Units.

10.2 Transfers Not Requiring Managing Member Consent. The consent of the Managing Member shall not be required for any Transfer, whether or not for consideration, by a Member (or, in the case of a Member which is a trust, by its grantor(s)): (i) to the spouse of such Member; (ii) the issue of such Member (outright, to a custodian under the Uniform Transfers to Minors Act (or similar statute) of any State, or to a revocable or irrevocable trust of which such issue is the sole beneficiary as to such interest in the Company); (iii) to a trust for the benefit of such Member (or such Member's spouse or issue); provided that only the Member or the spouse or issue of such Member has the right to vote the interest in the Company on behalf of the trust pursuant to the trust agreement, and further provided that if at any time the Unit held in trust is proposed to be allocated or distributed to a Person other than the grantor(s) of the trust who was a former Member or to the spouse or issue of such former Member (except for an allocation or distribution completed upon the death of the grantor), then the consent of the Managing Member shall be required; or (iv) to the Initial Managing Member or any of its Affiliates. Notwithstanding the foregoing, each transferee pursuant to this Section 10.2 must comply with the provisions of clauses (i), (ii) and (iii) of Section 10.1(a).

10.3 No Dissolution. If a Member Transfers all or any part of its interests in the Company without complying with the provisions of this Agreement, such action shall not cause or constitute a dissolution of the Company.

10.4 New Members. Except in connection with a Transfer made in accordance with Section 10, no new Member may be admitted into the Company without the written consent of the Managing Member.

11. DISSOLUTION AND WINDING UP OF THE COMPANY.

11.1 Dissolution of Company. The Company shall be dissolved upon the happening of any of the following events:

(a) The written consent of the Managing Member; or

(b) Entry of a judicial decree of dissolution pursuant to the Act.

11.2 Winding Up of the Company. Upon dissolution of the Company, the Managing Member shall wind up the affairs and liquidate the assets of the Company in accordance with the provisions of this Section and the Act. Profits, Losses, Nonrecourse Deductions, Member Nonrecourse Deductions and all other Company items shall be allocated until the liquidation is completed in the same ratio as such items were allocated prior thereto. The proceeds from liquidation of the Company when and as received by the Company shall be utilized, paid and distributed in the following order:

(a) First, to pay expenses of liquidation;

(b) Next, to pay the debts of the Company to third parties other than the Members;

(c) Next, to pay the debts of the Company owing to creditors who are Members;

(d) Next, to the establishment of any Cash Reserves; and

(e) Thereafter, to the Members, pursuant to Section 8.2; provided, however, that the final Capital Account balances of each of the Members prior to the distribution contemplated by this Section 11.2(e), as determined by taking into account all Capital Account adjustments required by this Agreement, are intended to equal the amount that each Member will receive pursuant to Section 8.2. If, for any reason, the distributions pursuant to this Section 11.2(e) (pursuant to Section 8.2) do not result in the same distribution to each Member as would a distribution to the Members in accordance with their positive Capital Account balances upon liquidation of the Company, then the Profits and Losses of the Company and items thereof (including gross income and gross deduction) for the taxable year of the distribution contemplated by this Section 11.2(e) and, if necessary and agreed to by the Managing Member in it sole discretion, for all prior taxable years for which amended federal tax returns can be filed, shall be revised or amended to the extent possible in order that the final Capital Account balance of each of the Members, prior to the distribution contemplated by this Section 11.2(e) (pursuant to Section 8.2) equals the amount that such Members will receive when the remaining proceeds available for distribution to the Members are distributed pursuant to Section 8.2.

11.3 Right To Receive Property. The Members shall have no right to demand or receive property other than cash in return for their Contributions.

12. BOOKS AND RECORDS; EXPENSES.

12.1 Books of Account. The Company shall, at the Company's sole cost and expense, keep adequate books of account of the Company wherein shall be recorded and reflected all of the Contributions and all of the income, expenses and transactions of the Company and a list of the names, addresses and Participation Percentages held by the Members in alphabetical order. The books and records shall be maintained in accordance with a method of accounting determined by the Managing Member.

12.2 Accounting and Reports.

(a) The Managing Member shall, at the Company's sole cost and expense, cause the following to be delivered to the Members such financial information with respect to each Fiscal Year as shall be reportable for federal and state income tax purposes in connection with Members' individual income tax returns, which is expected to be available not later than 90 days after the end of each Fiscal Year.

(b) The Managing Member, at the Company's sole cost and expense, may deliver to Members such other information as the Managing Member, in its sole discretion, elects to distribute from time to time.

12.3 Banking. All withdrawals of funds of the Company from bank accounts shall be made upon checks (or wire transfer authorizations) signed by the Person or Persons designated by the Managing Member.

12.4 Expenses of Company. All Administrative Expenses shall be billed to and paid by the Company or, if paid by the Managing Member, the Managing Member shall be reimbursed for Administrative Expenses without interest. For this purpose, "Administrative Expenses" means all costs and expenses relating to the Company's activities, investments and ongoing business, including: (i) insurance, legal, accounting, auditing, consulting and other fees and expenses, including finder fees not otherwise characterized as organizational expenses; (ii) all out-of-pocket fees and expenses incurred by the Company, the Managing Member, or the Managing Member's agents, officers and employees relating to the Company's business; (iii) all expenses (including, without limitation, travel, printing, legal, filing, finder, private placement, and accounting fees and expenses) incurred in connection with the organization and funding of the Company, including without limitation, Placement Fees, (iv) fees paid to professional advisors for services rendered, (v) unreimbursed travel expenses of the Managing Member or the Managing Member's personnel in connection with the Company or any Holding Entity, (vi) costs of preparation of reports to the Members and (vii) the expense of governmental compliance such as preparation of applicable tax filings.

12.5 Member Information. The Managing Member shall internally maintain a schedule of all Members, their respective mailing addresses, the amount and series of Units held by them, their Commitments and their Participation Percentages the form of Exhibit A attached hereto and the Managing Member shall update such schedule upon the issuance or Transfer of any Units to any new or existing Member, provided that, notwithstanding anything to the contrary in this Agreement, no Member other than the Managing Member shall have the right to review or receive a copy of Exhibit A (or any information thereon), Exhibit C for any other Member or the Subscription Agreement for any other Member, unless consented to by the Managing Member, which consent may be withheld (with respect to any one or more of the Members) in the sole and absolute discretion of the Managing Member. Notwithstanding the foregoing, the Managing Member shall provide each Member with (i) the number of Units issued to such Member (but not the other Members), (ii) the Commitment of such Member (but not the other Members) and (iii) the aggregate number of Units and Commitments of all Members (but not any particular individual Member other than such Member) so that such Member can determine its Participation Percentage.

13. ADJUSTMENT OF BASIS ELECTION. In the event of a Transfer of any Units in the Company, or in the event of a distribution of the property of the Company to any Member hereto, the Managing Member may, if it so determines in its sole and absolute discretion, file an election, in accordance with Section 754 of the Code and applicable Treasury Regulations, to cause the basis of the Company's property to be adjusted for federal income tax purposes, as provided in Sections 734, 743 and 754 of the Code.

14. WAIVER OF ACTION FOR PARTITION. Each of the Members hereby irrevocably waives, during the term of the Company, any right such Member may have to maintain any action for partition with respect to any property of the Company.

15. AMENDMENTS. Amendments to this Agreement may be made only if approved by the Managing Member and the approval of Members other than the Managing is not required;

provided, however, no amendment will be valid as to any Member without the written consent of such Member that (i) alters or modifies the limited liability of the Member, or (ii) alters the Member's right to distributions under Section 8 unless each Member's interest is altered proportionately to other Members holding the same class of Units. Upon such approval of any amendment, all Members shall be bound by the terms and provisions thereof as if they had so consented. If an amendment is approved by less than all Members, then a copy of such amendment shall be mailed to the Members who did not vote on the amendment.

16. EQUITABLE RELIEF. The rights granted to the parties hereunder are of a special and unique kind and character, and if there is a breach by any party of any material provision of this Agreement, the other parties would not have an adequate remedy at law. Therefore, the rights of the parties under this Agreement may be enforced by equitable relief as is provided under the laws of the State of Delaware.

17. NOTICES. Any and all notices, demands or other communications required or desired to be given hereunder by any party shall be in writing and shall be validly delivered to another party only if served either personally by overnight courier service, by facsimile transmission, by email or if deposited in the United States first class mail, certified return receipt requested, postage prepaid at the address/facsimile numbers set forth on the books of the Company. If such notice, demand or other communication is served personally, service shall be conclusively deemed made at the time of such personal service. If such notice, demand or other communication is sent by facsimile transmission or overnight courier service, service shall be conclusively deemed made at the time of written confirmation of receipt, if on or before 5:00 p.m. local time on a legal business day at the place of receipt, and if not, then on the next legal business day thereafter. If such notice, demand or other communication is given by mail, service shall be conclusively deemed made on the date shown on the return receipt. If such notice, demand or other communication is delivered by email, service shall be conclusively deemed made at the time of written confirmation of receipt. The address, email and facsimile number for delivery of notices, demands or other communications for each Member is set forth on such Member's Subscription Agreement. Any party hereto may change its address for the purpose of receiving notices, demands and other communications as herein provided by a written notice given in the manner aforesaid to the other party or parties hereto.

18. ATTORNEYS' FEES. Should any party hereto institute any arbitration or action or proceeding at law or in equity to enforce any provision hereof, including an action for declaratory relief or for damages by reason of an alleged breach of any provision of this Agreement, or otherwise in connection with this Agreement, or any provision hereof, the prevailing party shall be entitled to recover from the losing party or parties reasonable attorneys' fees and costs for services rendered to the prevailing party in such action or proceeding.

19. INVESTMENT REPRESENTATIONS OF THE MEMBERS

19.1 Member Representations. Each Member understands that the Units have not been registered with the Securities and Exchange Commission or qualified with any state securities agency, in reliance upon exemptions therefrom that are predicated, in part, upon the information previously provided by such Member and the following representations:

(a) Such Member understands that, in addition to the restrictions imposed by applicable federal and state securities laws, the right to Transfer Units is restricted by the terms of this Agreement. No Transfer will be permitted if, in the opinion of counsel for the Company, such Transfer will violate applicable federal or state securities laws. The burden and expense will be borne by a Member to satisfy the Company that all of the conditions of transfer have been satisfied. In addition, even if a Member meets all of these requirements, there is no present market for Units and none is anticipated to develop;

(b) Such Member represents that such Member is acquiring Units for investment purposes and for such Member's own account, with no present intention of dividing the same with others, or reselling or otherwise distributing such interest, and such Member will not sell or otherwise dispose of such interest in violation of the Securities Act relevant state securities laws, or regulations promulgated thereunder. Such Member hereby affirms that it is an Accredited Investor as defined in Securities and Exchange Commission Regulation D promulgated under the Securities Act;

(c) Such Member represents that such Member is capable of bearing the economic risk of such Member's investment in the Company (meaning such Member can afford either a complete loss of the investment or hold it indefinitely without materially adversely affecting such Member's standard of living, causing financial difficulties, or impairing such Member's ability to meet current needs and possible personal contingencies);

(d) Such Member represents that such Member either has a preexisting personal or business relationship with the Company, or by reason of such Member's business or financial experience or the business or financial experience of such Member's professional advisors who are unaffiliated with and not compensated by any other Member, or any affiliate or any selling agent of any other Member, has the capacity to protect such Member's interests in the Company;

(e) Such Member recognizes that the purchase of Units as an investment involves special risks; and

(f) Such Member's principal place of business is located at the address set forth on the signature page hereto.

20. MISCELLANEOUS.

20.1 Applicable Law; Venue. This Agreement shall, in all respects, be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to conflict of law principles. Subject only to the arbitration provisions of this Agreement, the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the state courts of the State of California in Los Angeles County or the United States District Court for the Central District of California, for the purposes of any lawsuit, action or other proceeding arising out of or based upon this Agreement and the subject matter hereof. The parties hereto, to the greatest extent permitted by applicable law, hereby irrevocably and unconditionally waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such lawsuit, action or other proceeding brought in the above-named courts or as provided in the arbitration provisions of this Agreement, any claim that it is not subject personally to the jurisdiction of such courts or arbitration tribunal, that its property is exempt or immune from attachment or execution, that the lawsuit, action or proceeding is brought in an inconvenient forum, that the venue of the lawsuit, action or proceeding is improper or that this

Agreement may not be enforced in or by such court or tribunal. Final judgment against a party in any such lawsuit, action or proceeding shall be conclusive, and may be enforced in any other jurisdiction (x) by lawsuit, action or proceeding on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and of the amount of the liability of the party as therein described or (y) in any other manner provided by or pursuant to the laws of such other jurisdiction.

20.2 Severability. Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provisions contained herein and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail; but the provision of this Agreement which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.

20.3 Successors and Assigns. All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns.

20.4 Number and Gender. In this Agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall each be deemed to include the others whenever the context so requires.

20.5 Entire Agreement. This Agreement, the Subscription Agreement (if any) executed by each Member, and the Confidentiality Agreement (if any) executed by each Member, constitute the entire understanding and agreement of the parties with respect to the subject matter hereof and thereof and any and all prior agreements, understandings or representations with respect to the subject matter hereof and thereof are hereby terminated and canceled in their entirety and are of no further force or effect.

20.6 Waiver. A waiver of any provision of this Agreement shall be valid only if it is in writing and signed by the party making the waiver. No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof.

20.7 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signatures provided by facsimile or in portable document format (a/k/a pdf) or other electronic format shall be as binding as original signatures.

20.8 Interpretation. The captions appearing at the commencement of the sections hereof are descriptive only and for convenience in reference.

20.9 Parties in Interest. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third Persons to any party to this Agreement, nor shall any provision give any third Person any right of subrogation or action over or against any party to this Agreement.

20.10 Arbitration. Any dispute, controversy or claim arising out of or relating to this Agreement (other than claims for injunctive or equitable relief), including, but not limited to, the interpretation, breach or termination thereof (including whether the claims asserted are arbitrable), shall be referred to and finally determined by arbitration in accordance with Judicial Arbitration and Mediation Services, Inc. ("JAMS") Arbitration Rules. The tribunal will consist of a sole arbitrator selected in accordance with the JAMS Arbitration Rules. The place of arbitration shall be Los Angeles, California. The arbitrator shall issue a written opinion stating the essential findings and conclusions upon which the arbitrator's award is based within 30 days after the presentation of arguments has been completed. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. The arbitrator may, in the award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator. Discovery in accordance with California law shall be permitted.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned Managing Member has executed this Agreement as of the Effective Date.

**MANAGING MEMBER:**

Weyl Manager LLC



By: Name:
Title: Manager

Address:

520 Newport Center Drive Suite 480

Newport Beach, CA 92660

# EXHIBIT 5

# AMENDED AND RESTATED OPERATING AGREEMENT OF WEYL MANAGER LLC

This Amended and Restated Operating Agreement ("**Agreement**") of Weyl Manager LLC, a Delaware limited liability company ("**Company**"), is entered into as of October 1, 2025 (the "**Effective Date**"), by Jason Miller ("**Member**"), with reference to the following facts:

## RECITALS

A. The Certificate of Formation for the Company was filed with the Delaware Secretary of State under the Delaware Limited Liability Company Act (the "**Act**").

B. The Company owns or may own in the future a limited liability company membership interest as the "managing member" (the "**Interest**") in any limited liability company mutual agreed upon by Member and Manager as defined herein ("**LLC**").

C. The Member desires to have the Company to enter into those certain operating agreements of LLC (the "**LLC Operating Agreements**").

D. The Member desires to adopt and approve an Amended and Restated Operating Agreement for the Company under the Act.

## AGREEMENT

1. Name. The name of the limited liability company shall be Weyl Manager LLC.

2. Purpose. The purpose of the Company is to (i) acquire, hold, maintain, operate and dispose of the Interest (ii) to act as the managing member of LLC and (iii) to engage in any and all general business activities related or incidental thereto permitted under the Act.

3. Principal Place of Business and Office of the Company. The principal place of business and office of the Company shall be located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

4. Member. Jason Miller is the sole Member of the Company.

5. Disregarded Entity for Tax Purposes. As of the Effective Date, the Member is the sole member of the Company. As long as the Member is the sole member of the Company, the Company shall be treated as an entity disregarded as separate from the Member for federal tax purposes.

6. Management of the Company.

a. General Management. Subject to the remaining provisions of this Agreement, the Company's business shall be managed by a "manager" as that term is defined in the Act (the "**Manager**"). Subject to the terms of this Agreement, including without limitation Section 6c below, the Manager shall be responsible for the day to day management of the Company's business and shall have all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith. The Manager shall devote such time to the Company as shall be necessary in its sole and absolute discretion to conduct the Company's business and to carry out its duties and responsibilities under this Agreement for the furtherance of the Company's business.

b. Member Approval. No annual or regular meetings of the Member is required to be held. However, if such meetings are held, such meetings shall be noticed, held and conducted pursuant to the Act. In any instance in which the approval of the Member is required under this Agreement, such approval may be obtained in any manner permitted by the Act.

c. Appointment, Removal or Resignation of the Manager.

i. Jason Miller is hereby appointed as the initial Manager.

ii. A Manager may be removed at any time by the Member upon written notice to the Company and such Manager. A Manager may resign at any time upon written notice to the Company and the Member.

iii. If Jason Miller not the appointed Manager, then a successor Manager shall be appointed by the Member.

d. Execution of Documents. Each check, contract, deed, lease, promissory note, deed of trust, escrow instruction, bond, release or any other documents of any nature whatsoever, in any way pertaining to the Company or on behalf of the Company shall be signed by the person or persons designated from time to time by the Member.

e. Liability/Indemnification.

i. Neither the Member not the Manager shall be liable, responsible or accountable in damages or otherwise to the Company or to the other for any acts performed within the scope of the authority conferred on such Manager or Member by this Agreement, except for such Member's or Manager's gross negligence, willful misconduct or breach of fiduciary duty. Other than claims for a breach of fiduciary duty, the Company shall indemnify and hold harmless the Member and the Manager (individually, an "**Indemnitee**") from and against any and all losses, claims, demands, costs, damages, liabilities, expenses of any nature

(including reasonable attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, brought against, or threatened against, such Indemnitee by reason of the fact such Indemnitee was a Member or Manager of the Company. Such indemnification shall be provided regardless of whether the Indemnitee continues to be a Member or Manager at the time any such liability or expense is paid or incurred.

ii. Expenses incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding subject to this Section 7, shall from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall be determined that such person is not entitled to be indemnified under this Section 7.

iii. The indemnification provided by this Section 7 shall be in addition to any other rights to which the Indemnitee may be entitled under any agreement, vote of the Member, as a matter of law or equity or otherwise and shall inure to the benefit of the heirs, successors, assigns and administrators of the Indemnitee.

iv. The Company may purchase and maintain insurance, at the Company's expense, on behalf of the Member, the Manager and such other persons as the Manager shall determine, against any liability that may be asserted against, or any expense that may be incurred by, such persons in connection with the activities of the Company and/or the acts or omissions of such persons regardless of whether the Company would have the power to indemnify such persons against such liability under the provisions of this Agreement.

v. Any indemnification under this Section 7 shall be satisfied solely out of the assets of the Company. No Member or Manager shall be subject to personal liability or required to provide any funds, or to cause any funds to be provided, to the Company to satisfy any indemnification obligation of the Company under this Section 7.

7. <u>Term; Dissolution</u>. The term of the Company shall continue on a perpetual basis unless dissolved pursuant to this Section 7. The Company shall dissolve, and its affairs shall be wound upon the entry of a decree of judicial dissolution under the Act. Upon the winding up of the Company, subject to the provisions of the Act, the Manager shall pay or make reasonable provision to pay all claims and obligations of the Company, including all costs and expenses of the liquidation and all contingent, conditional or un-matured claims and obligations that are known to the Manager. If there are sufficient assets, such claims and obligations shall be paid in full and any such provision shall be made in full. If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available therefore. Any remaining assets shall be distributed to the Member.

8. Capital Account; Membership Interest. The Member's capital account shall be credited with additional contributions made by the Member and revenues of the Company and shall be debited with all costs, expenses and losses of the Company and the amount of any distributions (including return of capital) made to the Member. No interest will be paid on the Member's Capital Account. One (1) membership unit hereby is issued to the Member, which represents one hundred percent (100%) of the membership interests in the Company.

9. Additional Contributions. The Member shall make capital contributions to fund all amounts necessary to meet the Company's obligations under its Amended and Restated Operating Agreement. The Member shall not be required to make any other capital contributions to the Company but may make additional capital contributions at such times and upon such terms as the Member may from time to time determine.

10. Allocation of Profits and Losses. The Company's net profits and losses shall be allocated 100% to the Member.

11. Distributions. Distributions shall be made by the Company to the Member at the times and in the aggregate amounts determined by the Member, subject to the limitations on distributions provided in the Act.

12. Liability of Manager and Member. The Member shall not be liable for the obligations or liabilities of the Company except as provided in the Act. The Manager shall not be liable for the obligations or liabilities of the Company.

13. Books and Records; Bank Accounts.

a. Books and Records. The Company's books and records shall be maintained at the principal place of business of the Company.

b. Bank Accounts. All funds of the Company shall be deposited in such bank account or accounts as the Manager and/or Member shall from time to time determine. All withdrawals and disbursements therefrom shall be made by wire transfer or by check signed by the Manager and/or Member, or by authorized persons designated by the Manager and/or Member.

14. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

15. Headings. The title or section headings of the various provisions hereof are intended solely for convenience of reference and shall not in any manner amplify, limit or modify or otherwise be used in the interpretation of any of such provisions.

16. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Execution by electronic format (PDF) or fax shall be deemed an original signature.

17. Interpretation. As used in this Agreement, the masculine, feminine or neuter gender, and the singular and plural number, shall be deemed to include the other whenever the context so indicates.

18. Severability. If any provision of this Agreement shall be held invalid, the remaining provisions of this Agreement shall remain enforceable in accordance with their terms, subject to such modification as is necessary to achieve to the extent legally possible the economic effect intended by the parties to this Agreement.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Amended and Restated Operating Agreement as of the date first above written.

**MEMBER**:

JASON MILLER

**MANAGER**:

JASON MILLER

# EXHIBIT 6

GROBSTEIN TEEPLE

April 16, 2026

Ynez Shops LLC
520 Newport Center Drive, Suite 480
Newport Beach, California 92660

Re: **Chief Restructuring Officer, Manager, and Financial Advisors**
**In re: Ynez Shops LLC, Chapter 11, Case No.: 8:26-bk-10693-SC ("Bankruptcy Estate")**

Dear Mr. Miller,

Thank you for retaining Howard B. Grobstein ("Grobstein") and Grobstein Teeple LLP (collectively "GT",) to provide Chief Restructuring Officer, Manager, and financial advisory services for the Debtor and Debtor-in-Possession, Ynez Shops LLC ("Client"). This engagement agreement is effective as of April 16, 2026. Client and Weyl Manager, LLC ("Manager") agree to effectuate a resolution ("Resolution") appointing Grobstein as an officer and manager of Client. Grobstein will provide corporate and operational oversight to Client upon execution of this engagement agreement and the Resolution. Grobstein will communicate with relevant parties including investors, creditors, members and their counsel, and other parties as necessary. Grobstein will direct his professionals including Client's counsel, Wall & Son and GT.

GT will provide supporting and financial advisory services at the direction of Grobstein. Such financial advisory services include, but are not limited to, analysis of the value of the real property and whether a sale or refinance is in the best interests of the constituents, review of corporate, financial, and loan documents, tax return preparation, and compliance with reporting obligations to the United States Trustee, . GT will take possession of and secure all digital, electronic, and hard copy documents pertaining to Client.

This letter confirms the scope and terms of GT's retention by Client. GT's engagement is governed by the terms and conditions set forth in this statement of work, and *the Standard Terms and Conditions* (**Exhibit A**). Unless Client or GT terminates GT's services in writing, GT will work at the direction of Client. This Agreement is binding; therefore, it is important that Client thoroughly reviews this document.

## Fees & Costs

Fees are based on GT's hourly rates and will include out-of-pocket expenses. In setting its fees, GT gives primary consideration to the time and effort devoted to the advice and service provided by its staff and other personnel charged at hourly fee rates. Hourly rates vary depending on the skill and experience of the individual and are subject to change on a periodic basis. The Bankruptcy Estate is the only source of recovery of fees incurred under this agreement. GT understands that if funds are not available in the Bankruptcy Estate, GT will not be paid its fees. GT also understands that all its fees are subject to United States Bankruptcy Court approval.

GT will seek Bankruptcy Court approval of its employment pursuant to the requirements of 11 U.S.C. § 327(a); and approval of all fees and expenses incurred on behalf of Client pursuant to the requirements of 11 U.S.C. § 330. Its retention is subject to and conditioned on the approval of the U.S. Bankruptcy Court and the ability to obtain a directors' and officers' liability policy.

GT adjusts its billing rates from time to time to reflect the proper market rate for the services provided by its professionals and administrative team. However, rates are typically only increased at the beginning of each calendar year.

Initial
Client Initial

Current hourly rates for GT's professionals are:

| | |
|---|---|
| Partners | $425 - $780 |
| Managers & Directors | $330 - $495 |
| Staff & Senior Accountants | $175 - $375 |
| Paraprofessionals | $95 - $250 |

In the course of its work, GT may be asked or required to maintain original or copies of hard paper documents for purposes of conducting analysis or for other purposes. GT may seek reimbursement for pass-through storage fees.

### Retainer

GT has not received, nor will it request, a retainer from Client.

### Data Storage Fees

As part of GT's services, GT will store and manage data related to Client's case, which may include client data, data produced by parties in the matter, forensic images of devices, data processed in forensic tools, production archives, and other GT work products. GT may charge the Client for data storage, and will only seek reimbursement for actual and necessary expenses incurred.

### ACCEPTANCE

This Agreement and the accompanying *Standard Terms and Conditions* (**Exhibit A**) reflect the entire agreement between GT and Client relating to the services covered by the letter. Client confirms the agreement by signing below.

This Agreement may not be amended or varied except by a written document signed by both parties. It replaces and supersedes any other proposals, correspondence, agreements, and understandings, whether written or oral, relating to the services covered by this letter. This Agreement shall survive the completion or termination of this engagement. If any term herein is found unenforceable or invalid, this shall not affect the other terms herein, all of which shall continue in effect as if the stricken term had not been included. This Agreement shall be interpreted and construed under and governed by the internal laws of the State of California, with any dispute to be resolved by the United States Bankruptcy Court, without regard for choice of law principles.

Signatures transmitted and received via email or DocuSign will be treated for all purposes as an original, and multiple signed pages shall be considered duplicate originals. This Agreement is made in California.

We are pleased to have this opportunity to serve you, and we look forward to a mutually beneficial relationship. If this letter meets Client's approval, please sign below, and return the signed letter to GT, retaining a copy for yourself.

**Services will not commence until this agreement is fully executed and the retainer is received.**

**Grobstein Teeple LLP**

Signed by:
Howard B. Grobstein
468FC6C9A58046E...
Signature

Howard B. Grobstein
Printed Name

CPA, CFE | Partner
Title

4/20/2026
Date

**Ynez Shops LLC**

**...er, LLC, its manager**

Signed by:
66DBD2152FE9429...
Signature

Jason Miller
Jason Miller

JASON MILLER
Manager

4/20/2026
Date

Initial
Client Initia

# EXHIBIT A

# STANDARD TERMS AND CONDITIONS

## GENERAL TERMS AND CONDITIONS FOR ALL ENGAGEMENTS

**Record Retention**
All documents GT receives from Client, which are normally kept in the course of business, will be maintained in client-specific folders. It is Client's responsibility to retain and protect Client's own records for possible future use, including potential examination by any governmental or regulatory agencies.

**Accountant-Client Privilege**
Certain communications between Client and GT may be privileged from disclosure, such as in any non-criminal tax matters before the Internal Revenue Service, non-criminal proceedings in Federal court that stem from matters before the Internal Revenue Service, and/or if the United States is a party to the proceedings.

If Client wishes GT to divulge privileged information on Client's behalf, Client must first provide GT written authority to do so. In addition, if it is ultimately determined that a significant purpose of the tax matter was to avoid or evade any U.S. federal income tax, the privilege under Section 7525 of the Internal Revenue Code will not apply to any communications between Client and GT.

If GT receives a request from a third-party, including the Internal Revenue Service, for the production of privileged information, GT will notify Client and will follow Client's reasonable instructions before disclosing any information required to be disclosed under applicable laws or rules. Client hereby agrees to hold GT harmless from and be responsible for GT's fees and costs associated with compliance in conjunction with any expenses, including reasonable outside attorney's fees, incurred by GT as a result of Client's assertion of the privilege or direction to GT to assert the privilege on Client's behalf or in the event GT determines that it is required by applicable law or rules to assert the privilege without having received direction from Client.

**Client's Assistance**
For GT to provide its services effectively and efficiently, Client agrees to provide GT all information requested promptly and within the time requested by GT and to make Client's employees/staff available to GT for questions and other requests. Completion of GT's work depends on appropriate and timely cooperation from Client and Client's personnel/staff, and includes complete, accurate, and timely responses to inquiries and timely communication of all significant accounting and financial reporting matters of which Client is aware. If for any reason this does not occur, a revised fee to reflect the additional time or resources required by GT will be mutually agreed upon, and Client agrees to hold GT harmless against all matters that arise in whole or in part from any resulting delay.

If circumstances arise that, in GT's professional judgment, prevent GT from completing this engagement, GT retains the right to take any course of action permitted by professional standards, including declining to express an opinion or issue other work product or withdrawing from the engagement.

**Third-Party Provider**
At GT's sole discretion, and to enhance its ability to perform under this Agreement effectively and efficiently, GT may use third-party service providers to aid in providing professional services, which may require GT sharing Client's confidential information with the providers. If a third-party service provider is used, GT will enter into a confidentiality agreement with the provider to require confidentiality of Client's information. Using third-party service providers does not alter GT and Client's Agreement.

**Confidentiality**
GT will maintain the confidentiality of Client's confidential information in accordance with professional standards. Client agrees not to disclose any confidential material obtained from GT without GT's prior written consent, except to the extent such disclosure is an agreed objective of this Agreement to Client's business/legal representatives, and/or as required by law/court order. Client's use of GT's work-product shall be limited to its stated purpose and to business use only. GT retains the right to use the ideas, concepts, techniques, industry data, and know-how

Client Initial Initial

or developed during the engagement. Client agrees to the use of fax, email, and voicemail to communicate both sensitive and non-sensitive matters; provided, however, that nonpublic personal information regarding Client's customers or consumers shall be communicated by unencrypted email.

**Insurance**
GT maintains errors and omissions insurance. GT will remain liable when losses, damages, penalties, assessments, are as result of GT's gross negligence, willful or intentional misconduct, or fraudulent behavior.

**No Transfer or Assignment of Claims**
No claims against GT, or any recovery from or against GT, may be sold, assigned, or otherwise transferred, in whole or in part.

**Response to Legal Process**
If GT is requested by subpoena, other legal process, or other proceedings to produce documents pertaining to Client and GT is not a named party to the proceeding, Client will reimburse GT for professional time, plus out-of-pocket expenses, as well as reasonable attorney's fees incurred in responding to such request.

**Legal and Regulatory Change**
The scope of services and the fees for the services covered by this Agreement are based on current laws and regulations. If changes in laws or regulations require expanding Client's requirements or the scope of GT's work, Client and GT agree that GT's fees will be modified to a mutually agreed-upon amount to reflect the changed level of GT's services.

**Of Non-Licensee Ownership**
GT and certain of its owners are properly licensed by the governing bodies in the states in which they work. However, GT has owners not licensed by the same accountancy boards who may provide services under this Agreement. If Client has any questions regarding licensure of the personnel performing services under this Agreement, please do not hesitate to contact GT.

**Publication**
Client agrees to obtain GT's specific permission before using GT's report or its firm's name in a published document, and Client agrees to submit to GT copies of such documents to obtain GT's permission before they are filed or published.

**No Punitive or Consequential Damages**
Any liability of GT to Client shall not include any special, consequential, incidental, punitive, or exemplary damages or loss nor any lost profits, savings, or business opportunity.

**Non-Solicitation**
Client and GT acknowledge the importance of retaining key personnel. Accordingly, both parties agree that during the period of this agreement and for one year after its expiration or termination, neither party will solicit any personnel of the other party for employment without the written consent of the other party. If an individual becomes an employee of the other party, the other party agrees to pay a fee equal to the individual's compensation for the prior full twelve-month period to the original employer.

**Other**
These terms are part of this Agreement and apply to all future services unless a specific/different agreement is entered into for those services. GT is not an investment advisor, and no advice GT may provide should be construed to be investment advice. Each of these terms shall survive and apply after termination of this Agreement.

**International Alliance Membership**
GT is an independent member firm of Alliott Global Alliance, which is an international alliance of independent accounting, law and specialist firms. Alliott Global Alliance and its member firms are legally distinct and separate entities. These entities are not and shall not be construed to be in the relationship of a parent firm, subsidiary, partner, joint venture, agent or a network. No Alliott Global Alliance member firm has any authority (actual, apparent, implied or otherwise) to obligate or bind Alliott Global Alliance or any other Alliott Global Alliance member firm in any manner whatsoever. Equally, neither Alliott Global Alliance nor any other member firm has any au

Initial

Client Initia

to obligate or bind GT or any other member firm. All Alliott Global Alliance members are independent firms, and as such, they each render their services entirely on their own account (including benefit and risk). In connection with the engagement contemplated by this letter or any other services from time to time provided by GT, GT may seek advice from or may recommend the retention of an Alliott Global Alliance member firm. Alliott Global Alliance and its other member firms shall have no liability for advice rendered by GT or such consulted or retained Alliott Global Alliance member firm. Nor shall GT have liability for advice rendered by any of the other Alliott Global Alliance member firms, even if consulted or recommended to you by GT.

## GENERAL TERMS AND CONDITIONS FOR TAX PREPARATION ENGAGEMENTS

GT will not assume responsibility for the preparation of any tax returns, reports, or analyses not specifically identified herein. If, however, there are additional tax returns, reports, or analyses that Client would like GT to prepare, then please provide specific directions in a letter or an email. Upon GT's assent to the broader scope of work under this Agreement, the additional work will be included within this Agreement, or a separate engagement agreement will be issued.

Client's tax returns may be selected for review or audit by the taxing authorities. Any proposed adjustments by the examining agent are subject to certain rights of appeal. In the event of such government tax examination, GT is available upon request to assist Client in responding to the taxing authorities and to provide expert knowledge and information. If such services are required, a separate engagement agreement will be issued, additional fees at GT's normal hourly rate will be incurred, and invoices will be rendered for the time and expenses incurred in performing such additional services.

**Client Responsibilities**
Client will provide GT with copies of the information and any relevant source documentation required for preparation of these tax returns. The tax laws provide that the obligation of a preparer is based only on information of which the preparer has knowledge. The completeness and accuracy of the information Client provides to GT remains Client's responsibility. By signing this Agreement, Client is warranting the accuracy and completeness of such information.

Client has the final responsibility for the timeliness of the information provided to GT, the accuracy and completeness of the information and the returns. Client is advised, accordingly, to review the tax returns carefully before signing any forms that authorize the returns for filing. Client must retain original records supporting the filed tax return(s).

**Listed and Reportable Transactions**
The Internal Revenue Service requires individuals and other entities to file certain disclosure statements regarding tax strategies/transactions that the Internal Revenue Service defines under Treasury Regulations §1.6011-4 as a "listed transaction", a transaction that is substantially similar to a "listed transaction", a transaction of interest, or a reportable transaction. Failure to properly disclose any of these transactions may result in severe penalties under the Internal Revenue Code for which Client may be liable. It is Client's responsibility to provide to GT complete and accurate information regarding Client's participation in the transactions identified in Treasury Regulation §1.6011-4.

If Client has any questions regarding a specific "listed transaction," a transaction that is substantially similar to a "listed transaction," a transaction of interest, or another reportable transaction, or if Client would like to receive a copy of guidance published by the Internal Revenue Service, please contact GT.

**FBAR, FATCA and Other Financial Reporting**
If Client has a financial interest, directly or indirectly, through an entity Client controls, or has signature authority over a foreign financial account, Client may be required to prepare and file Form TDF 90-22.1 (FBAR) if the aggregate value of all foreign financial accounts exceeds $10,000 at any time during the calendar year.

The Internal Revenue Service, under IRC Sections 6038 and 6046, requires information reporting with respect to certain foreign corporations (Form 5471), foreign-owned U.S. corporations or foreign corporations engaged in a U.S. trade or business (Form 5472), U.S. transferors of property to a foreign corporation (Form 926), and holders of

Client Initial _____

foreign financial assets with an aggregate value exceeding $50,000 (Form 8938 - FATCA). These code sections describe the information required to be reported on the respective forms, which are due when Client's income tax return is due, including extensions. Therefore, if Client falls into one of the above categories, Client may be required to file one of the above-listed forms. Failure to timely file may result in substantial penalties for which Client may be liable. Client agrees to comply with these reporting requirements. If Client requires assistance with any portion of foreign financial account reporting requirements, please contact GT as soon as possible to ensure timely filing of these reports. Account holders who do not comply with these reporting requirements may be subject to civil penalties, criminal penalties, or both.

**Cryptocurrency**

Transactions involving cryptocurrency are subject to taxation. It is Client's responsibility to provide information regarding investments in or acceptance as payment of cryptocurrency. If GT is not informed of transactions involving cryptocurrency, Client's taxable income may be inaccurately calculated, resulting in potential interest and penalties for which Client may be liable.

Due to the popularity of Blockchain technology, existing tax law and regulation will often be inadequate to provide guidance on every scenario encountered. As such, GT will propose tax treatment and strategies for any Blockchain technology related transactions that, in GT's assessment, represent the most tax efficient and compliant direction based on the information provided. However, GT's recommendations will often be based on analogies and assumptions that may prove to be different from the views or subsequent guidance issued by government agencies, regulatory bodies, and taxing authorities. It is possible that Client will take positions that later need to be restructured, or that lead to additional tax and/or penalties based on changes or clarifications in the law. These risks are a consequence of doing business in an area where the rules are not tested.

## GENERAL TERMS AND CONDITIONS FOR CYBERSECURITY, EDISCOVERY, LITIGATION, AND INSOLVENCY ENGAGEMENTS

GT's procedures may include evaluating books and records, gathering, and analyzing available documents and electronic data, interviewing parties to the matter, and performing financial and other analyses. GT will provide services as requested by Client within GT's expertise.

GT will follow Client's written direction regarding preserving confidentiality and work product privilege. However, it shall be Client's responsibility to defend any claims of privilege or confidentiality related to GT's work. Any applicable laws or legal principles that should be considered by GT in performing analysis or developing a methodology to support an opinion, should be brought to GT's attention.

In the event GT is requested or authorized by counsel or are required by government regulation, subpoena, or other legal process to produce GT's documents or GT's personnel as witnesses with respect to this engagement, Client will reimburse GT for the professional time and out-of-pocket expenses, as well as the fees and out-of-pocket expenses of GT's counsel incurred in responding to such requests.

GT will abide by any court orders provided to GT regarding confidentiality. At Client's request, GT can transmit information via fax, email, or the Internet. Any confidentiality breaches due to data transmission over the Internet at Client's request will not be considered a breach of GT's confidentiality obligations. If Client wants to limit such transmissions or seek more secure communication for highly confidential information, please inform GT.

The scope of this engagement does not constitute the provision by GT, its partners, or staff of any legal advice. Moreover, because GT's engagement is limited in nature and scope, it cannot be relied upon to discover all documents and other information or provide all analyses which may have importance to this matter. This engagement does not anticipate the compilation, review, or audit of financial records or financial statements.

GT's fees and costs are not contingent upon the outcome of the engagement.

If a court determines that GT is not qualified to testify in this matter, such determination will not be deemed a breach of this Agreement and Client will remain liable for payment of fees and out-of-pocket expenses as set forth herein.

Client Initial Initial

Neither Counsel nor Client shall hold GT or any of its affiliates or representatives legally responsible for any loss or liability that may result from the non-discovery of facts or information that could otherwise have influenced the outcome or interpretation of GT's findings and/or testimony.

GT have undertaken an inquiry of GT's records to determine conflicts with this Agreement and have not noted any such conflicts. If additional relationships or potential conflicts come to GT's attention, GT will promptly notify Client.

*[END OF DOCUMENT]*

Client Initial Initial

GROBSTEIN
TEEPLE

April 16, 2026

Jason Miller
Pro Temecula Town Center LLC
520 Newport Center Drive
Newport Beach, California 92660

Re: **Chief Restructuring Officer, Manager, and Financial Advisors**
**In re: Pro Temecula Town Center, LLC, Chapter 11, Case No.: 8:26-bk-10694-SC ("Bankruptcy Estate")**

Dear Mr. Miller,

Thank you for retaining Howard B. Grobstein ("Grobstein") and Grobstein Teeple LLP (collectively "GT",) to provide Chief Restructuring Officer, Manager, and financial advisory services for the Debtor and Debtor-in-Possession, Pro Temecula Town Center LLC ("Client"). This engagement agreement is effective as of April 16, 2026. Client and Weyl Manager, LLC ("Manager") agree to effectuate a resolution ("Resolution") appointing Grobstein as the manager and chief restructuring officer of Client. Grobstein will provide corporate and operational oversight to Client upon execution of this engagement agreement and the Resolution. Grobstein will communicate with relevant parties including investors, creditors, members and their counsel, and other parties as necessary. Grobstein will direct his professionals including Client's counsel, Raines Feldman Littrell LLP, and GT.

GT will provide supporting and financial advisory services at the direction of Grobstein. Such financial advisory services include, but are not limited to, analysis of the value of the real property and whether a sale or refinance is in the best interests of the constituents, review of corporate, financial, and loan documents, tax return preparation, and compliance with reporting obligations to the United States Trustee, . GT will take possession of and secure all digital, electronic, and hard copy documents pertaining to Client.

This letter confirms the scope and terms of GT's retention by Client. GT's engagement is governed by the terms and conditions set forth in this statement of work, and *the Standard Terms and Conditions* (**Exhibit A**). Unless Client or GT terminates GT's services in writing, GT will work at the direction of Client. This Agreement is binding; therefore, it is important that Client thoroughly reviews this document.

## Fees & Costs

Fees are based on GT's hourly rates and will include out-of-pocket expenses. In setting its fees, GT gives primary consideration to the time and effort devoted to the advice and service provided by its staff and other personnel charged at hourly fee rates. Hourly rates vary depending on the skill and experience of the individual and are subject to change on a periodic basis. The Bankruptcy Estate is the only source of recovery of fees incurred under this agreement. GT understands that if funds are not available in the Bankruptcy Estate, GT will not be paid its fees. GT also understands that all its fees are subject to United States Bankruptcy Court approval.

GT will seek Bankruptcy Court approval of its employment pursuant to the requirements of 11 U.S.C. § 327(a); and approval of all fees and expenses incurred on behalf of Client pursuant to the requirements of 11 U.S.C. § 330. Its retention is subject to and conditioned on the approval of the U.S. Bankruptcy Court and the ability to obtain a directors' and officers' liability policy.

GT adjusts its billing rates from time to time to reflect the proper market rate for the services provided by its professionals and administrative team. However, rates are typically only increased at the beginning of each calendar year.

Client Initia Initial

Current hourly rates for GT's professionals are:

| | |
|---|---|
| Partners | $425 - $780 |
| Managers & Directors | $330 - $495 |
| Staff & Senior Accountants | $175 - $375 |
| Paraprofessionals | $95 - $250 |

In the course of its work, GT may be asked or required to maintain original or copies of hard paper documents for purposes of conducting analysis or for other purposes. GT may seek reimbursement for pass-through storage fees.

### Retainer

GT has not received, nor will it request, a retainer from Client.

### Data Storage Fees

As part of GT's services, GT will store and manage data related to Client's case, which may include client data, data produced by parties in the matter, forensic images of devices, data processed in forensic tools, production archives, and other GT work products. GT may charge the Client for data storage, and will only seek reimbursement for actual and necessary expenses incurred.

### ACCEPTANCE

This Agreement and the accompanying *Standard Terms and Conditions* (**Exhibit A**) reflect the entire agreement between GT and Client relating to the services covered by the letter. Client confirms the agreement by signing below.

This Agreement may not be amended or varied except by a written document signed by both parties. It replaces and supersedes any other proposals, correspondence, agreements, and understandings, whether written or oral, relating to the services covered by this letter. This Agreement shall survive the completion or termination of this engagement. If any term herein is found unenforceable or invalid, this shall not affect the other terms herein, all of which shall continue in effect as if the stricken term had not been included. This Agreement shall be interpreted and construed under and governed by the internal laws of the State of California, with any dispute to be resolved by the United States Bankruptcy Court, without regard for choice of law principles.

Signatures transmitted and received via email or DocuSign will be treated for all purposes as an original, and multiple signed pages shall be considered duplicate originals. This Agreement is made in California.

We are pleased to have this opportunity to serve you, and we look forward to a mutually beneficial relationship. If this letter meets Client's approval, please sign below, and return the signed letter to GT, retaining a copy for yourself.

**Services will not commence until this agreement is fully executed and the retainer is received.**

**Grobstein Teeple LLP**

Signed by:
Howard B. Grobstein
468FC6C9A58046E...
Signature

Howard B. Grobstein
Printed Name

CPA, CFE | Partner
Title

4/20/2026
Date

**Pro Temecula Town Center, LLC**

**By: Weyl Manager, LLC**

Signed by:
66DBD2152FE9429...
Signature

Jason Miller
Jason Miller

JASON MILLER
Manager

4/20/2026
Date

Client Initial

Initial

# EXHIBIT A

# STANDARD TERMS AND CONDITIONS

## GENERAL TERMS AND CONDITIONS FOR ALL ENGAGEMENTS

**Record Retention**
All documents GT receives from Client, which are normally kept in the course of business, will be maintained in client-specific folders. It is Client's responsibility to retain and protect Client's own records for possible future use, including potential examination by any governmental or regulatory agencies.

**Accountant-Client Privilege**
Certain communications between Client and GT may be privileged from disclosure, such as in any non-criminal tax matters before the Internal Revenue Service, non-criminal proceedings in Federal court that stem from matters before the Internal Revenue Service, and/or if the United States is a party to the proceedings.

If Client wishes GT to divulge privileged information on Client's behalf, Client must first provide GT written authority to do so. In addition, if it is ultimately determined that a significant purpose of the tax matter was to avoid or evade any U.S. federal income tax, the privilege under Section 7525 of the Internal Revenue Code will not apply to any communications between Client and GT.

If GT receives a request from a third-party, including the Internal Revenue Service, for the production of privileged information, GT will notify Client and will follow Client's reasonable instructions before disclosing any information required to be disclosed under applicable laws or rules. Client hereby agrees to hold GT harmless from and be responsible for GT's fees and costs associated with compliance in conjunction with any expenses, including reasonable outside attorney's fees, incurred by GT as a result of Client's assertion of the privilege or direction to GT to assert the privilege on Client's behalf or in the event GT determines that it is required by applicable law or rules to assert the privilege without having received direction from Client.

**Client's Assistance**
For GT to provide its services effectively and efficiently, Client agrees to provide GT all information requested promptly and within the time requested by GT and to make Client's employees/staff available to GT for questions and other requests. Completion of GT's work depends on appropriate and timely cooperation from Client and Client's personnel/staff, and includes complete, accurate, and timely responses to inquiries and timely communication of all significant accounting and financial reporting matters of which Client is aware. If for any reason this does not occur, a revised fee to reflect the additional time or resources required by GT will be mutually agreed upon, and Client agrees to hold GT harmless against all matters that arise in whole or in part from any resulting delay.

If circumstances arise that, in GT's professional judgment, prevent GT from completing this engagement, GT retains the right to take any course of action permitted by professional standards, including declining to express an opinion or issue other work product or withdrawing from the engagement.

**Third-Party Provider**
At GT's sole discretion, and to enhance its ability to perform under this Agreement effectively and efficiently, GT may use third-party service providers to aid in providing professional services, which may require GT sharing Client's confidential information with the providers. If a third-party service provider is used, GT will enter into a confidentiality agreement with the provider to require confidentiality of Client's information. Using third-party service providers does not alter GT and Client's Agreement.

**Confidentiality**
GT will maintain the confidentiality of Client's confidential information in accordance with professional standards. Client agrees not to disclose any confidential material obtained from GT without GT's prior written consent, except to the extent such disclosure is an agreed objective of this Agreement to Client's business/legal representatives, and/or as required by law/court order. Client's use of GT's work-product shall be limited to its stated purpose and to business use only. GT retains the right to use the ideas, concepts, techniques, industry data, and know-how

Client Initial Initial

or developed during the engagement. Client agrees to the use of fax, email, and voicemail to communicate both sensitive and non-sensitive matters; provided, however, that nonpublic personal information regarding Client's customers or consumers shall be communicated by unencrypted email.

**Insurance**
GT maintains errors and omissions insurance. GT will remain liable when losses, damages, penalties, assessments, are as result of GT's gross negligence, willful or intentional misconduct, or fraudulent behavior.

**No Transfer or Assignment of Claims**
No claims against GT, or any recovery from or against GT, may be sold, assigned, or otherwise transferred, in whole or in part.

**Response to Legal Process**
If GT is requested by subpoena, other legal process, or other proceedings to produce documents pertaining to Client and GT is not a named party to the proceeding, Client will reimburse GT for professional time, plus out-of-pocket expenses, as well as reasonable attorney's fees incurred in responding to such request.

**Legal and Regulatory Change**
The scope of services and the fees for the services covered by this Agreement are based on current laws and regulations. If changes in laws or regulations require expanding Client's requirements or the scope of GT's work, Client and GT agree that GT's fees will be modified to a mutually agreed-upon amount to reflect the changed level of GT's services.

**Of Non-Licensee Ownership**
GT and certain of its owners are properly licensed by the governing bodies in the states in which they work. However, GT has owners not licensed by the same accountancy boards who may provide services under this Agreement. If Client has any questions regarding licensure of the personnel performing services under this Agreement, please do not hesitate to contact GT.

**Publication**
Client agrees to obtain GT's specific permission before using GT's report or its firm's name in a published document, and Client agrees to submit to GT copies of such documents to obtain GT's permission before they are filed or published.

**No Punitive or Consequential Damages**
Any liability of GT to Client shall not include any special, consequential, incidental, punitive, or exemplary damages or loss nor any lost profits, savings, or business opportunity.

**Non-Solicitation**
Client and GT acknowledge the importance of retaining key personnel. Accordingly, both parties agree that during the period of this agreement and for one year after its expiration or termination, neither party will solicit any personnel of the other party for employment without the written consent of the other party. If an individual becomes an employee of the other party, the other party agrees to pay a fee equal to the individual's compensation for the prior full twelve-month period to the original employer.

**Other**
These terms are part of this Agreement and apply to all future services unless a specific/different agreement is entered into for those services. GT is not an investment advisor, and no advice GT may provide should be construed to be investment advice. Each of these terms shall survive and apply after termination of this Agreement.

**International Alliance Membership**
GT is an independent member firm of Alliott Global Alliance, which is an international alliance of independent accounting, law and specialist firms. Alliott Global Alliance and its member firms are legally distinct and separate entities. These entities are not and shall not be construed to be in the relationship of a parent firm, subsidiary, partner, joint venture, agent or a network. No Alliott Global Alliance member firm has any authority (actual, apparent, implied or otherwise) to obligate or bind Alliott Global Alliance or any other Alliott Global Alliance member firm in any manner whatsoever. Equally, neither Alliott Global Alliance nor any other member firm has any au

Initial

Client Initia

to obligate or bind GT or any other member firm. All Alliott Global Alliance members are independent firms, and as such, they each render their services entirely on their own account (including benefit and risk). In connection with the engagement contemplated by this letter or any other services from time to time provided by GT, GT may seek advice from or may recommend the retention of an Alliott Global Alliance member firm. Alliott Global Alliance and its other member firms shall have no liability for advice rendered by GT or such consulted or retained Alliott Global Alliance member firm. Nor shall GT have liability for advice rendered by any of the other Alliott Global Alliance member firms, even if consulted or recommended to you by GT.

## GENERAL TERMS AND CONDITIONS FOR TAX PREPARATION ENGAGEMENTS

GT will not assume responsibility for the preparation of any tax returns, reports, or analyses not specifically identified herein. If, however, there are additional tax returns, reports, or analyses that Client would like GT to prepare, then please provide specific directions in a letter or an email. Upon GT's assent to the broader scope of work under this Agreement, the additional work will be included within this Agreement, or a separate engagement agreement will be issued.

Client's tax returns may be selected for review or audit by the taxing authorities. Any proposed adjustments by the examining agent are subject to certain rights of appeal. In the event of such government tax examination, GT is available upon request to assist Client in responding to the taxing authorities and to provide expert knowledge and information. If such services are required, a separate engagement agreement will be issued, additional fees at GT's normal hourly rate will be incurred, and invoices will be rendered for the time and expenses incurred in performing such additional services.

**Client Responsibilities**
Client will provide GT with copies of the information and any relevant source documentation required for preparation of these tax returns. The tax laws provide that the obligation of a preparer is based only on information of which the preparer has knowledge. The completeness and accuracy of the information Client provides to GT remains Client's responsibility. By signing this Agreement, Client is warranting the accuracy and completeness of such information.

Client has the final responsibility for the timeliness of the information provided to GT, the accuracy and completeness of the information and the returns. Client is advised, accordingly, to review the tax returns carefully before signing any forms that authorize the returns for filing. Client must retain original records supporting the filed tax return(s).

**Listed and Reportable Transactions**
The Internal Revenue Service requires individuals and other entities to file certain disclosure statements regarding tax strategies/transactions that the Internal Revenue Service defines under Treasury Regulations §1.6011-4 as a "listed transaction", a transaction that is substantially similar to a "listed transaction", a transaction of interest, or a reportable transaction. Failure to properly disclose any of these transactions may result in severe penalties under the Internal Revenue Code for which Client may be liable. It is Client's responsibility to provide to GT complete and accurate information regarding Client's participation in the transactions identified in Treasury Regulation §1.6011-4.

If Client has any questions regarding a specific "listed transaction," a transaction that is substantially similar to a "listed transaction," a transaction of interest, or another reportable transaction, or if Client would like to receive a copy of guidance published by the Internal Revenue Service, please contact GT.

**FBAR, FATCA and Other Financial Reporting**
If Client has a financial interest, directly or indirectly, through an entity Client controls, or has signature authority over a foreign financial account, Client may be required to prepare and file Form TDF 90-22.1 (FBAR) if the aggregate value of all foreign financial accounts exceeds $10,000 at any time during the calendar year.

The Internal Revenue Service, under IRC Sections 6038 and 6046, requires information reporting with respect to certain foreign corporations (Form 5471), foreign-owned U.S. corporations or foreign corporations engaged in a U.S. trade or business (Form 5472), U.S. transferors of property to a foreign corporation (Form 926), and hold[...]

Client Initial Initial

foreign financial assets with an aggregate value exceeding $50,000 (Form 8938 - FATCA). These code sections describe the information required to be reported on the respective forms, which are due when Client's income tax return is due, including extensions. Therefore, if Client falls into one of the above categories, Client may be required to file one of the above-listed forms. Failure to timely file may result in substantial penalties for which Client may be liable. Client agrees to comply with these reporting requirements. If Client requires assistance with any portion of foreign financial account reporting requirements, please contact GT as soon as possible to ensure timely filing of these reports. Account holders who do not comply with these reporting requirements may be subject to civil penalties, criminal penalties, or both.

**Cryptocurrency**

Transactions involving cryptocurrency are subject to taxation. It is Client's responsibility to provide information regarding investments in or acceptance as payment of cryptocurrency. If GT is not informed of transactions involving cryptocurrency, Client's taxable income may be inaccurately calculated, resulting in potential interest and penalties for which Client may be liable.

Due to the popularity of Blockchain technology, existing tax law and regulation will often be inadequate to provide guidance on every scenario encountered. As such, GT will propose tax treatment and strategies for any Blockchain technology related transactions that, in GT's assessment, represent the most tax efficient and compliant direction based on the information provided. However, GT's recommendations will often be based on analogies and assumptions that may prove to be different from the views or subsequent guidance issued by government agencies, regulatory bodies, and taxing authorities. It is possible that Client will take positions that later need to be restructured, or that lead to additional tax and/or penalties based on changes or clarifications in the law. These risks are a consequence of doing business in an area where the rules are not tested.

## GENERAL TERMS AND CONDITIONS FOR CYBERSECURITY, EDISCOVERY, LITIGATION, AND INSOLVENCY ENGAGEMENTS

GT's procedures may include evaluating books and records, gathering, and analyzing available documents and electronic data, interviewing parties to the matter, and performing financial and other analyses. GT will provide services as requested by Client within GT's expertise.

GT will follow Client's written direction regarding preserving confidentiality and work product privilege. However, it shall be Client's responsibility to defend any claims of privilege or confidentiality related to GT's work. Any applicable laws or legal principles that should be considered by GT in performing analysis or developing a methodology to support an opinion, should be brought to GT's attention.

In the event GT is requested or authorized by counsel or are required by government regulation, subpoena, or other legal process to produce GT's documents or GT's personnel as witnesses with respect to this engagement, Client will reimburse GT for the professional time and out-of-pocket expenses, as well as the fees and out-of-pocket expenses of GT's counsel incurred in responding to such requests.

GT will abide by any court orders provided to GT regarding confidentiality. At Client's request, GT can transmit information via fax, email, or the Internet. Any confidentiality breaches due to data transmission over the Internet at Client's request will not be considered a breach of GT's confidentiality obligations. If Client wants to limit such transmissions or seek more secure communication for highly confidential information, please inform GT.

The scope of this engagement does not constitute the provision by GT, its partners, or staff of any legal advice. Moreover, because GT's engagement is limited in nature and scope, it cannot be relied upon to discover all documents and other information or provide all analyses which may have importance to this matter. This engagement does not anticipate the compilation, review, or audit of financial records or financial statements.

GT's fees and costs are not contingent upon the outcome of the engagement.

If a court determines that GT is not qualified to testify in this matter, such determination will not be deemed a breach of this Agreement and Client will remain liable for payment of fees and out-of-pocket expenses as set forth herein.

Client Initial Initial

Neither Counsel nor Client shall hold GT or any of its affiliates or representatives legally responsible for any loss or liability that may result from the non-discovery of facts or information that could otherwise have influenced the outcome or interpretation of GT's findings and/or testimony.

GT have undertaken an inquiry of GT's records to determine conflicts with this Agreement and have not noted any such conflicts. If additional relationships or potential conflicts come to GT's attention, GT will promptly notify Client.

*[END OF DOCUMENT]*

Client Initial

Initial

# EXHIBIT 7

# WRITTEN CONSENT

# OF THE MEMBER OF

# PRO TEMECULA TOWN CENTER LLC

**a Delaware limited liability company**

**WHEREAS** on April 20, 2026, Henkin Investor Group, LLC (the "Member"), Weyl Manager, LLC, the acting manager of Pro Temecula Town Center, LLC, and Howard Grobstein executed Amendment No. 1 to the Operating Agreement of Pro Temecula Town Center LLC under which Howard Grobstein was designated as the manager of Pro Temecula Town Center, LLC as set forth in greater detail in the Amendment No. 1 to Operating Agreement of Pro Temecula Town Center, LLC that is attached as Exhibit 1;

**NOW, THEREFORE, BE IT RESOLVED,** that Amendment No. 1 to the Operating Agreement of Pro Temecula Town Center, LLC, is adopted upon execution of this Written Consent.

**IN WITNESS WHEREOF**, the undersigned, being the Member of Pro Temecula Town Center, LLC, has executed this Action by Written Consent as of the date first written above.

**MEMBER:**

**HENKIN INVESTOR GROUP, LLC**

**By: WEYL MANAGER, LLC**

Signed by:

66DBD2152FE9429...

________________________________________

Jason Miller, its manager

**ACKNOWLEDGMENT AND ACCEPTANCE BY SUCCESSOR MANAGER OF PRO TEMECULA TOWN CENTER, LLC**

The undersigned, Howard Grobstein, hereby accepts the appointment as Manager of Pro Temecula Town Center, LLC, as set forth in the foregoing written consent and agrees to be bound by the terms of the Operating Agreement of the Company that became effective January 17, 2025, as amended by Amendment No. 1 to Operating Agreement of Pro Temecula Town Center LLC attached as Exhibit 1 hereto.

Signed by:
Howard Grobstein
468FC6C9A58046E...
________________________________
Howard Grobstein
Date: April 21, 2026

# EXHIBIT 1

# AMENDMENT NO. 1 TO OPERATING AGREEMENT OF PRO TEMECULA TOWN CENTER LLC

This Amendment No. 1 (this "**Amendment**") to the Operating Agreement of Pro Temecula Town Center LLC, a Delaware limited liability company (the "**Company**"), is made and entered into as of April 16, 2026 (the "**Effective Date**"), by and among the Company, the Company's sole member, Henkin Investor Group, LLC, a Delaware limited liability company (the "**Member**"), and Howard Grobstein (the "**Successor Manager**").

## RECITALS

A. The Member entered into that certain Operating Agreement of the Company that became effective as of the date of filing of Articles of Organization with the Delaware Secretary of State, which occurred on January 17, 2025 (the "**Operating Agreement**"), with the Operating Agreement setting forth the respective rights, powers, and interests of the Member with respect to the Company and to provide for the management of the business and the operations of the Company;

B. The Member deems it to be in the best interest of the Company to change its corporate governance in light of pending restructuring proceedings (the "**Restructuring Proceedings**");

C. The Member desires to appoint Howard Grobstein as the Manager of the Company to serve as a restructuring officer and to oversee and direct the business, affairs, and operations of the Company during the Restructuring Proceedings, and the Manager desires to accept such appointment, subject to the terms and conditions set forth herein and in that certain engagement letter between the Company and the Manager dated as of April 20, 2026 (the "**Engagement Letter**");

D. In connection with the Restructuring Proceedings, the Member desires to amend the Operating Agreement to provide that the Company is managed by the Manager and to appoint the Manager for the duration of the Restructuring Proceedings;

NOW, THEREFORE in consideration of the foregoing, and for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Member agrees as follows:

1. Sections 10.1-10.14.3 are deleted in their and replaced with the following:

10. Management of the Company.

10.1 Manager. The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Manager. The Manager shall have, and is hereby granted, full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as they may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company. Without limiting the generality

of the foregoing, the Manager shall have the sole and exclusive authority to: (i) retain and engage attorneys, financial advisors, investment bankers, accountants, and other professionals on behalf of the Company; (ii) refinance the loans obtained by the Company or secured by its real property; (iii) negotiate with creditors and other stakeholders of the Company; (iv) seek dismissal or the chapter 11 case or propose, support, or object to any plan of reorganization or liquidation; (v) sell, transfer, or otherwise dispose of assets of the Company, including pursuant to Section 363 of the Bankruptcy Code; (vi) obtain debtor-in-possession financing or other credit facilities on behalf of the Company; and (vii) take any and all other actions necessary or advisable in connection with the Restructuring Proceedings. All rights with respect to management of the Company are reserved to the Manager.

10.2 Duration. The Manager of the Company shall be the Manager, who will serve as Manager until the earlier to occur of his death, resignation or removal by the U.S. Bankruptcy Court. The Manager may delegate any of his management authority to any other person as he determines in his sole and absolute discretion and may revoke such authority at any time; provided, however, such delegation will in no way impair or otherwise reduce the Manager's management authority under this Agreement or under the Act. The Manager may resign at any time upon written notice thereof to the Company and the Member.

10.3 Removal by the Member. The Manager may not be removed by the Member for any reason unless and until the Restructuring Proceedings have been dismissed, the case converted, or the case is closed. The Member shall not be able to take any action or inaction that would limit the Manager's authority including, without limitation, amending or modifying this Amendment or the Operating Agreement. For purposes of this Amendment, the Restructuring Proceedings shall be deemed "concluded" upon the entry of a final, non-appealable order dismissing or closing the bankruptcy case.

10.4 – 10.14: Intentionally omitted

2. Governing Law. This Amendment is governed and will be construed according to the Act and the internal laws of the State of Delaware (without regard to conflict of law principles).

3. Counterparts. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute only one original.

4. No Other Amendments. Except as expressly modified by this Amendment, the Operating Agreement shall be unmodified and remain in full force and effect.

5. Binding Effect. This Amendment shall be binding upon and inure to the benefit of the Member, and its respective heirs, estates, personal representatives, successors and assigns.

6. Definitions. Capitalized Terms used but not defined herein shall have the meaning provided in the Operating Agreement.

7. Indemnification and Exculpation. The Company shall indemnify, defend, and hold harmless the Manager and any Authorized Person from and against any and all claims, losses, damages, liabilities, costs, and expenses (including reasonable attorneys' fees and expenses) arising out of or relating to the Manager's or such Authorized Person's service in such capacity, except to the extent resulting from such person's fraud, willful misconduct, or gross negligence as determined by a final, non-appealable order of a court of competent jurisdiction. The Manager shall not be liable to the Company or the Member for any act or omission taken in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company, except in the case of fraud, willful misconduct, or gross negligence.

8. Manager Compensation. The Manager shall be entitled to compensation for services rendered to the Company as set forth in the Engagement Letter or as otherwise agreed in writing between the Company and the Manager.

*Signature Page Follows*

IN WITNESS WHEREOF, the Member has executed this Amendment effective as of the date first written above.

**MEMBER:**

**HENKIN INVESTOR GROUP, LLC**
a Delaware limited liability company

Signed by:
By: _________________________
66DBD2152FE9429...
Name: Jason Miller, Manager of Weyl Manager, LLC, manager of Henkin Investor Group

**THE COMPANY:**

**PRO TEMECULA TOWN CENTER LLC,**
a Delaware limited liability company

By: WEYL MANAGER, LLC, its Manager

Signed by:
_________________________
66DBD2152FE9429...
Jason Miller, Manager of Weyl Manager, LLC

MANAGER:

Signed by:
Howard Grobstein
_________________________
468FC6C9A58046E...
Howard Grobstein

# EXHIBIT 8

# WRITTEN CONSENT

# OF THE MEMBER OF

# YNEZ SHOPS LLC

**a Delaware limited liability company**

**WHEREAS** on April 20, 2026, Henkin Investor Group, LLC (the "Member"), Weyl Manager, LLC, the acting manager of Ynez Shops LLC, and Howard Grobstein executed Amendment No. 1 to the Operating Agreement of Ynez Shops LLC under which Howard Grobstein was designated as the manager of Ynez Shops LLC as set forth in greater detail in the Amendment No. 1 to Operating Agreement of Ynez Shops LLC that is attached as Exhibit 1;

**NOW, THEREFORE, BE IT RESOLVED,** that Amendment No. 1 to the Operating Agreement of Ynez Shops LLC is adopted upon execution of this Written Consent.

**IN WITNESS WHEREOF**, the undersigned, being the Member of Ynez Shops LLC has executed this Action by Written Consent as of the date first written above.

**MEMBER:**

**HENKIN INVESTOR GROUP, LLC**

**By: WEYL MANAGER, LLC**

Signed by:

66DBD2152FE9429...

______________________________

Jason Miller, its manager

**ACKNOWLEDGMENT AND ACCEPTANCE BY SUCCESSOR MANAGER OF YNEZ SHOPS LLC**

The undersigned, Howard Grobstein, hereby accepts the appointment as Manager of Ynez Shops LLC, as set forth in the foregoing written consent and agrees to be bound by the terms of the Operating Agreement of the Company that became effective January 17, 2025, as amended by Amendment No. 1 to Operating Agreement of Ynez Shops LLC attached as Exhibit 1 hereto.

Signed by:
Howard Grobstein
468FC6C9A58046E...
_______________________________
Howard Grobstein
Date: April 21, 2026

# EXHIBIT 1

# AMENDMENT NO. 1 TO OPERATING AGREEMENT OF YNEZ SHOPS LLC

This Amendment No. 1 (this "**Amendment**") to the Operating Agreement of Ynez Shops LLC, a Delaware limited liability company (the "**Company**"), is made and entered into as of April 16, 2026 (the "**Effective Date**"), by and among the Company, the Company's sole member, Henkin Investor Group, LLC, a Delaware limited liability company (the "**Member**"), and Howard Grobstein (the "**Manager**").

## RECITALS

A. The Member entered into that certain Operating Agreement of the Company that became effective as of the date of filing of Articles of Organization with the Delaware Secretary of State, which occurred on January 17, 2025 (the "**Operating Agreement**"), with the Operating Agreement setting forth the respective rights, powers, and interests of the Member with respect to the Company and to provide for the management of the business and the operations of the Company;

B. The Member deems it to be in the best interest of the Company to change its corporate governance in light of pending restructuring proceedings (the "**Restructuring Proceedings**");

C. The Member desires to appoint Howard Grobstein as the Manager of the Company to serve as a restructuring officer and to oversee and direct the business, affairs, and operations of the Company during the Restructuring Proceedings, and the Manager desires to accept such appointment, subject to the terms and conditions set forth herein and in that certain engagement letter between the Company and the Manager dated as of April 20, 2026 (the "**Engagement Letter**");

D. In connection with the Restructuring Proceedings, the Member desires to amend the Operating Agreement to provide that the Company is managed by the Manager and to appoint the Manager for the duration of the Restructuring Proceedings;

NOW, THEREFORE in consideration of the foregoing, and for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Member agrees as follows:

1. Sections 10.1-10.14.3 are deleted in their entirety and replaced with the following:

10. <u>Management of the Company</u>.

10.1 Manager. The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Manager. The Manager shall have, and is hereby granted, full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as they may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company. Without limiting the generality

of the foregoing, the Manager shall have the sole and exclusive authority to: (i) retain and engage attorneys, financial advisors, investment bankers, accountants, and other professionals on behalf of the Company; (ii) refinance the loans obtained by the Company or secured by its real property; (iii) negotiate with creditors and other stakeholders of the Company; (iv) seek dismissal or the chapter 11 case or propose, support, or object to any plan of reorganization or liquidation; (v) sell, transfer, or otherwise dispose of assets of the Company, including pursuant to Section 363 of the Bankruptcy Code; (vi) obtain debtor-in-possession financing or other credit facilities on behalf of the Company; and (vii) take any and all other actions necessary or advisable in connection with the Restructuring Proceedings. All rights with respect to management of the Company are reserved to the Manager.

10.2 Duration. The Manager of the Company shall be the Manager, who will serve as Manager until the earlier to occur of his death, resignation or removal by the U.S. Bankruptcy Court. The Manager may delegate any of his management authority to any other person as he determines in his sole and absolute discretion and may revoke such authority at any time; provided, however, such delegation will in no way impair or otherwise reduce the Manager's management authority under this Agreement or under the Act. The Manager may resign at any time upon written notice thereof to the Company and the Member.

10.3 Removal by the Member. The Manager may not be removed by the Member for any reason unless and until the Restructuring Proceedings have been dismissed, the case converted, or the case is closed. The Member shall not be able to take any action or inaction that would limit the Manager's authority including, without limitation, amending or modifying this Amendment or the Operating Agreement. For purposes of this Amendment, the Restructuring Proceedings shall be deemed "concluded" upon the entry of a final, non-appealable order dismissing or closing the bankruptcy case.

10.4 – 10.14: Intentionally omitted

2. Governing Law. This Amendment is governed and will be construed according to the Act and the internal laws of the State of Delaware (without regard to conflict of law principles).

3. Counterparts. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute only one original.

4. No Other Amendments. Except as expressly modified by this Amendment, the Operating Agreement shall be unmodified and remain in full force and effect.

5. Binding Effect. This Amendment shall be binding upon and inure to the benefit of the Member, and its respective heirs, estates, personal representatives, successors and assigns.

6. Definitions. Capitalized Terms used but not defined herein shall have the meaning provided in the Operating Agreement.

7. Indemnification and Exculpation. The Company shall indemnify, defend, and hold harmless the Manager and any Authorized Person from and against any and all claims, losses, damages, liabilities, costs, and expenses (including reasonable attorneys' fees and expenses) arising out of or relating to the Manager's or such Authorized Person's service in such capacity, except to the extent resulting from such person's fraud, willful misconduct, or gross negligence as determined by a final, non-appealable order of a court of competent jurisdiction. The Manager shall not be liable to the Company or the Member for any act or omission taken in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company, except in the case of fraud, willful misconduct, or gross negligence.

8. Manager Compensation. The Manager shall be entitled to compensation for services rendered to the Company as set forth in the Engagement Letter or as otherwise agreed in writing between the Company and the Manager.

*Signature Page Follows*

IN WITNESS WHEREOF, the Member has executed this Amendment effective as of the date first written above.

**MEMBER:**

**HENKIN INVESTOR GROUP, LLC**
a Delaware limited liability company

Signed by:
By: ______________________
66DBD2152FE9429...
Name: Jason Miller, Manager of Weyl Manager, LLC, manager of Henkin Investor Group

**THE COMPANY:**

**PRO TEMECULA TOWN CENTER LLC,**
a Delaware limited liability company

By: WEYL MANAGER, LLC, its Manager

Signed by:
______________________
66DBD2152FE9429...
Jason Miller, Manager of Weyl Manager, LLC

MANAGER:

Signed by:
Howard Grobstein
______________________
468FC6C9A58046E...
Howard Grobstein

# EXHIBIT 9

**BRYAN CAVE LEIGHTON PAISNER LLP**
Sharon Z. Weiss (State Bar No.: 169446)
*sharon.weiss@bclplaw.com*
120 Broadway, Suite 300
Santa Monica, California 90401-2385
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Martin W. Taylor (State Bar No: 149744)
*marty.taylor@bclplaw.com*
David J. Root (State Bar No: 307251)
*david.root@bclplaw.com*
1920 Main Street, Suite 1000
Irvine, California 92614-7276
Telephone: (949) 223-7000
Facsimile: (949) 223-7100

Attorneys for Creditor NANO BANC

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>PRO TEMECULA TOWN CENTER, LLC,<br><br>Debtor. | Case No.: 8:26-bk-10694-SC<br><br>Chapter 11<br><br>**STIPULATION TO APPOINT HOWARD GROBSTEIN AS DEBTOR-IN-POSSESSION AUTHORIZED REPRESENTATIVE**<br><br>**[NO HEARING REQUIRED]** |

This stipulation ("Stipulation") is entered into by and among (i) Nano Banc ("Nano"), (ii) City of Temecula, (iii) Howard Grobstein ("Mr. Grobstein"), and (iv) Pro Temecula Town Center, LLC ("Debtor") (collectively, the "Parties") in the above-captioned case (the "Case"). The Parties hereby agree and enter into this Stipulation to appoint Mr. Grobstein as the Debtor-in-Possession Authorized Representative ("DIP Authorized Representative"). This Stipulation shall be enacted as follows:

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**RECITALS**

A. On March 3, 2026, Debtor Pro Temecula Town Center, LLC filed its Chapter 11 bankruptcy petition. ECF No. 1.

B. On April 15, 2026, Debtor filed its initial Status Report. ECF No. 38. Then, on April 22, 2026, Debtor filed an updated Status Report, with a declaration from Mr. Grobstein in support thereof. ECF No. 45.

C. Mr. Grobstein is a principal and co-founder of Grobstein Teeple, LLP, and effective April 21, 2026, began serving as the manager of Debtor. Pursuant to a written consent and amendment to the Debtor's operating agreement, Mr. Grobstein was designated as the manager of the Debtor with all rights, powers, duties and authorities as set forth in the Operating Agreement of Pro Temecula Town Center, LLC, which gives the manager broad authority over the Debtor. Under the operating agreement, members ceded all control to the manager and agreed that they have no right to participate in the control, operation, management or direction of the Debtor.

D. Mr. Grobstein has evaluated whether to refinance or sell the property located at 25776, 27536, 27560 Ynez Road and 29720 Rancho California Road, Temecula, California 92591 (the "Property"). Mr. Grobstein has decided, in his business judgment, that it would be in the best interest of the bankruptcy estate to sell the Property.

E. The Parties have agreed on salient terms for the appointment of Mr. Grobstein as a DIP Authorized Representative and have memorialized those terms in the *Proposed Terms for the Appointment of a Debtor-in-Possession Authorized Representative* (the "DIP Authorized Representative Structure"). A true and correct copy of the DIP Authorized Representative Structure is attached hereto as Exhibit 1 and incorporated herein by reference.

F. To ensure that Mr. Grobstein is able to act with complete independence from the Debtor's former management and holders of the Debtor's membership interests, including any member associated with former management, and any of their respective representatives, agents and affiliates (collectively, the "Former Management") and only be answerable to this Court as the Debtor's sole DIP Authorized Representative, including for Mr. Grobstein to sell the Property without

any interference from Former Management, the Parties have reached an agreement to confirm and appoint Mr. Grobstein as the sole DIP Authorized Representative on the terms and conditions set forth below, and in accordance with the DIP Authorized Representative Structure.

G. Nano and City of Temecula have advised Debtor that, absent the implementation of the DIP Authorized Representative Structure, they intend to seek the appointment of a Chapter 11 Trustee in this Case. The inducement for Nano and City of Temecula to enter into this Stipulation is the entry of an order of this Court providing that Mr. Grobstein, as the sole DIP Authorized Representative, shall serve as the sole decision maker for the Debtor, with the broadest powers available under applicable law, and shall not be answerable to, or required to seek authority or direction from, Former Management.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

## STIPULATION

**NOW, THEREFORE,** in consideration of the mutual promises set forth herein and other good and valuable consideration, the adequacy of which is acknowledged, Nano, City of Temecula, Mr. Grobstein, and Debtor hereby stipulate and agree as follows:

1. Incorporation of Recitals: The Recitals set forth above are incorporated herein by reference and will be deemed to be true and correct representations of the Parties with respect to the statements therein as such statements apply to each or all of the Parties. Each of the Parties to this Stipulation represents that it has the right and authority to execute this Stipulation and act in accordance with its terms.

2. Subject to Court approval, Debtor shall implement the DIP Authorized Representative Structure, which shall vest Mr. Grobstein, and only Mr. Grobstein, with the broadest rights, powers, authority and duties available under, and otherwise provided by, applicable law to manage, administer, and operate the Debtor's estate, including, without limitation, the authority to sell the Property. Mr. Grobstein, as the sole DIP Authorized Representative, shall have the same powers, authority, duties, rights, and remedies as a trustee appointed under 11 U.S.C. § 1104, including, without limitation, the rights, authority, powers and duties set forth in 11 U.S.C. §§ 363, 364, 365, 544-548, 704, and 1106,

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

as applicable. Mr. Grobstein shall not take direction from any party and shall be answerable solely to the Bankruptcy Court.

3. Upon entry of the Order, none of the Former Management shall have any authority whatsoever to take any action in or in connection with the Case, including, without limitation, any action relating to the administration of the Debtor's estate, the Property, or any other asset of the Debtor, nor shall they have any authority to take any corporate governance actions, including amending the operating agreement. All such authority shall be vested exclusively in Mr. Grobstein as the sole DIP Authorized Representative, subject only to the jurisdiction and approval of this Court. Notwithstanding the foregoing, nothing in this Stipulation or the order approving it deprives the Debtor's members of any standing each may have to seek appropriate relief in this Court, whether by opposition or motion or otherwise.

4. Debtor shall take all actions reasonable and necessary to implement the DIP Authorized Representative Structure, including, to the extent necessary, amending any implicated corporate governance documents of Debtor, in form and substance acceptable to Nano and City of Temecula.

5. Mr. Grobstein shall take all actions reasonable and necessary to administer the Debtor's estate, including, without limitation, the marketing and sale of the Property, and shall exercise the broadest authority available under applicable law in furtherance thereof.

6. Upon entry of the Order, Mr. Grobstein, as the sole DIP Authorized Representative and as sole manager of the Debtor, shall have sole and exclusive possession, custody, and control of all of the Debtor's books and records, in whatever form maintained, including, without limitation, financial statements, general ledgers, accounts payable and receivable records, bank and brokerage statements, tax returns and supporting workpapers, leases, contracts, corporate governance and organizational documents, minutes, resolutions, written consents, communications, and all other documents, data, and information relating to the Debtor, the Property, or the administration of the Debtor's estate, whether maintained in physical, electronic, cloud-based, or other format (collectively, the "Books and Records"). No Former Management or other person or entity shall retain or assert any right of possession, custody, or control over the Books and Records.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

7. Within thirty (30) days of entry of the Order, Former Management and any of the Debtor's former or current officers, managers, members, employees, agents, accountants, bookkeepers, attorneys, IT providers, vendors, and other service providers (collectively, the "Custodians") shall turn over to Mr. Grobstein all Books and Records in their possession, custody, or control, including, without limitation: (a) all physical Books and Records; (b) all electronic Books and Records, together with all access credentials (including usernames, passwords, multi-factor authentication tokens, encryption keys, and administrative rights) necessary for Mr. Grobstein to access, use, and administer such records, including any cloud-based or third-party hosted accounting, banking, email, document-management, or other systems used in connection with the Debtor's business; and (c) any keys, codes, or other means of access to physical premises or storage locations where Books and Records are kept. The Custodians shall execute such documents and take such further actions as Mr. Grobstein may reasonably request to effectuate the turnover and Mr. Grobstein's continued access contemplated by this paragraph. Nothing in this paragraph requires any individual to waive any privilege belonging to such individual in his or her personal (non-Debtor) capacity.

8. City of Temecula and Nano can make any reasonable request for information from Howard Grobstein, to which request Mr. Grobstein shall respond promptly to the best of his ability based on the information available to him.

9. The Parties agree to the entry of an order (the "Order") substantially in the form attached hereto as Exhibit 3.

10. To the extent there is any inconsistency, conflict, or discrepancy between this Stipulation and previous documentation or agreements regarding Mr. Grobstein's role in this Case or that would affect his role in this Case, the Stipulation shall govern.

11. Nothing contained herein will be deemed or construed as an admission or waiver by Nano or City of Temecula regarding any right that either of them may have to seek the appointment of a Chapter 11 Trustee, seek conversion or dismissal of the Case, or seek any other remedy available to either of them under applicable law. In addition, Nano and City of Temecula each expressly reserve their respective rights to object to any action taken by Mr. Grobstein in the Case.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

12. This Stipulation may be executed in one or more counterparts, each of which will be deemed an original, and all of which together will constitute one and the same instrument.

13. The terms and conditions of this Stipulation will be immediately effective and enforceable upon entry of the Order by the Bankruptcy Court.

DATED: June 3, 2026

**BRYAN CAVE LEIGHTON PAISNER LLP**

By:______________________
David J. Root
Attorneys for Nano Banc

DATED: June 3, 2026

**CITY OF TEMECULA**

By:______________________
David Wood
Attorneys for City of Temecula

DATED: June __, 2026

**RAINES FELDMAN LITTRELL LLP**

By:______________________
Kyra Andrassy
Attorneys for Debtor

DATED: June __, 2026

**PRO TEMECULA TOWN CENTER, LLC**

By:______________________
Howard Grobstein, Manager and Proposed DIP Authorized Representative

12. This Stipulation may be executed in one or more counterparts, each of which will be deemed an original, and all of which together will constitute one and the same instrument.

13. The terms and conditions of this Stipulation will be immediately effective and enforceable upon entry of the Order by the Bankruptcy Court.

DATED: June __, 2026

**BRYAN CAVE LEIGHTON PAISNER LLP**

By:______________________________
David J. Root
Attorneys for Nano Banc

DATED: June __, 2026

**CITY OF TEMECULA**

By:______________________________
David Wood
Attorneys for City of Temecula

DATED: June 16, 2026

**RAINES FELDMAN LITTRELL LLP**

By: [signature]
Kyra Andrassy
Attorneys for Debtor

DATED: June 15, 2026

**PRO TEMECULA TOWN CENTER, LLC**

By: [signature]
Howard Grobstein, Manager and Proposed DIP Authorized Representative

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

# <u>Exhibit 1</u>

## Proposed Terms for the Appointment of a Debtor-in-Possession Authorized Representative

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**PROPOSED TERMS FOR THE APPOINTMENT OF A DEBTOR-IN-POSSESSION AUTHORIZED REPRESENTATIVE**

**June 1, 2026**

The following is a summary of proposed terms with respect to the appointment of Howard Grobstein ("Mr. Grobstein") as the sole Debtor-in-Possession Authorized Representative ("DIP Authorized Representative") of Debtor Pro Temecula Town Center, LLC ("Debtor"). Mr. Grobstein replaces any previous persons identified as an authorized representative of Debtor and answers only to the Bankruptcy Court. This term sheet is a non-exhaustive summary of select salient terms with respect to such arrangement.

| NO. | CATEGORY | TERMS |
|---|---|---|
| 1. | Debtor | Pro Temecula Town Center, LLC |
| 2. | Property | 25776, 27536, 27560 Ynez Road and 29720 Rancho California Road, Temecula, California 92591, and all associated rights and interests with respect thereto, including all rents and profits. |
| 3. | Debtor-in-Possession (DIP) Authorized Representative's Authority | Howard Grobstein is the sole decision maker on behalf of Debtor in relation to the bankruptcy case, 8:26-bk-10694-SC, and shall exercise the broadest powers available under applicable law, including, without limitation, decision-making authority over the sale of the Property and all other matters relating to the administration of the Debtor's estate. Mr. Grobstein, as DIP Authorized Representative, shall have the same powers, rights, and remedies as a trustee appointed under 11 U.S.C. § 1104, including, without limitation, the powers and duties set forth in 11 U.S.C. §§ 363, 364, 365, 704, and 1106, as applicable. Mr. Grobstein shall not take direction from any party, including the Debtor's members, former management, agents or affiliates, including, but not limited to, Continuum Analytics or its members, Deba Shyam, and Mahender Makhijani, and shall be answerable only to the Bankruptcy Court. Mr. Grobstein's authority supersedes that of any persons previously identified as authorized representatives of Debtor. |
| 4. | Removal for Cause | Mr. Grobstein may not be removed as the DIP Authorized Representative without "cause" as defined under 11 USC §§ 1104(a)(1) and (2) and Bankruptcy Court approval. |

| NO. | CATEGORY | TERMS |
|---|---|---|
| 5. | Amendment No. 1 to Operating Agreement of Pro Temecula Town Center, LLC (A true and correct copy is attached hereto as Exhibit 2). | To the extent necessary, the Operating Agreement shall be deemed amended to allow for Mr. Grobstein to manage the property independently, subject to the supervision of only the Bankruptcy Court and to the extent that the Operating Agreement might be construed otherwise, neither its current form nor any future amended form shall hinder, interrupt, delay, or in any way infringe upon Mr. Grobstein's independent authority to make decisions on behalf of Debtor and to seek appropriate orders from the Bankruptcy Court for the duration of the Debtor's bankruptcy case. |
| 6. | Reservation of Rights | All parties reserve all rights and remedies with respect to the Property and the Pro Temecula Town Center, LLC bankruptcy, including, but not limited to, supporting or objecting to any action or inaction by Debtor or Mr. Grobstein and claims and causes of action against any individuals or party. |
| 7. | Documentation and Terms | Entry of an implementing order by the Bankruptcy Court. |

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**<u>Exhibit 2</u>**

**Intentionally Omitted**

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit 3**

**Order**

**BRYAN CAVE LEIGHTON PAISNER LLP**
Sharon Z. Weiss (State Bar No.: 169446)
*sharon.weiss@bclplaw.com*
120 Broadway, Suite 300
Santa Monica, California 90401-2385
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Martin W. Taylor (State Bar No: 149744)
*marty.taylor@bclplaw.com*
David J. Root (State Bar No: 307251)
*david.root@bclplaw.com*
1920 Main Street, Suite 1000
Irvine, California 92614-7276
Telephone: (949) 223-7000
Facsimile: (949) 223-7100

Attorneys for Creditor NANO BANC

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>PRO TEMECULA TOWN CENTER, LLC,<br><br>Debtor. | Case No.: 8:26-bk-10694-SC<br><br>Chapter 11<br><br>**STIPULATION TO APPOINT HOWARD GROBSTEIN AS DEBTOR-IN-POSSESSION AUTHORIZED REPRESENTATIVE**<br><br>**[NO HEARING REQUIRED]** |

The Court having reviewed and considered the *Stipulation to Appoint Howard Grobstein as Debtor-in-Possession Authorized Representative* (the “Stipulation”) entered into by and among Nano Banc (“Nano”), City of Temecula, and Pro Temecula Town Center, LLC (“Debtor”), and the record in this case, and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) notice of the Stipulation was adequate and sufficient under the circumstances; (d) the terms of the

Stipulation are fair and reasonable and were negotiated in good faith and at arm's length; and (e) good cause exists for the relief granted herein:

IT IS HEREBY ORDERED that:

1. The Stipulation is APPROVED in its entirety.

2. The recitals and agreements in the Stipulation are incorporated by reference as if fully set forth herein. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Stipulation.

3. The terms of the Stipulation and this Order are binding on all parties to the Stipulation and Agreement and their successors and assigns.

4. Debtor shall take all actions reasonable and necessary to implement the DIP Authorized Representative Structure, including, but not limited to, amending any implicated corporate governance documents of Debtor, in form and substance acceptable to Nano and City of Temecula, to the extent necessary to do so. Mr. Grobstein shall be vested with the broadest powers available under applicable law to manage, administer, and operate the Debtor's estate, including, without limitation, the authority to sell the Property. Mr. Grobstein, as DIP Authorized Representative, shall have the same powers, rights, and remedies as a trustee appointed under 11 U.S.C. § 1104, including, without limitation, the powers and duties set forth in 11 U.S.C. §§ 363, 364, 365, 704, and 1106, as applicable. Mr. Grobstein shall not take direction from any party and shall be answerable solely to the Bankruptcy Court.

5. Upon entry of this Order, the Former Management shall not have any authority whatsoever to take any action in or in connection with the Case, including, without limitation, any action relating to the administration of the Debtor's estate, the Property, or any other asset of the Debtor, nor shall they have any authority to take corporate governance actions, including amending the operating agreement. All such authority shall be vested exclusively in Mr. Grobstein as DIP Authorized Representative, subject only to the jurisdiction and approval of this Court. Notwithstanding the foregoing, nothing in this Order deprives the Debtor's members of any standing each may have to seek appropriate relief in this Court, whether by opposition or motion or otherwise.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

6. Mr. Grobstein shall take all actions reasonable and necessary to administer the Debtor's estate, including, without limitation, the sale of the Property, and shall exercise the broadest authority available under applicable law in furtherance thereof.

7. Mr. Grobstein shall respond promptly to reasonable requests for information from City of Temecula and Nano.

8. Mr. Grobstein, as the sole DIP Authorized Representative and as sole manager of the Debtor, is hereby vested with sole and exclusive possession, custody, and control of all Books and Records (as defined in the Stipulation). No Former Management or other person or entity shall retain or assert any right of possession, custody, or control over the Books and Records.

9. City of Temecula and Nano retain the right to seek the appointment of a Chapter 11 Trustee, seek conversion or dismissal of the case, seek any other remedy available to either of them by applicable law and/or to object to any action taken by Mr. Grobstein in the case.

10. Within thirty (30) days of entry of this Order, the Custodians (as defined in the Stipulation) shall turn over to Mr. Grobstein all Books and Records in their possession, custody, or control, including all physical and electronic records, together with all access credentials, keys, codes, and administrative rights required for Mr. Grobstein to access and administer such records and any premises or systems where they are stored, all on the terms set forth in the Stipulation.

11. Mr. Grobstein shall be compensated pursuant to the terms of a separate order authorizing his employment.

12. The Court retains jurisdiction over all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

####

# EXHIBIT 10

**BRYAN CAVE LEIGHTON PAISNER LLP**
Sharon Z. Weiss (State Bar No.: 169446)
*sharon.weiss@bclplaw.com*
120 Broadway, Suite 300
Santa Monica, California 90401-2385
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Martin W. Taylor (State Bar No: 149744)
*marty.taylor@bclplaw.com*
David J. Root (State Bar No: 307251)
*david.root@bclplaw.com*
1920 Main Street, Suite 1000
Irvine, California 92614-7276
Telephone: (949) 223-7000
Facsimile: (949) 223-7100

Attorneys for Creditor NANO BANC

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>YNEZ SHOPS, LLC,<br><br>Debtor. | Case No.: 8:26-bk-10693-SC<br><br>Chapter 11<br><br>**STIPULATION TO APPOINT HOWARD GROBSTEIN AS DEBTOR-IN-POSSESSION AUTHORIZED REPRESENTATIVE**<br><br>**[NO HEARING REQUIRED]** |

This stipulation ("Stipulation") is entered into by and among (i) Nano Banc ("Nano"), (ii) City of Temecula, (iii) Howard Grobstein ("Mr. Grobstein"), and (iv) Ynez Shops, LLC ("Debtor") (collectively, the "Parties") in the above-captioned case (the "Case"). The Parties hereby agree and enter into this Stipulation to appoint Mr. Grobstein as the Debtor-in-Possession Authorized Representative ("DIP Authorized Representative"). This Stipulation shall be enacted as follows:

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

# RECITALS

A. On March 3, 2026, Debtor Ynez Shops, LLC filed its Chapter 11 bankruptcy petition. ECF No. 1.

B. On April 15, 2026 Debtor filed its initial Status Report. ECF No. 36. Then, on April 22, 2026, Debtor filed an updated Status Report, with a declaration from Mr. Grobstein in support thereof. ECF No. 42.

C. Mr. Grobstein is a principal and co-founder of Grobstein Teeple, LLP, and effective April 16, 2026, began serving as the manager of Debtor. Pursuant to the written consent under which he was appointed, Mr. Grobstein was designated as the manager of the Debtor with all rights, powers, duties and authorities as set forth in the Debtor's Amendment No. 1 to Operating Agreement of Ynez Shops, LLC, which gives the manager broad authority over the Debtor. Under the operating agreement, members ceded all control to the manager and agreed that they have no right to participate in the control, operation, management or direction of the Debtor.

D. Mr. Grobstein has evaluated whether to refinance or sell the property located at 27520, 27576, 27644 & 27648 Ynez Road and 29640 Rancho California Road, Temecula, California 92591 (the "Property"). Mr. Grobstein has decided, in his business judgment, that it would be in the best interest of the bankruptcy estate to sell the Property.

E. The Parties have agreed on salient terms for the appointment of Mr. Grobstein as a DIP Authorized Representative and have memorialized those terms in the *Proposed Terms for the Appointment of a Debtor-in-Possession Authorized Representative* (the "DIP Authorized Representative Structure"). A true and correct copy of the DIP Authorized Representative Structure is attached hereto as Exhibit 1 and incorporated herein by reference.

F. To ensure that Mr. Grobstein is able to act with complete independence from the Debtor's former management and holders of the Debtor's membership interests, including any member associated with former management, and any of their respective representatives, agents and affiliates (collectively, the "Former Management") and only be answerable to this Court as the Debtor's sole DIP Authorized Representative, including for Mr. Grobstein to sell the Property without

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

any interference from Former Management, the Parties have reached an agreement to confirm and appoint Mr. Grobstein as the sole DIP Authorized Representative on the terms and conditions set forth below, and in accordance with the DIP Authorized Representative Structure.

G. Nano and City of Temecula have advised Debtor that, absent the implementation of the DIP Authorized Representative Structure, they intend to seek the appointment of a Chapter 11 Trustee in this Case. The inducement for Nano and City of Temecula to enter into this Stipulation is the entry of an order of this Court providing that Mr. Grobstein, as the sole DIP Authorized Representative, shall serve as the sole decision maker for the Debtor, with the broadest powers available under applicable law, and shall not be answerable to, or required to seek authority or direction from, Former Management.

## STIPULATION

**NOW, THEREFORE,** in consideration of the mutual promises set forth herein and other good and valuable consideration, the adequacy of which is acknowledged, Nano, City of Temecula, Mr. Grobstein, and Debtor hereby stipulate and agree as follows:

1. Incorporation of Recitals: The Recitals set forth above are incorporated herein by reference and will be deemed to be true and correct representations of the Parties with respect to the statements therein as such statements apply to each or all of the Parties. Each of the Parties to this Stipulation represents that it has the right and authority to execute this Stipulation and act in accordance with its terms.

2. Subject to Court approval, Debtor shall implement the DIP Authorized Representative Structure, which shall vest Mr. Grobstein, and only Mr. Grobstein, with the broadest rights, powers, authority and duties available under, and otherwise provided by, applicable law to manage, administer, and operate the Debtor's estate, including, without limitation, the authority to sell the Property. Mr. Grobstein, as the sole DIP Authorized Representative, shall have the same powers, authority, duties, rights, and remedies as a trustee appointed under 11 U.S.C. § 1104, including, without limitation, the rights, authority, powers and duties set forth in 11 U.S.C. §§ 363, 364, 365, 544-548, 704, and 1106,

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

as applicable. Mr. Grobstein shall not take direction from any party and shall be answerable solely to the Bankruptcy Court.

3. Upon entry of the Order, none of the Former Management shall have any authority whatsoever to take any action in or in connection with the Case, including, without limitation, any action relating to the administration of the Debtor's estate, the Property, or any other asset of the Debtor, nor shall they have any authority to take any corporate governance actions, including amending the operating agreement. All such authority shall be vested exclusively in Mr. Grobstein as the sole DIP Authorized Representative, subject only to the jurisdiction and approval of this Court. Notwithstanding the foregoing, nothing in this Stipulation or the order approving it deprives the Debtor's members of any standing each may have to seek appropriate relief in this Court, whether by opposition or motion or otherwise.

4. Debtor shall take all actions reasonable and necessary to implement the DIP Authorized Representative Structure, including, to the extent necessary, amending any implicated corporate governance documents of Debtor, in form and substance acceptable to Nano and City of Temecula.

5. Mr. Grobstein shall take all actions reasonable and necessary to administer the Debtor's estate, including, without limitation, the marketing and sale of the Property, and shall exercise the broadest authority available under applicable law in furtherance thereof.

6. Upon entry of the Order, Mr. Grobstein, as the sole DIP Authorized Representative and as sole manager of the Debtor, shall have sole and exclusive possession, custody, and control of all of the Debtor's books and records, in whatever form maintained, including, without limitation, financial statements, general ledgers, accounts payable and receivable records, bank and brokerage statements, tax returns and supporting workpapers, leases, contracts, corporate governance and organizational documents, minutes, resolutions, written consents, communications, and all other documents, data, and information relating to the Debtor, the Property, or the administration of the Debtor's estate, whether maintained in physical, electronic, cloud-based, or other format (collectively, the "Books and Records"). No Former Management or other person or entity shall retain or assert any right of possession, custody, or control over the Books and Records.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

7. Within thirty (30) days of entry of the Order, Former Management and any of the Debtor's former or current officers, managers, members, employees, agents, accountants, bookkeepers, attorneys, IT providers, vendors, and other service providers (collectively, the "Custodians") shall turn over to Mr. Grobstein all Books and Records in their possession, custody, or control, including, without limitation: (a) all physical Books and Records; (b) all electronic Books and Records, together with all access credentials (including usernames, passwords, multi-factor authentication tokens, encryption keys, and administrative rights) necessary for Mr. Grobstein to access, use, and administer such records, including any cloud-based or third-party hosted accounting, banking, email, document-management, or other systems used in connection with the Debtor's business; and (c) any keys, codes, or other means of access to physical premises or storage locations where Books and Records are kept. The Custodians shall execute such documents and take such further actions as Mr. Grobstein may reasonably request to effectuate the turnover and Mr. Grobstein's continued access contemplated by this paragraph. Nothing in this paragraph requires any individual to waive any privilege belonging to such individual in his or her personal (non-Debtor) capacity.

8. City of Temecula and Nano can make any reasonable request for information from Howard Grobstein, to which request Mr. Grobstein shall respond promptly to the best of his ability based on the information available to him.

9. The Parties agree to the entry of an order (the "Order") substantially in the form attached hereto as Exhibit 3.

10. To the extent there is any inconsistency, conflict, or discrepancy between this Stipulation and previous documentation or agreements regarding Mr. Grobstein's role in this Case or that would affect his role in this Case, the Stipulation shall govern.

11. Nothing contained herein will be deemed or construed as an admission or waiver by Nano or City of Temecula regarding any right that either of them may have to seek the appointment of a Chapter 11 Trustee, seek conversion or dismissal of the Case, or seek any other remedy available to either of them under applicable law. In addition, Nano and City of Temecula each expressly reserve their respective rights to object to any action taken by Mr. Grobstein in the Case.

12. This Stipulation may be executed in one or more counterparts, each of which will be deemed an original, and all of which together will constitute one and the same instrument.

13. The terms and conditions of this Stipulation will be immediately effective and enforceable upon entry of the Order by the Bankruptcy Court.

DATED: June 3, 2026

**BRYAN CAVE LEIGHTON PAISNER LLP**

By:________________________
David J. Root
Attorneys for Nano Banc

DATED: ~~May~~ June 3 __, 2026

**CITY OF TEMECULA**

By:________________________
David Wood
Attorneys for City of Temecula

DATED: ~~May~~ June 16 __, 2026

**RAINES FELDMAN LITTRELL LLP**

By:________________________
Kyra Andrassy
Attorneys for Debtor

DATED: ~~May~~ June 3 __, 2026

**YNEZ SHOPS, LLC**

By:________________________
Howard Grobstein, Manager and Proposed DIP Authorized Representative



BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit 1**

**Proposed Terms for the Appointment of a Debtor-in-Possession Authorized Representative**

**PROPOSED TERMS FOR THE APPOINTMENT OF A DEBTOR-IN-POSSESSION AUTHORIZED REPRESENTATIVE**

**May 20, 2026**

The following is a summary of proposed terms with respect to the appointment of Howard Grobstein ("Mr. Grobstein") as the sole Debtor-in-Possession Authorized Representative ("DIP Authorized Representative") of Debtor Ynez Shops, LLC ("Debtor"). Mr. Grobstein replaces any previous persons identified as an authorized representative of Debtor and answers only to the Bankruptcy Court. This term sheet is a non-exhaustive summary of select salient terms with respect to such arrangement.

| NO. | CATEGORY | TERMS |
|---|---|---|
| 1. | Debtor | Ynez Shops, LLC |
| 2. | Property | 27520, 27576, 27644 & 27648 Ynez Road and 29640 Rancho California Road, Temecula, California 92591, and all associated rights and interests with respect thereto, including all rents and profits. |
| 3. | Debtor-in-Possession (DIP) Authorized Representative's Authority | Howard Grobstein is the sole decision maker on behalf of Debtor in relation to the bankruptcy case, 8:26-bk-10693-SC, and shall exercise the broadest powers available under applicable law, including, without limitation, decision-making authority over the sale of the Property and all other matters relating to the administration of the Debtor's estate. Mr. Grobstein, as DIP Authorized Representative, shall have the same powers, rights, and remedies as a trustee appointed under 11 U.S.C. § 1104, including, without limitation, the powers and duties set forth in 11 U.S.C. §§ 363, 364, 365, 704, and 1106, as applicable. Mr. Grobstein shall not take direction from any party, including the Debtor's members, former management, agents or affiliates, including, but not limited to, Continuum Analytics or its members, Deba Shyam, and Mahender Makhijani, and shall be answerable only to the Bankruptcy Court. Mr. Grobstein's authority supersedes that of any persons previously identified as authorized representatives of Debtor. |
| 4. | Removal for Cause | Mr. Grobstein may not be removed as the DIP Authorized Representative without "cause" as defined under 11 USC §§ 1104(a)(1) and (2) and Bankruptcy Court approval. |

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

| NO. | CATEGORY | TERMS |
|---|---|---|
| 5. | Amendment No. 1 to Operating Agreement of Ynez Shops, LLC (A true and correct copy is attached hereto as Exhibit 2). | To the extent necessary, the Operating Agreement shall be deemed amended to allow for Mr. Grobstein to manage the property independently, subject to the supervision of only the Bankruptcy Court and to the extent that the Operating Agreement might be construed otherwise, neither its current form nor any future amended form shall hinder, interrupt, delay, or in any way infringe upon Mr. Grobstein's independent authority to make decisions on behalf of Debtor and to seek appropriate orders from the Bankruptcy Court for the duration of the Debtor's bankruptcy case. |
| 6. | Reservation of Rights | All parties reserve all rights and remedies with respect to the Property and the Ynez Shops, LLC bankruptcy, including, but not limited to, supporting or objecting to any action or inaction by Debtor or Mr. Grobstein and claims and causes of action against any individuals or party. |
| 7. | Documentation and Terms | Entry of an implementing order by the Bankruptcy Court. |

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit 2**

**Intentionally Omitted**

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**Exhibit 3**

**Order**

**BRYAN CAVE LEIGHTON PAISNER LLP**
Sharon Z. Weiss (State Bar No.: 169446)
*sharon.weiss@bclplaw.com*
120 Broadway, Suite 300
Santa Monica, California 90401-2385
Telephone: (310) 576-2100
Facsimile: (310) 576-2200

Martin W. Taylor (State Bar No: 149744)
*marty.taylor@bclplaw.com*
David J. Root (State Bar No: 307251)
*david.root@bclplaw.com*
1920 Main Street, Suite 1000
Irvine, California 92614-7276
Telephone: (949) 223-7000
Facsimile: (949) 223-7100

Attorneys for Creditor NANO BANC

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>YNEZ SHOPS, LLC,<br><br>Debtor. | Case No.: 8:26-bk-10693-SC<br><br>Chapter 11<br><br>**STIPULATION TO APPOINT HOWARD GROBSTEIN AS DEBTOR-IN-POSSESSION AUTHORIZED REPRESENTATIVE**<br><br>**[NO HEARING REQUIRED]** |

The Court having reviewed and considered the *Stipulation to Appoint Howard Grobstein as Debtor-in-Possession Authorized Representative* (the "Stipulation") entered into by and among Nano Banc ("Nano"), City of Temecula, and Ynez Shops, LLC ("Debtor"), and the record in this case, and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) notice of the Stipulation was adequate and sufficient under the circumstances; (d) the terms of the Stipulation are

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

fair and reasonable and were negotiated in good faith and at arm's length; and (e) good cause exists for the relief granted herein:

IT IS HEREBY ORDERED that:

1. The Stipulation is APPROVED in its entirety.

2. The recitals and agreements in the Stipulation are incorporated by reference as if fully set forth herein. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Stipulation.

3. The terms of the Stipulation and this Order are binding on all parties to the Stipulation and Agreement and their successors and assigns.

4. Debtor shall take all actions reasonable and necessary to implement the DIP Authorized Representative Structure, including, but not limited to, amending any implicated corporate governance documents of Debtor, in form and substance acceptable to Nano and City of Temecula, to the extent necessary to do so. Mr. Grobstein shall be vested with the broadest powers available under applicable law to manage, administer, and operate the Debtor's estate, including, without limitation, the authority to sell the Property. Mr. Grobstein, as DIP Authorized Representative, shall have the same powers, rights, and remedies as a trustee appointed under 11 U.S.C. § 1104, including, without limitation, the powers and duties set forth in 11 U.S.C. §§ 363, 364, 365, 704, and 1106, as applicable. Mr. Grobstein shall not take direction from any party and shall be answerable solely to the Bankruptcy Court.

5. Upon entry of this Order, the Former Management shall not have any authority whatsoever to take any action in or in connection with the Case, including, without limitation, any action relating to the administration of the Debtor's estate, the Property, or any other asset of the Debtor, nor shall they have any authority to take corporate governance actions, including amending the operating agreement. All such authority shall be vested exclusively in Mr. Grobstein as DIP Authorized Representative, subject only to the jurisdiction and approval of this Court. Notwithstanding the foregoing, nothing in this Order deprives the Debtor's members of any standing each may have to seek appropriate relief in this Court, whether by opposition or motion or otherwise.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

6. Mr. Grobstein shall take all actions reasonable and necessary to administer the Debtor's estate, including, without limitation, the sale of the Property, and shall exercise the broadest authority available under applicable law in furtherance thereof.

7. Mr. Grobstein shall respond promptly to reasonable requests for information from City of Temecula and Nano.

8. Mr. Grobstein, as the sole DIP Authorized Representative and as sole manager of the Debtor, is hereby vested with sole and exclusive possession, custody, and control of all Books and Records (as defined in the Stipulation). No Former Management or other person or entity shall retain or assert any right of possession, custody, or control over the Books and Records.

9. City of Temecula and Nano retain the right to seek the appointment of a Chapter 11 Trustee, seek conversion or dismissal of the case, seek any other remedy available to either of them by applicable law and/or to object to any action taken by Mr. Grobstein in the case.

10. Within thirty (30) days of entry of this Order, the Custodians (as defined in the Stipulation) shall turn over to Mr. Grobstein all Books and Records in their possession, custody, or control, including all physical and electronic records, together with all access credentials, keys, codes, and administrative rights required for Mr. Grobstein to access and administer such records and any premises or systems where they are stored, all on the terms set forth in the Stipulation.

11. Mr. Grobstein shall be compensated pursuant to the terms of a separate order authorizing his employment.

12. The Court retains jurisdiction over all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

####

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
4675 MacArthur Court, Suite 1550, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*): **MOTION FOR APPROVAL OF STIPULATIONS TO APPOINT HOWARD GROBSTEIN AS DEBTOR-IN-POSSESSION AUTHORIZED REPRESENTATIVE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF HOWARD GROBSTEIN IN SUPPORT THEREOF**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **June 17, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) **June 17, 2026**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **June 17, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Federal Express**
Hon. Scott C. Clarkson
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 17, 2026 | Connie-Marie Santiago | /s/ Connie-Marie Santiago |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Kyra E Andrassy** kandrassy@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Jessica L Bagdanov** jbagdanov@bg.law, ecf@bg.law
- **John Bistritz** jack.bistritz@afslaw.com
- **Matthew Bouslog** mbouslog@allenmatkins.com, ncampos@allenmatkins.com
- **Dora Duru** dora.duru@bclplaw.com, verlisa.lewis@bclplaw.com
- **Martin P Eramo** MPEramo@aol.com
- **David B Golubchik** dbg@lnbyg.com, dbg@lnbyg.com
- **Rachael Tamiko Gonzales** rgonzales@allenmatkins.com, pmorris@allenmatkins.com
- **Golsa Honarfar** ghonarfar@rutan.com, avaccaro@rutan.com;apineda@rutan.com
- **Alphamorlai Lamine Kebeh** mkebeh@allenmatkins.com, mdiaz@allenmatkins.com
- **Kenneth Misken** Kenneth.M.Misken@usdoj.gov
- **Stephen M. Mott** smott@raineslaw.com, csantiago@raineslaw.com;bclark@raineslaw.com
- **Aram Ordubegian** ordubegian.aram@arentfox.com
- **David M Poitras** dpoitras@bg.law
- **David James Root** david.root@bclplaw.com, verlisa.lewis@bclplaw.com
- **Joseph M Rothberg** jmr@lnbyg.com, jmr.LNBYG@ecf.inforuptcy.com
- **Annie Y Stoops** annie.stoops@afslaw.com, yvonne.li@afslaw.com
- **Martin W Taylor** marty.taylor@bclplaw.com, shawn.williams@bclplaw.com
- **United States Trustee (SA)** ustpregion16.sa.ecf@usdoj.gov
- **Sharon Z. Weiss** sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,sharon-weiss-7104@ecf.pacerpro.com
- **David Wood** dwood@marshackhays.com, dwood@ecf.courtdrive.com;lbuchananmh@ecf.courtdrive.com;spineda@ecf.courtdrive.com;alinares@ecf.courtdrive.com

2. **SERVED BY UNITED STATES MAIL**:

Continuum Analytics
520 Newport Center Dr.
Suite 480
Newport Beach, CA 92660

Henkin Investor Group, LLC
Attn: Manager
520 Newport Center Dr.
Suite 480
Newport Beach, CA 92660

Weyl Manager, LLC
Attn: Jason Miller, Manager
520 Newport Center Dr.
Suite 480
Newport Beach, CA 92660